FILED

2020 Sep-18  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**ROY S. MOORE,**
    **Plaintiff,**

**v.**

**GUY CECIL, *et al.***
    **Defendants.**

**Case No. 4:19-cv-1855-CLM**

## <u>MEMORANDUM OPINION</u>

Political campaigns get nasty. Some can be downright brutal. And then there's the 2017 special election for one of Alabama's seats in the United States Senate.

In the final weeks of that race, two women accused Republican nominee Roy Moore of sexually assaulting them when they were teenagers. Others told the media that Moore used to badger young girls who worked at the local mall.

Defendants used these allegations to release ads and tweets that called Moore (among other things) a "child molester," a "sexually assaulting pedophile," and a "Republican pedophile." Defendants also ran a television ad that said Moore "was actually banned from the Gadsden Mall … for soliciting sex from young girls."

Moore sues Defendants for defamation. Defendants ask the court to dismiss Moore's complaint. Within, the court explains why Defendants' various statements calling Moore a "child molester" and a "pedophile" are not actionable as pleaded but the television ad about Moore's interactions with young girls at the mall is.

## STATEMENT OF THE FACTS

Roy Moore has been a fixture of Alabama politics since the mid-1990's. Moore was twice elected Chief Justice of Alabama's Supreme Court (2000, 2012) and was twice defeated in runs to become Alabama's Governor (2006, 2010).

During this stretch, Moore has been outspoken about his political and religious beliefs. His detractors have been equally clamorous. Moore was removed from office the first time he was Chief Justice, and he resigned from the same post amid proceedings to remove him a second time.

In short, Moore is controversial, and he has been called many things during his 20-plus years in the public spotlight. But Moore was never called—at least not in public media—a child predator who solicited sex from underage girls.

Then he ran for the United States Senate.

### A. The Washington Post Allegations

In February 2017, Jeff Sessions resigned as one of Alabama's United States Senators to become Attorney General. Governor Kay Ivey scheduled a special election for the seat to be held on December 12, 2017. Moore won the Republican nomination; Doug Jones won the Democratic nomination.

On November 9, 2017—33 days before the special election—the Washington Post published an article in which four women (Leigh Corfman, Wendy Miller, Debbie Gibson, and Gloria Deason) accused Moore of courting them when Moore

was in his early 30s and the women were ages 14 to 18. Stephanie McCrummen, Beth Reinhard & Alice Cites, "Woman says Roy Moore initiated sexual encounter when she was 14, he was 32," Washington Post, November 9, 2017. Corfman levied the most serious allegation: When Corfman was 14 years old, Moore (32) drove Corfman to his home; "took off her shirt and pants and removed his clothes"; then, "touched her over her bra and underpants . . . and guided her hand to touch him over his underwear." *Id*. While the three other women (Miller, Gibson, and Deason) stated that Moore asked them out on dates, none of the women alleged that Moore "forced them into any sort of relationship or sexual contact." *Id.* None of the four women claimed that she had sex with Moore.

The Post reporters stated that their article was "based on interviews with more than 30 people who said they knew Moore between 1977 and 1982." *Id.* According to the article, "several women" who worked at the local mall stated that Moore "often walked, usually alone, around the newly opened Gadsden Mall." *Id.* Two of the four accusers said they first met Moore at the mall: Deason claimed that she met Moore when she was 18 years old and working at the Pizitz jewelry counter, and Miller said that she met Moore when she was 14 and "working as a Santa's helper" at the mall. *Id.* Miller said that Moore asked her out two years later, when she was 16 and her mother was working at a photo booth in the mall. *Id*.

Moore denied the allegations as "completely false" and "a desperate attack by the National Democrat Party and the Washington Post on [his Senate] campaign." *Id.* Moore's campaign later issued a statement proclaiming that "this garbage is the very definition of fake news." *Id.*

## B. Subsequent Allegations

But the floodgates had opened. In the weeks leading up to the election, multiple newspapers, television networks, podcasts, and blogs recounted the initial allegations and published additional allegations of similar conduct. The court recounts some of the more relevant articles below, but the following list is by no means exhaustive.[1]

New American Journal (November 12): Three days after the initial Post article, New American Journal editor Glynn Wilson wrote that "sources tell me that Moore was actually banned from the Gadsden Mall and the YMCA for his inappropriate behavior of soliciting sex from young girls." Doc. 25-2 at 3.[2] Wilson did not name his sources, nor did he name additional accusers.

---

[1] The court considers articles cited in Moore's complaint, plus articles that are central to his claim (*e.g.* proving actual malice) and whose authenticity are not challenged. *See SFM Holdings, Ltd. v. Banc of AM. Sec. LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). The court limits its review to allegations about Moore's interactions with young girls (18 and under) and his interactions at the Gadsden Mall because only those allegations are central to his claim. *Id.*

[2] The New American Journal ("NAJ") is an Alabama-based website that practices, in its words, "watchdog news reporting." New American Journal, "About Us," http://www.newamerican journal.net/welcome-to-the-new-american-journal, last viewed on September 18, 2020.

The New Yorker (November 13): The day after Wilson stated that Moore had been "actually banned" from the Gadsden Mall, *id.*, the New Yorker published an article titled, "Locals were troubled by Roy Moore's interactions with teen girls at the Gadsden Mall." Doc. 25-1. The author, Charles Bethea, wrote that he had spoken to, or messaged with, "more than a dozen people—including a major political figure in the state—who told me that they had heard, over the years, that Moore had been banned from the mall because he repeatedly badgered teenage girls." *Id.* at 4.

While some of Bethea's sources requested anonymity, others did not. Greg Legat, for example, worked at a record store in the mall. Legat told Bethea that Moore's ban "started around 1979, I think." *Id.* at 5. Legat said that he learned of the ban from a mall security officer and his boss at the record store. Bethea reached out to both men; the security office refused to speak to Bethea about the alleged ban, and the record store manager did not return his call.

Bethea spoke with two mall managers. One was Barnes Boyle, who managed the mall from 1981 to 1988. Boyle said nothing—at least in Bethea's article—about the alleged mall ban. Boyle and his wife, Brenda, did say, however, that they thought the "recent allegations . . . [were] likely liberal propaganda," *id.*, and Brenda added that Barnes Boyle and Moore were "longtime acquaintance[s]" and that Barnes Boyle planned to vote for Moore. *Id.* The second, unnamed manager "began working there [at the mall] in the late eighties," presumably after Boyle. *Id.* This unnamed

mall manager "confirmed the existence of a ban list, but did not recall Moore being on the list during the manager's tenure there." *Id.*

Bethea also talked to current law enforcement officials who "could not confirm the existence of a mall ban on Moore." *Id.* at 6. Two of the current officers, who asked to remain anonymous, told Bethea however "that they have long heard stories about Moore and the mall." *Id.* One of the officers stated that he had been told Moore "was banned from there." *Id.* The other officer stated that he was told by a mall employee that Moore had "been run off from there, from a number of stores. Maybe not legally banned, but run off." *Id.*

Al.com (November 13): On the same day that the New Yorker reported the alleged mall ban, Alabama news site Al.com published a similar article. *See* Anna Claire Vollers, *Gadsden locals say Moore's predatory behavior at mall, restaurants not a secret*, Al.com (Nov. 13, 2017), https://www.Al.com/news/2017/11/gadsden_residents_say_moores_b.html. The Al.com article recounted Greg Legat's statements to Bethea about a mall ban. The Al.com article then added new statements from three residents of the Gadsden area: Blake Usry, Jason Nelms, and Sheryl Porter. While none of these sources stated knowledge of an official ban, each added more fuel to the fire. Usry said that he remembered seeing Moore at the mall and that Moore "would go and flirt with all the young girls[.]" *Id.* Nelms said that a mall concession worker told him that mall employees "kept watch for an older guy

[Moore] who was known to pick up younger girls." *Id.* And Porter stated that Moore "liking and dating young girls was never a secret in Gadsden[.]" *Id.*

Nelson Press Conference (November 13): The same day that allegations of a mall ban were spreading, a fifth accuser emerged. Beverly Nelson Young ("Nelson") held a press conference, at which she accused Moore of sexually molesting her when she was 16 years old.[3] According to Nelson, Moore offered her a ride home after her shift as a waitress. But Moore instead drove Nelson behind the restaurant, "reached over and began groping me, putting his hands on my breasts." Nelson alleged that, when she tried to fight Moore, "he began squeezing my neck attempting to force my head onto his crotch. . . . He was also trying to pull my shirt off." Nelson alleged that Moore ultimately gave up and left her in the parking lot. Nelson quit her job the next day. *Id.*

Moore denied Nelson's allegations, stating that he had not committed "any sexual misconduct with anyone." Jonathan Martin & Sheryl Gay Stolberg, *Roy Moore is Accused of Sexual Misconduct by a Fifth Woman*, New York Times (Nov. 13, 2017), https://www.nytimes.com/2017/11/13/us/politics/roy-moore-alabama-senate.html. Moore's campaign also denied the allegation, describing Young's

---

[3] Nelson's statement is available online at http://www.nytimes.com/2017/11/13/us/politics/text-beverly-young-nelson-statement.html. All quotes from Nelson come from this statement.

attorney, Gloria Allred, as a "sensationalist leading a witch hunt, and she is only around to create a spectacle." *Id.*

Washington Post (November 15): Two days later, two more women levied mall-related allegations. *See* Stephanie McCrummen, Beth Reinhard & Alice Crites, *Two more women describe unwanted overtures by Roy Moore at Alabama mall*, Washington Post (Nov. 15, 2017), http://www.washingtonpost.com/investigations/two-more-women-describe-unwanted-overtures-by-roy-moore-at-alabamamall/2017/11/15/2a1da432-ca24-11e7-b0cf-7689a9f2d84e_story.html.

Gena Richardson alleged that Moore pursued her when she was an 18-year-old mall employee. Richardson alleged that her store manager told new hires to "watch out for this guy," but she ultimately went on a date with Moore after he called her at school, while she was in class. *Id.* Richardson alleged that the date ended with "an unwanted, 'forceful' kiss that left her scared." *Id.*

Becky Gray, who was 22 at the time, worked in the men's department at Pizitz. She alleged that Moore approached her multiple times, and that "she became so disturbed that she complained to the Pizitz manager . . . [who] told her that it was 'not the first time he had a complaint about [Moore] hanging out at the mall.'" *Id.*

ABC News Interview (Nov. 15): On the same day that the Washington Post outlined Becky Gray's allegation, ABC News interviewed her. Chris Francescani, *Roy Moore accuser: I got him banned from the mall,* ABC News (Nov. 16, 2017)

http://abcnews.go.com/Politics/roy-moore-accuser-banned-mall/story?id=
51195632. Gray told ABC News that "I went to my manager and talked to him about it and asked him, basically, what could be done." *Id.* She continued, "Later on, he . . . came back through my department and told me that [Moore] had been banned from the mall." *Id.*

Conflicting mall ban reports (Nov. 16-27): Over the next two weeks, news outlets ran stories with somewhat conflicting accounts about the mall ban: Some said that Moore was banned from the mall; some said that Moore was not banned; others said that Moore was not officially banned but was instead run off by mall employees. For example, Birmingham television station WBRC interviewed Barnes Boyle, the 1980's mall manager cited in the New Yorker article. Boyle told WBRC that "we did have written reports and things. But to my knowledge, [Moore] was not banned from the mall." Anna Giaritelli, *Former mall manager doesn't recall banning Roy Moore, despite reports,* Washington Examiner (Nov. 16, 2017), http://www.washingtonexaminer.com/former-mall-manager-doesnt-recall-banning-roy-moore-despite-reports.

Four days later (November 20), the Moore campaign released a written statement from Boyle, who repeated that "to my knowledge, he was not banned from the mall." Paul Gattis, *Roy Moore campaign disputes reports he was banned from mall*, Al.com (Nov. 20, 2017), http://www.Al.com/news/2017/11/roy_moore_

campaign_disputes_re.html. The campaign simultaneously released statements from two more mall employees. Johnny Adams, who was the mall's Operations Manager for 14 years, said that "I never heard anything about Roy Moore being banned from the mall or any other mention of issues concerning him." *Id.* Johnnie Sanders, who worked at the Morrison's Cafeteria restaurant and was friends with Boyle, said that he "never heard of Roy Moore's name come in conversation with any such misconduct against women or a supposed banning from the Gadsden Mall."

Yet, the next day, former Gadsden Police Officer Faye Gary told MSNBC that "we were advised that [Moore] was being suspended from the mall because he would hang around the young girls who worked in the stores . . . and he really got to a place where they said [Moore] was harassing them." Andrea Mitchell, *Former Alabama Officer: 'The rumor was that Roy Moore likes young girls,'* MSNBC (Nov. 21, 2017), https://youtu.be/myBL_1ollCA (video of interview).

Some media outlets reported Gary's comments as fact, thus reaffirming the mall ban. *See, e.g.*, Elizabeth Elizalde, *Ex-Alabama copy had to watch Roy Moore in case he harassed cheerleaders at ball games in the 80s*, New York Daily News (Nov. 21 2017), http://www.nydailynews.com/news/politics/ex-ala-prevent-roy-moore-harassing-cheerleaders-article-1.3648980.[4]

---

[4] The New York Daily News article was republished by other local and national outlets, such as AOL news, the Tuscaloosa News, and the Seattle Times.

Others noted that Gary was not clear whether her superior officers had given "explicit orders or whether the rumors were just pervasive enough that cops were actively keeping an eye on Moore." Alex Lubben, *Former cop says police were instructed to keep Roy Moore away from cheerleaders*, Vice News (Nov. 22, 2017), http://www.vice.com/en_us/article/vbzzg9/former-cop-says-police-were-instructed -to-keep-roy-moore-away-from-cheerleaders.

New American Journal (November 27): As noted above, Glynn Wilson first mentioned a mall ban on November 12, 2017. Two weeks later, Wilson posted a follow-up article that, in his words, addressed "all the confusion and conflicting reports." Doc. 33-1 at 5. Wilson stated that, since his first report, he "talk[ed] to key people in the legal community in Gadsden and Montgomery, people who are familiar with court records and have known and worked with both Roy Moore and Doug Jones for many years." *Id*. Regarding the alleged mall ban, Flynn arguably walked back his initial reporting:

> While it has previously been reported that he was 'banned' from the local mall and YMCA for inappropriate behavior and pursuing sexual relationships with underage girls, further reporting indicates that 'ban' may be too strong a word. We now know that he was 'run off' by store managers and mall security officers first from the Pizitz store in the mall, for spending hours fondling the female lingerie and hitting on store employees. He was 'run off' from the mall itself on numerous occasions, also for being 'creepy' and harassing teenaged girls and female employees.

Doc. 33-1 at 5. Wilson did not name the person(s) who convinced him that the term "run off" was more appropriate than "banned."

Wilson posted this follow-up article on November 27, 2017—the same day that Defendants first ran the television advertisement at issue in this case.

### C. Highway 31 Super PAC

The Highway 31 Super PAC filed its statement of organization on November 6, 2017—*i.e.*, three days before the Washington Post published the first set of allegations. Moore alleges that Highway 31 "was a conduit for [Defendants] SMP and Priorities, national campaign organizations allied with the Democratic Party, to pour money into attack ads against Judge Moore without voters being aware that the ads were funded by out-of-state entities." Doc. 1, ¶ 11. While Defendants may quibble with this characterization, no one seems to dispute that Highway 31 was created and funded by left-leaning organizations to help Doug Jones defeat Moore in the special election and thus increase the number of Democrats in the United States Senate.[5]

The following chart shows the organization of Highway 31, as it relates to Defendant Bully Pulpit, a digital media production firm used by Defendant Priorities USA and its chair Defendant Guy Cecil, and Defendant Waterfront Strategies, a

---

[5] As Moore notes in his complaint, Defendant Senate Majority PAC's ("SMP") stated goal is to "protect and expand the number of Democrats in the U.S. Senate." Doc. 1, ¶ 42 n.11 (quoting http://www.senatemajority.com/ourwork).

media buying firm used by Defendant Senate Majority PAC ["SMP"] to place pro-Jones, anti-Moore advertising:



*See* Doc. 1, ¶¶ 11-12. SMP and Priorities USA "together provided 94% of the funding for Highway 31." Doc. 1, ¶ 47.

This case involves two ads run by Highway 31: (1) the 30-second "Shopping-Mall" television ad, which aired on Alabama stations and (2) the "child predator" digital ad, which ran on platforms such as YouTube. The court includes the full text of these ads in its analysis section, so it does not do so here. To put it mildly, both ads recounted the media reports in the light least favorable to Moore—labeling him a "child predator" in the digital ad and quoting Glynn Wilson's initial report that "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls" in the television ad. Doc. 1 at 31, 49-50.

## D. The Cecil Tweets

Moore also claims that certain tweets of Guy Cecil, the chair of Priorities USA, were defamatory. The court includes Cecil's tweets in its analysis section. For now, it's enough to say that Cecil treated the allegations with the same level of veracity as Highway 31—using them to call Moore a "child predator," a "Republican pedophile," and a "sexually assaulting pedophile." Doc. 1 at 63.

## E. The Defamation Lawsuit

Jones defeated Moore in the special election. Employees of Defendants SMP and Priorities USA promptly took credit for the Highway 31 advertising campaign and lauded their successful effort to help Jones defeat Moore. *See* Doc. 1, ¶¶ 54-56.

Moore later filed this lawsuit, alleging under Alabama law that Defendants defamed him (Count 1), defamed him by implication (Count 2), and intentionally inflicted emotional distress upon him (Count 3). Doc. 1, ¶¶ 57-69. This court has diversity jurisdiction under 28 U.S.C. § 1332 because Moore seeks more than $75,000 in damages and is a citizen of a different State than each Defendant.

Defendants have collectively moved this court to dismiss Moore's complaint under Rule 12(b)(6) because it fails to state a claim upon which relief can be granted. *See* Doc. 25. Defendant Cecil also argues that the court lacks personal jurisdiction over him, so the court must dismiss the claims against him under Rule 12(b)(2). *Id.*

## STANDARD OF REVIEW

Because this is a Rule 12 motion, the court accepts the allegations in Moore's complaint as true and construes them in the light most favorable to Moore. *Lanfear v. Home Depot, Inc.*, 697 F.3d 1267, 1275 (11th Cir. 2012). The ultimate question is whether all of Moore's allegations, when accepted as true, "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). If the facts as pleaded could entitle Moore to relief, then the court must deny Defendants' motion to dismiss. If, however, the court accepts all of Moore's pleaded facts as true, and Moore still would not be entitled to relief, then the court must grant the motion.

## ANALYSIS

The court must tackle two questions: (1) does the First Amendment bar Moore from suing Defendants and (2) does this court have personal jurisdiction over Guy Cecil? The court must answer the latter question first, because if the court lacks personal jurisdiction over Cecil, then the court is powerless to decide whether the First Amendment protects Cecil's statements about Moore. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

## I.  Rule 12(b)(2): Does the court have personal jurisdiction over Guy Cecil?

Plaintiffs cannot sue defendants wherever they want. To force a defendant to face trial in another State, the Constitution requires the plaintiff to show that the defendant had "minimal contacts" with that State, *see Int'l Shoe v. Washington*, 326

U.S. 310 (1945); contacts that would allow the defendant to "reasonably anticipate being haled into court" in that State.[6] *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985).

Plaintiffs can do so in one of two ways: (1) the plaintiff can show that the defendant has continual and systematic contact with the State (*i.e.* "general jurisdiction"), or (2) the plaintiff can establish a substantial connection between the conduct at issue and the state where the lawsuit was filed (*i.e.* "specific jurisdiction"). Because Cecil neither lives nor does business in Alabama, Moore argues only that the court has specific jurisdiction over Cecil. *See* Doc. 32 at 21-23.

The Supreme Court applies a three-element "effects test" when determining whether specific personal jurisdiction exists over a defendant in a libel or defamation case: Did the defendant (1) commit an "intentional" tort that was (2) "aimed at the forum State" and (3) caused an injury that the defendant should have anticipated would be suffered in the forum state? *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (first applying the test in a libel case); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013) (recognizing that the *Calder* "effects test" applies to intentional tort cases and outlining the three elements).[7]

---

[6] Alabama's long-arm statute extends to the limits of the Due Process Clause, so the court need only conduct the federal Due Process analysis under *International Shoe* and its progeny. *See Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007).

[7] Moore limits his argument for personal jurisdiction to the *Calder* effects test (doc. 32 at 22-23), so that is the only test the court applies in this opinion.

Moore sues Cecil for defamation (Count 1) and intentional infliction of emotional distress ("IIED") (Count 3) based on a series of four tweets and an election-night press release. *See* Doc. 1, ¶¶ 60, 69. Cecil does not claim that he unintentionally spoke about Moore; nor does Cecil challenge that, if Moore was injured, the injury occurred in Alabama. So the court's task is to determine whether Cecil aimed any of his statements at Alabama, thereby allowing Cecil to be haled into an Alabama court for making the statement(s).

**A. The tweets**

The court considers the four tweets in chronological order. This was the first:



Doc. 1 at 63. This thread was started by Kellyanne Conway, an advisor to President Trump. Conway's tweet expressed her perception that the media's narrative about sexual assault allegations against Minnesota Senator Al Franken had been swiftly

supplanted by statements from Democratic Senators. Cecil responded by proclaiming that Conway supported "a sexually assaulting pedophile," a reference to Moore.

The court finds that Cecil did not aim his response to Conway at Alabama. Neither Conway nor Cecil was in Alabama during this exchange. *See* Doc. 25-5 (unrebutted Cecil affidavit). Rather, both work in the Washington DC area, Conway as an advisor to the Republican President, Cecil as the chair of a nonprofit that supports Democrats. *See* Doc. 1, ¶ 4; Doc. 25-5.

As with all four tweets, Cecil was engaged in a tit for tat with a Republican on a matter of national politics, with an intended national audience. Cecil's intent was not to harm Moore's reputation in Alabama; it was to harm the credibility of Conway and other Republicans across the country.

The second tweet is similar. Not long after Cecil tweeted at Conway, he tweeted that the announcement that former Tennessee Governor Phil Bredesen was running for Senate was a "game changer." That tweet led to the following exchange with Ward Baker, "a Republican strategist based out of Tennessee who focused on national party politics," Doc. 25-5, ¶ 14:



Doc. 1 at 63. The court finds that this tweet was not aimed at Alabama. Neither Cecil nor Baker was in Alabama. Nor was Roy Moore or Alabama the primary topic; the Tennessee Senate race was. As Cecil described it, this was just another "twitter fight" between a Republican and a Democrat over national politics. *Id.*

The third tweet came shortly after Jones was announced the winner of the December 12 special election:



Doc. 1 at 63. The court finds that Cecil did not aim this tweet at Alabama either. Cecil sent the tweet "[t]o the @GOP" (the national Republican Committee), not Alabama, and Cecil's message was that "we" (presumably Democrats nationwide) would hold Republicans' support of Moore over their heads in the future.

    The final tweet, which came an hour later, follows the same pattern:



Doc. 1 at 64. Ronna McDaniel was the chairwoman of the national Republican Committee, doc. 25-5, ¶¶ 16-17, and she arguably aimed her tweet at Alabama, specifically at Doug Jones.

    But Cecil did not aim his response at Alabama; he aimed it at McDaniel, who was in Washington DC. *Id.* And Cecil's intent for this fourth tweet mirrored his intent for the first three: to 'twitter shame' the national Republican Party and those affiliated with it. Moore was merely the tool Cecil used to swing at his opponents.

In sum, Cecil didn't use Twitter to "aim" a message at Alabama. Cecil aimed his tweets at Republicans outside Alabama with the intent to reach a national audience. If Cecil could have "reasonably anticipate[d] being haled into court" over his tweets, *Burger King*, 471 U.S. at 474, it would have been in the Washington DC area or possibly Tennessee, not Alabama.

### B. The Priorities USA press release

The  court reaches the opposite conclusion on the December 12 press release because, unlike Cecil's tweets, it was aimed at Alabama:

**Priorities USA Congratulates Senator-elect Doug Jones**

**Washington, DC** — *Priorities USA Chairman Guy Cecil released the following statement congratulating Doug Jones on his victory in the Alabama special election for US Senate:*

"Doug Jones has spent decades fighting for Alabamians and will now have the opportunity to continue to do so in the United States Senate. The people of Alabama sent a message tonight by putting country and state ahead of partisan politics and all Americans will now benefit from their decision. Unfortunately, the same cannot be said for Donald Trump and national Republicans, who supported a child molester who wants an America where being gay is a criminal offense, women shouldn't run for office, and African Americans are discriminated against at the ballot box, all in service to tax cuts for the rich. This is a stain on the Republican Party that will last forever. We will make sure of it."

"Priorities USA was proud to stand up for Doug and against a pedophile by partnering with Senate Majority PAC to run a $1.5 million digital campaign focused on persuading and mobilizing Alabama's voters, particularly those in the African American community, beginning even before the news broke about allegations against Roy Moore."

21

Doc. 1 at 65.[8] The court finds that the press release was aimed at Alabama for two primary reasons.

First, by its plain language, the press release was intended to "congratulat[e] Doug Jones on his victory in the Alabama special election[.]" *Id.* Jones was running for election in Alabama, and Jones was physically in Alabama when Cecil issued the press release. *See* Charles Bethea, *Scenes from Doug Jones's unlikely victory party in Alabama*, the New Yorker (Dec. 13, 2017), http://www.newyorker.com/culture/photo-booth/scenes-from-doug-joness-unlikely-victory-party-in-alabama.

Second, the press release ends by touting Priorities USA's "$1.5 million digital campaign focused on persuading and mobilizing Alabama's voters[.]" *Id.* If congratulating Jones was Cecil's primary goal for the press release, then patting Priorities USA on the back for targeting Alabama voters was a close second.

In short, Alabama was the "focal point both of the [press release] and the harm suffered." *Calder*, 465 U.S. at 789. So if Cecil could have "reasonably anticipate[d] being haled into court" in some State to defend statements he made in the press release, *Burger King*, 471 U.S. at 474, that State would have to be Alabama.

 Because Moore meets the elements of the *Calder* effects test, and Cecil does not argue that exercising jurisdiction over him fails to comport with fair play and

---

[8] Moore attributed the press release to Cecil in his complaint, doc. 1, ¶¶ 41, 60, and Cecil does not deny writing it in the affidavit he attached to the motion to dismiss. Doc. 25-5.

substantial justice, *see International Shoe*, 326 U.S. at 320, the court finds that it has personal jurisdiction over Cecil for the December 12 press release.

## C. Pendent Personal Jurisdiction

In sum, Cecil aimed the December 12 press release at Alabama, but he aimed none of the four tweets at Alabama. So only the press release establishes the contact needed to confer specific personal jurisdiction over Cecil.

That raises the question: If the court has specific personal jurisdiction over Cecil based on one action (the press release), does the court have 'supplemental' or 'pendent' personal jurisdiction over *all* claims against Cecil—even those based on actions that fail the minimum contacts analysis? A federal statute, 28 U.S.C. § 1367, governs the exercise of supplemental *subject matter* jurisdiction but does not address supplemental or pendent *personal* jurisdiction. So the court does not apply it. The court instead looks to circuit precedent. *See* 4A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure ("FPP") § 1069.7 (4th ed.) ("Since there is no federal statute on this subject, it seems clear that if it exists, pendent personal jurisdiction must be a creature of federal common law[.]").

Eleventh Circuit law on the issue is sparse, but the rule appears to be that "personal jurisdiction over one individual claim cannot be expanded to cover other related claims unless the claims 'arose from the same jurisdiction generating event.'" *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 Fed. Appx. 779, 788 (11th Cir.

2014) (quoting *Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993)). Here, the "jurisdiction generating event" was Cecil issuing the press release. None of Cecil's tweets arose from the press release. So, under *Cronin*, the court does not have pendent personal jurisdiction over Moore's claims that Cecil's tweets defamed him (Count 1) or intentionally caused him emotional distress (Count 3).

Other circuits give district courts some discretion. *See* FPP § 1069.7 (citing circuit and district precedent for the proposition that "a district court has discretion to exercise personal jurisdiction over a claim that it ordinarily lacks personal jurisdiction over only when that claim arises out of the same common nucleus of operative fact as does a claim that is within the in personam jurisdiction power of the court"). If this court had discretion, it would decline to exercise pendent personal jurisdiction over claims that fail the minimum contacts test for two reasons.

First, extending personal jurisdiction beyond the bounds of the federal Due Process Clause would seemingly violate Alabama's Long Arm Statute, which allows service outside Alabama only if it "is not inconsistent with the constitution of this state or the Constitution of the United States." Ala. R. Civ. P. 4.2. This is a state-law case, so the court is wary of straying beyond the bounds of state law.

Second, allowing Cecil's lone contact with Alabama to vest the court with personal jurisdiction over all of Cecil's actions—including those aimed at other

States—would eliminate the distinction between specific personal jurisdiction and general personal jurisdiction. This may violate Due Process.

In short, the court finds that state and federal law require Moore to establish specific personal jurisdiction for each claim arising from each individual statement. Because Moore has established specific personal jurisdiction over Cecil's issuance of the December 12th press release, the court denies Cecil's Rule 12(b)(2) motion to dismiss Moore's defamation (Count 1) and IIED (Count 3) claims to the extent that those counts stem from statements in the press release. Conversely, because Moore cannot establish specific personal jurisdiction over any of Cecil's tweets, the court dismisses without prejudice all claims related to the tweets under Rule 12(b)(2).

## II. Rule 12(b)(6): Does Moore plead any claims that could entitle him to relief?

Moore pleads three claims in his complaint: defamation (Count 1), defamation by implication (Count 2), and IIED (Count 3). Defendants make two arguments that apply to all three claims and would thus result in outright dismissal of Moore's complaint if correct: (1) Moore fails to plead facts that could establish "actual malice," and (2) Moore is a "libel-proof plaintiff." The court addresses these overarching issues first, then deals with Defendants' claim-specific arguments.

### A. Actual Malice

Defendants argue that, even if Moore can prove that Defendants' statements were false, Moore's complaint fails to plead facts that would prove that Defendants

acted with "actual malice" when making them. Because "actual malice" is a legal term of art (and somewhat of a misnomer), the court starts by defining it.

### 1. Actual Malice Defined

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech[.]" But the First Amendment has limits. Everyone accepts, for example, that the First Amendment "would not protect a man falsely shouting fire into a theater and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52 (1919). Notably, it is the combination of falsity plus injury (causing a panic/riot) that withdraws First Amendment protection. Shouting "fire" into a burning theater would be protected and appropriate.

Defamation works much the same way. The First Amendment protects truthful statements. But Congress and States may pass laws that make a person liable for making false statements that injure another person. Each of Moore's state-law claims generally require a showing of falsity plus injury. *See Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) (outlining the defamation elements); *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (outlining the elements of IIED). And if Moore was a "non-public" figure—an average citizen, for lack of a better term—that's all he would have to prove.

But the rule is different for public figures. In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that the First Amendment requires a public

figure to prove another element, "actual malice," before he can recover damages from the speaker. Actual malice requires public figures to prove not only that a defamatory statement was false, but also that the defendant said it "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. Put another way, even if the public figure can prove the statement was false, the First Amendment protects the speaker if he had reason to believe the statement was true. The Fourteenth Amendment extends this protection to speakers sued under state law.[9] *See New York Times*, 376 U.S. at 265 (rejecting the state court holding that the First Amendment did not apply to a state-law libel action).

Moore, as a candidate for the United States Senate, was a public figure subject to the actual malice requirement. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971) (applying the actual malice standard to a Senate candidate). That means that, to survive Defendants' Rule 12(b)(6) motion, Moore must plead some facts that, if proved true, would establish that Defendants made one or more of their defamatory statements "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* at 279-80.

---

[9] Whether the Constitution requires proof of "actual malice" is still debated. Justice Thomas, for example, recently said that "[t]here are sound reasons to question whether either the First or Fourteenth Amendment, as originally understood, encompasses an actual-malice standard for public figures or otherwise displaces vast swaths of state defamation law" and has thus called on the Court to reconsider its holding in *New York Times. McKee v. Cosby*, 139 S. Ct. 675, 680-82 (2019) (Thomas, J. concurring in cert denial). Moore does not raise that argument here.

## 2.  Actual Malice Applied

As explained above, the court's task is to determine whether Moore pleads facts that could establish "actual malice"; that is, that Defendants made any statement "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. Three principles of Supreme Court and Eleventh Circuit law permeate the court's review of Defendants' statements, so the Court explains them before it begins.

### a)  *Proving animus or bad motives doesn't prove actual malice.*

"Actual malice" is somewhat of a misnomer; it "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). In fact, "ill-will, improper motive, or personal animosity plays no role in determining whether a defendant acted with actual malice." *Dunn v. Airline Pilots Ass'n*, 193 F.3d 1185, 1998 (11th Cir. 1999). In other words, it is not enough to show that a defendant is the type of person who would lie about the plaintiff or that he has motive to lie about the plaintiff. The question is whether the defendant *actually* lied about the plaintiff or acted with a reckless disregard for the truth.

### b)  *Reliance on published media reports can vitiate actual malice.*

Defamation cases are often like this one, when the defendant points to a third party's earlier statement about the plaintiff as the basis for his defamatory statement.

In *St. Amant v. Thompson*, 390 U.S. 731 (1968), the Supreme Court stated that, for a plaintiff to establish actual malice in such a case, the plaintiff must show that the defendant had an "awareness" of the "probable falsity" of the third party's earlier statement upon which the defendant relied. 390 U.S. at 732-33.

The Fifth Circuit applied *St. Amant* to a case like this, where the earlier third-party statement was a published report. The Fifth Circuit held that "the subjective awareness of probable falsity required by *St Amant v. Thompson*, 390 U.S. 731 (1968), cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied." *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 862 (5th Cir. 1978). That holding—that actual malice "cannot be found" if the defendant's defamatory statement is "supported by a multitude of previous reports"—is binding Eleventh Circuit precedent. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (holding that Fifth Circuit cases decided before 1981 are controlling law in the Eleventh Circuit).

c) *Defendants have no duty to investigate.*

Defendants' "failure to investigate does not in itself establish bad faith." *St Amant*, 390 U.S. at 733 (citing *New York Times*, 376 U.S. at 287-88); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) ("a failure to investigate, standing on its own, does not indicate the presence of actual malice"). "Rather there

must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Michel*, 816 F.3d at 703.

* * *

The court now applies these principles to each statement mentioned in Counts 1-3 of Moore's complaint, *see* Doc. 1, ¶¶ 57-69, and the facts that Moore pleaded in his complaint to establish actual malice. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

### a)  The December 12th Press Release (Guy Cecil)

The court starts with Cecil's December 12, 2017 press release, which the court quoted in full in Issue I. *See supra* at 21. Moore alleges that Cecil's use of the words "child molester" and "pedophile" was defamatory (Doc. 1, ¶ 60) and intended to cause Moore emotional distress (Doc. 1, ¶ 69).

Basis for statements: Cecil argues that his use of the terms "child molester" and "pedophile" in December 2017 was supported by "several well-sourced articles [that] had published reports of Moore's sexual misconduct with minors." Doc. 25 at 24. The court finds that at least two reported allegations support Cecil's argument.

First, Leigh Corfman said that, when she was 14 and Moore was 32, Moore drove Corfman to his home; "took off her shirt and pants and removed his clothes"; then, "touched her over her bra and underpants . . . and guided her hand to touch him

over his underwear." Washington Post, November 9, 2017, *supra*. Second, Beverly Nelson Young said that, when she was 16, Moore "reached over and began groping [her], putting his hands on [her] breasts." *See supra* at 7, n.3. When she tried to fight back, Young said that Moore "began squeezing my neck attempting to force my head onto his crotch. . . . He was also trying to pull my shirt off." *Id.*

If a man in his thirties undressed and groped a 14 or 16-year-old girl against her will, it would be fair to say that man molested a child. Calling him a pedophile, however, is bit murkier. "Pedophilia" is a psychological disorder that "involves sexual activity with a prepubescent child (generally age 13 years or younger)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 302.2 (4th ed. 2000). Cecil cites no report that Moore was involved with a prepubescent girl. Corfman (14) was Moore's youngest accuser.

That said, Moore did not plead that Cecil used the wrong label; Moore claims the allegations are false. So, to establish actual malice, Moore must plead facts that would prove (a) the women's allegations were false and (b) Cecil made his statements "with a high degree of awareness of [their] probably falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974). Or, more simply, Moore must plead facts that would prove Cecil knew that both women were probably lying.

<u>Actual malice</u>: Moore pleads four bases for actual malice in his complaint. First, Moore alleges that "Cecil obviously had to have entertained doubts as to [the

accusers' allegations]" because Cecil "had no way of verifying the truth or falsity" of his statements. Doc. 1, ¶ 60. But this argument flips the parties' duties. Cecil had no duty to verify the truth or falsity of the women's allegations. *See St. Amant*, 390 U.S. at 733; *Michel*, 816 F.3d at 703. Rather, Moore had the duty—the duty to plead facts that would prove Cecil knew that the women were probably lying. *Gertz*, 418 U.S. at 332. Pleading that "Cecil obviously had to have entertained doubts" (doc. 1, ¶ 60) fails this duty; it is merely a conclusory statement that cannot satisfy the *Iqbal* and *Twombly* pleading requirements.

Second, Moore alleges that Cecil's treatment of the accusers' allegations as fact proves actual malice. *Id.* But the Supreme Court rejected the argument that omitting the word "alleged" proves actual malice in *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971). In *Pape*, the Court reaffirmed the public figure's duty to establish that the defendant "entertained serious doubts as to the truth of his publication." *Id.* at 292 (quoting *St. Amant*, 390 U.S. at 731). The Court held that merely omitting the word "alleged" does not satisfy that duty. *Id.* at 290-92.

Third, Moore alleges that Defendants' collective efforts to hide the true nature of the Highway 31 PAC from Alabama voters is evidence that lying "was the heart of their electoral strategy." Doc. 1, ¶ 61. This argument misses the point. Even if Moore can prove that Cecil lied about Highway 31's nature, thus proving that Cecil was willing to lie to help Doug Jones win the election, Moore still has not proved

that Cecil entertained serious doubts that Corfman and Nelson were telling the truth about their encounters with Moore. Cecil's belief in the accusers' veracity, not his willingness to lie about Moore, is what matters. *See Dunn*, 193 F.3d at 1998 ("ill-will, improper motive, or personal animosity plays no role in determining whether a defendant acted with actual malice").

Fourth and finally, Moore alleges that the collective Defendants' "single-minded laser-focused assault on Judge Moore's character that in no way pretends to be balanced reporting" is evidence of actual malice. Doc. 1, ¶ 62. Moore's argument again misses the point. The court accepts that Moore can prove that Defendants' singular mission was to ruin Moore's political campaign—and that they were willing to ruin Moore's personal life in the process. But proving Defendants' ill-will and motives would not answer the only question that matters: Did Cecil entertain serious doubts that Corfman and Nelson were telling the truth?

\* \* \*

Binding Eleventh Circuit precedent states that actual malice "cannot be found" if the Defendant's defamatory statement is "supported by a multitude of previous reports." *Rosanova*, 580 F.2d at 862. Multiple reports detailed Corfman and Nelson's allegations. Moore pleads no facts that would prove that Cecil had serious doubts about either woman's allegation. So all counts related to the press release are due to be dismissed for failing to state a claim that could entitle Moore to relief. *Id.*

### b) The "Child Predator" digital ad (Priorities USA and Bully Pulpit)

Moore alleges that the following ad that Defendants Priorities USA and Bully

Pulpit crafted and ran on digital platforms like YouTube was defamatory:

















Doc. 1 at 10-14 (factual allegations about digital ad); 49-53 (screen shots of digital

ad).

Moore alleges that Defendants' use of the term "child predator" in the digital ad was defamatory (doc. 1, ¶ 59) and intended to inflict emotional distress on Moore (doc. 1, ¶ 69).

Basis for statement: Like Cecil, Priorities USA and Bully Pulpit argue that "by the time the Online AD was published, there were multiple credible allegations that Moore had made sexual advances towards, and had sexually assaulted, teenage girls." Doc. 25 at 22. The court agrees. If believed, Corfman and Nelson's allegations that Moore undressed and groped them against their will support Defendants' use of the term "child predator." So to survive Rule 12 dismissal, Moore must plead facts that would establish that, when Priorities USA and Bully Pulpit ran the digital ad, they had serious doubts that Corfman and Nelson were telling the truth.

Actual Malice: Moore re-alleges some of the same bases for actual malice for the digital ad that he alleged about Cecil's press release. *See* Doc. 1, ¶¶ 61-62. The court rejects those allegations of actual malice for the same reasons it rejected them when discussing the press release. *See infra* at 31-33.

Moore pleads two more bases for actual malice for the digital ad. First, Moore argues that the digital ad's statement that "your vote is public record, and your community will know whether or not you voted to stop Roy Moore," followed by Defendants' refusal to take down the ad when requested by the Alabama Secretary of State, "is direct evidence of Priorities' propensity to employ deception in its

political advertising." Doc. 1, ¶ 59. The court agrees that suggesting someone will expose or dox voters who choose the wrong candidate is deplorable behavior that could establish Defendants' propensity to lie to help Jones defeat Moore. But proving that Priorities USA is willing to lie about ballot secrecy does not prove that Priorities USA or Bully Pulpit had serious doubts that Corfman and Nelson were telling the truth when they alleged that Moore sexually assaulted them. So it cannot prove actual malice. *See Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) ("a public figure plaintiff must prove more than an extreme departure from professional standards and … a newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice").

Second, Moore alleges that Defendants' "use of highly inflammatory language, typically applied to convicted sex offenders, shows the defendants' deliberate choice to defame Judge Moore regardless of the lack of supporting evidence." Doc. 1, ¶ 59. But Corfman and Nelson's allegations, if true, supported Defendants' choice of the term "child predator." And, as the Washington Post noted in its initial article, Corfman's allegation amounted to the crime of "sexual abuse in the second degree" at the time of the alleged encounter. Washington Post, November 7, 2017, *supra*. So this argument fails to establish actual malice.

* * *

Again, binding circuit precedent states that actual malice "cannot be found" if the Defendant's defamatory statement is "supported by a multitude of previous reports." *Rosanova*, 580 F.2d at 862. The digital ad's use of the term "child predator" was supported by many reports about Corfman and Nelson's allegations that Moore sexually assaulted them when they were teens. Moore pleads no facts that would prove that Priorities USA or Bully Pulpit had serious doubts about either woman's allegation. So all counts related to the digital ad are due to be dismissed for failing to state a claim that could entitle Moore to relief. *See id.*

### c) The Shopping Mall television ad (SMP and Waterfront Strategies)

Moore alleges that SMP and Waterfront Strategies designed and distributed the following television ad to defame him (doc. 1, ¶ 58), defame him by implication (doc. 1, ¶ 66), and cause him emotional distress (doc. 1, ¶ 69):













Gadsden Police Officer:

"I actually voted for Moore...
but I'm basically disgusted now."

Gadsden Police Officer, TNY.com, 11/13/2017

PAID FOR BY HIGHWAY 31. HIGHWAY31NOW.COM NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S
COMMITTEE. HIGHWAY 31 IS RESPONSIBLE FOR THE CONTENT OF THIS ADVERTISING

0:26 / 0:32

Doc. 1 at 3-14 (factual pleading in complaint); 31-33 (screenshots of ad).

In his complaint, Moore alleges that he can prove actual malice by showing that the the ad "contained quotations which were ***deceptively juxtaposed*** to create a false impression that Judge Moore solicited sex from young girls at the Gadsden Mall." Doc. 1, ¶ 58 (emphasis added). The court emphasizes the phrase "deceptively juxtaposed" because that's what makes this defamatory statement different from the others—and it's the reason this claim survives while the others don't.

<u>Deceptive Alterations</u>:  Unlike the digital ad and the press release, Defendants filled the shopping mall ad with quotes from news articles to give it extra credibility. Adding the opening phrase, "What do people who know Roy Moore say?" turned the credibility factor up a notch.

But quotes are malleable, and even the slightest tinkering with quotes can cause "devasting" impacts, as the Supreme Court acknowledged in *Masson v. New Yorker Magazine*, *Inc.*:

> Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner especially damning because so much of it appeared to be a self-portrait, told by petitioner in his own words. And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.

501 U.S. at 517-18. Because altered quotes can be "especially damning," *id.*, the Supreme Court held in *Masson* that a public figure can establish actual malice if the "alteration [of quotes] results in a material change in the meaning conveyed by the statement." *Id.* at 517.

Moore alleges that Defendants' juxtaposition of quotes from different articles materially changes the stories told in those articles. The court agrees that, when you accept Moore's interpretation of the TV ad, there is at least one mash-up that materially changes the meaning of the original article.

<u>Actual Malice—Santa's helper quote</u>: The first three slides in the ad state:

What do people who know Roy Moore say?

"Moore was actually banned from the Gadsden Mall … for soliciting sex from young girls."

One he approached "was 14 and working as Santa's helper."
Doc. 1 at 31-32. The two quotes come from two articles; the first from Glynn Wilson's website, New American Journal, and the second from Al.com. Moore alleges that Defendants juxtaposed the quotes to create the false impression that Moore solicited sex from Wendy Miller when she was 14 years old and working as Santa's helper at the Gadsden Mall. Doc. 1, ¶¶ 15-16, 58, 66. For this allegation to establish actual malice, Moore would need to prove two things: (1) The juxtaposed sentences say or imply that Moore asked Wendy Miller for sex when she was 14 and working at the mall as Santa's helper and (2) saying or implying that Moore asked Wendy Miller for sex at the mall materially changes the story in the Al.com article that contains the 'Santa's helper' quote. *See Masson*, 501 U.S. at 517.

Again, the commercial claims that "people who know Roy Moore" said that "'Moore was actually banned from the Gadsden Mall … for soliciting sex from young girls.' One he approached 'was 14 and working as Santa's helper.'" The word "One" that begins the last sentence plainly refers the viewer back to the preceding sentence and begs the question: One what?

The parties disagree how viewers would answer that question. Moore argues that the viewer—who just heard that Moore was banned from the mall "for soliciting sex from young girls"—would interpret the word "One" to mean "One of the young girls Moore supposedly approached at the Gadsden Mall to solicit sex." Doc. 32 at

15. Defendants argue that "the TV Ad did not say that Moore solicited sex from Miller" (doc. 33 at 7), meaning that the viewer would not tie the statement that Moore "approached" a 14-year-old girl working as Santa's helper to the preceding statement that Moore "solicited sex from young girls" at the mall.

Because the court is reviewing Defendants' Rule 12 motion to dismiss, the court must give Moore the benefit of the doubt if his interpretation is reasonable. *See Lanfear*, 697 F.3d at 1275. Having viewed the TV ad[10], the court finds that a reasonable person could have watched the TV ad and come away with the impression that someone "who know[s] Roy Moore" said that Moore "solicited sex" from a 14-year-old girl who was working at the Gadsden Mall as Santa's helper.

So the question now is whether the impression created by the TV ad is materially different from the story told by the article from which Defendants took the quote. Defendants took the "Santa's helper" quote from an article posted on Al.com on November 13, 2017. Doc. 1 at 32. The Al.com article recounts Miller's account to the Washington Post:

> Wendy Miller told The Post that she was 14 and working as Santa's helper at the Gadsden Mall in 1977 when Moore first spoke with her and told her she looked pretty. Two years later, when she was 16, he asked her out on dates, although her mother wouldn't let her go.

---

[10] As of the date of this opinion, the "Shopping Mall" TV ad can still be watched on YouTube at https://youtu.be/2SCI7ZQ1ZY4.

Doc. 1 at 35. The article says that, when Miller was 14, Moore "spoke with" Miller and "told her she looked pretty," not that Moore asked Miller for sex. Nor does the article claim that Moore solicited sex from any other girl at the mall. In other words, the TV ad changed the story—if you agree with Moore's interpretation of the ad.

Defendants argue that, even if the TV ad can be interpreted to say that Moore solicited sex from Miller when she was 14, "the creators of the TV Ad had plenty reason to believe that in approaching Miller when she was 14, Moore was seeking sex: the multiple sexual-assault accusations made against Moore prior to the TV Ad's publication gave significant reason to believe Moore exhibited a pattern of picking up teenage girls from public locations and trying to have sex with them." Doc. 33 at 7. But what Defendants thought Moore wanted from Miller is not the test. The test is whether Defendants changed the story that Al.com told the public. The Al.com story did not end with Moore asking a 14-year-old to have sex; it ended with Moore asking Miller on a date when she was 16, and Miller saying no. Moore has pleaded enough facts to show that Defendants knowingly changed the story told by Al.com to cast Moore in the worst possible light.

Because Moore has pleaded facts that could prove that Defendants' alteration of various media quotes "result[ed] in a material change in the meaning conveyed by the statement" Defendants quoted, *Masson*, 501 U.S. at 517, Moore has pleaded a plausible claim of actual malice for the TV ad.

* * *

In summary, Moore has sufficiently pleaded actual malice for the TV ad but not the December 12 press release or the digital ad. So all claims related to the press release and digital ad are due to be dismissed. The court addresses whether that dismissal is with or without prejudice in Part III. But first, the court must address Defendants' other arguments for dismissing Moore's claims about the TV ad.

### B. Libel-proof Plaintiff

Defendants next argue that the court should dismiss all of Moore's claims under the "libel-proof plaintiff doctrine." Doc. 25 at 25-26. Stated simply, Defendants argue that Moore's accusers, the media, and others ruined Moore's reputation beyond repair before Defendants first aired the TV ad. So, even if the TV ad defamed Moore, Moore would be "unlikely to recover anything other than nominal damages" because his reputation had little to no value when the TV ad aired. Doc. 25 at 25 (quoting *Cofield v. Advertiser Co.*, 486 So. 2d 434, 435 (Ala. 1986)).

As Defendants admitted at oral argument (trans. 23-26), this court must apply the state-law version of the libel-proof plaintiff doctrine, and to date, the Alabama Supreme Court has not extended the doctrine beyond someone who "***by virtue of his life as a habitual criminal is*** . . . unlikely to recover anything other than nominal damages." *Cofield*, 486 So. 2d at 435 (emphasis added). As Defendants also admitted at oral argument (trans. 25-26), Moore did not possess a life-long record of

criminal conduct when Defendants released the TV ad; Moore was instead weathering a two-week firestorm of sexual assault allegations. So Alabama's libel-proof plaintiff doctrine would not apply.

The court refuses to extend the doctrine here for two reasons. First and foremost, federal courts should not be expanding state-law doctrines. That's a job for state courts or the state legislature. Second, this court cannot hold at the Rule 12 stage that Moore's reputation was worthless when Defendants released the TV ad. Because Moore is the non-movant, the court must assume that Moore can prove his allegations that "his personal and professional reputations were damaged" (doc. 1, ¶ 64); that Moore "suffered economic loss including sharply curtailed speaking opportunities to market and publicize his works" (*id.*); and, Moore "suffered grievous emotional pain and suffering" (*id.*) because Defendants released the TV ad.

Defendants can argue in later stages that, as a matter of fact, Corfman and Nelson's public sexual assault allegations vitiate any damage Moore might have suffered from the TV ad's implication that he was soliciting sex from young girls. *See* Doc. 25 at 26. But the court cannot make that finding now as a matter of law.

## C. Failure to state a claim

As explained above, only claims about the TV ad remain. Moore pleads three counts related to the TV ad: defamation (doc. 1, ¶¶ 57-58, 61-64), defamation by implication (doc. 1, ¶¶ 65-67), and IIED (doc. 1, ¶¶ 68-69). For the two defamation-

related counts, Defendants only challenge Moore's pleading of actual malice. Doc. 25 at 15-28. Because the court finds that Moore has sufficiently pleaded facts that could establish actual malice for the TV ad, Defendants' motion to dismiss Counts 1 and 2, as those counts relate to the TV ad, must be denied.[11]

For IIED, however, Defendants challenge the sufficiency of two other elements: (1) an objective indicium of distress and (2) causation. Doc. 25 at 28-30. Moore does not refute this argument; he instead states that "[f]urther evidence of emotional distress, if needed, may be offered by a motion to amend." Doc. 32 at 30. So the court finds that Moore concedes that his IIED claim is insufficiently pleaded, and the court determines below whether to allow Moore to amend his complaint to cure the deficiency.

## III.   Dismissal with or without prejudice

As explained above, these claims are due to be dismissed because of insufficient pleading:

- Count 1, limited to claims about the digital ad and press release; and,
- Count 3, limited to claims about the digital ad, press release, and TV ad.

District courts are generally required to give a plaintiff one chance to amend a deficiently pleaded complaint, and the Eleventh Circuit has said that rule applies to

---

[11] Defendants say that it is "far from clear that defamation-by-implication is a cognizable cause of action under Alabama law." Doc. 25 at 26. But Defendants don't ask the court to dismiss Count 2 on this ground, so the court does not address the issue.

defamation complaints that fail to sufficiently plead actual malice: "A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint." *Michel*, 816 F.3d at 706.

But the rule is not absolute. Dismissal with prejudice is warranted if amending "would be futile or … some other substantial reason exists to deny leave." *Id.* Defendants rely on the futility exception to argue that the court should not allow Moore to amend his complaint because (a) the abundance of media reports make it impossible for Moore to prove actual malice and (b) allowing this case to move forward "would encourage candidates to use defamation suits as a tool to intimidate critics and chill scrutiny of their record and conduct." Doc. 30 at 25.

So the court's final task is to determine whether it would be "futile" to allow Moore to amend Counts 1 and 3 to cure his deficient pleadings.

### A. IIED from the TV ad (Count 3)

Moore failed to plead sufficient facts that would show that the TV ad caused him the requisite level of emotional distress. *See supra* Part II(C). Defendants argue that, in his opposition, "Moore provides no explanation for why he did not even attempt to plead basic elements of this cause of action[.]" Doc. 33 at 12. The court agrees, but that's not the test. The test is whether Moore could allege facts that could establish his claim of intentional infliction of emotional distress. The court sees no

reason why Moore cannot *plead* facts that, if proven, would establish that Moore suffered severe emotional distress caused by the TV ad. Whether Moore can *prove* distress and causation, of course, is a question for another day. So the court dismisses without prejudice Count 3, as it relates to the TV ad.

### B. Actual malice for the digital ad and press release (Counts 1 & 3)

Whether Moore can plead facts that would prove actual malice for the digital ad and press release is a closer question. Corfman and Nelson have steadfastly maintained that they are telling the truth about Moore, beginning with their initial allegations in November 2017 through the still-pending defamation case between Moore and his accusers. *See* Doc. 25-3 (Moore's complaint in Etowah County Circuit Court against Corfman, Nelson, and three others). Moore has not alleged that Defendants Cecil, Priorities USA, or Bully Pulpit had a relationship with, or connection to, Corfman or Nelson in 2017. So proving that those Defendants had "a high degree of awareness of probably falsity" of Corfman or Nelson's allegations in 2017 may well be futile. *Gertz*, 418 U.S. at 332.

That said, the court does not dismiss with prejudice Moore's first attempt to plead actual malice for two reasons. First, the Eleventh Circuit has instructed the court not to. *See Michel*, 816 F.3d at 706 ("A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint."). Second, having

considered the briefs and statements made during oral argument, the court believes that Moore could sufficiently plead facts that, if true, would prove actual malice for the press release and digital ad. Whether Moore can plead those facts in compliance with Rule 11(b), then prove them after discovery, remains to be seen.

Because Defendants Cecil, Priorities USA, and Bully Pulpit will be dismissed from this action if Moore cannot cure his deficient pleadings, the court will expedite the amendment process and hold discovery until after those Defendants have had the chance to challenge the sufficiency of Moore's amended complaint.

## CONCLUSION

This chart summarizes the court's ruling on the motion to dismiss (doc. 25):

| Count | Defendants | Statement | Ruling on Motion |
|-------|-----------|-----------|------------------|
| Count 1, ¶58 | SMP, Waterfront Strategies | TV ad | Motion denied |
| Count 1, ¶59 | Priorities USA, Bully Pulpit | Digital ad | Dismissed w/out Prejudice (deficient pleading) |
| Count 1, ¶60 | Cecil | Tweets | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 1, ¶60 | Cecil | Press Release | Dismissed w/out Prejudice (deficient pleading) |
| Count 2 | SMP, Waterfront Strategies | TV ad | Motion denied |
| Count 3 | SMP, Waterfront Strategies | TV ad | Dismissed w/out Prejudice (deficient pleading) |
| Count 3 | Priorities USA, Bully Pulpit | Digital ad | Dismissed w/out Prejudice (deficient pleading) |
| Count 3 | Cecil | Tweets | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 3 | Cecil | Press Release | Dismissed w/out Prejudice (deficient pleading) |

Moore may amend his complaint by **October 16, 2020**. The failure to amend by this date will lead to the court dismissing, with prejudice, the claims shaded in yellow.

If Moore amends his complaint, Defendants must respond by **November 13, 2020**. If any Defendant files a Rule 12 motion to dismiss, the court will enter a briefing schedule. Discovery will not be ordered until the court rules on any motion to dismiss the amended complaint.

**DONE** on September 18, 2020.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE