FILED

2021 Mar-31  AM 09:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**ROY S. MOORE,**
    **Plaintiff,**

**v.**                                    **Case No. 4:19-cv-1855**

**GUY CECIL,** *et al.*
    **Defendants.**

## MEMORANDUM OPINION

The court dismissed some of the claims in Moore's original complaint without prejudice to give Moore the opportunity to correct any deficiencies (docs. 45, 46). Moore has since amended his complaint (doc. 47); Defendants have moved to dismiss the amended complaint (doc 52), and the court rules on their motion here.

This opinion should be read as a continuation of the court's opinion about the original complaint (doc. 45), which the court calls "Part I" from now on. For the reasons stated below, Part II ends with the same result: The court **GRANTS in part** and **DENIES in part** Defendants' motion to dismiss (doc. 52).

## ANALYSIS

Moore bases his amended complaint on the same essential facts as his original complaint, so the court needn't repeat its statement of facts and standard of review. That allows the court to jump straight into the counts.

**COUNTS I-II: Defamation & Defamation by Implication**

In Count I, Moore asserts that the shopping mall ad, the digital ad, and a series of statements by Guy Cecil defamed him. Doc. 47 ¶¶ 73-82. In Count II, Moore asserts that the two ads also defamed him by implication. Doc. 47 ¶¶ 83-85. But Moore has not cited Alabama caselaw that says "defamation" and "defamation by implication" are distinct torts. Nor has the court found any. The Alabama Supreme Court has said that a defamation claim can be proved by various means, such as the use of "defamatory implication," "defamatory innuendo," and (as discussed in Part I) the unfair juxtaposition of words. *Finebaum v. Coulter*, 854 So.2d 1120, 1124-25 (Ala. 2003). That's likely why the Alabama Pattern Jury Instructions contain an instruction for "defamation," but not one for "defamation by implication." *Alabama Pattern Jury Instructions—Civil* 23.01 (3rd ed. 2020). So the court addresses Counts I and II together, as though both counts raise the same defamation claim.

But before the court dives into the allegedly defamatory statements, the court addresses Moore's new arguments about actual malice.

**A. Moore's New Arguments about Actual Malice**

1. <u>Constitutionality</u> (¶15, n.1): The Supreme Court announced that public figures must prove "actual malice" in *New York Times v. Sullivan*, 376 U.S. 254 (1964). Moore challenges the constitutionality of the *New York Times* actual malice requirement, citing Justice Thomas's recent statement that "[t]here are sound reasons

to question whether either the First or Fourteenth Amendment, as originally understood, encompasses an actual-malice standard for public figures or otherwise displaces vast swaths of state defamation law." *McKee v. Cosby*, 139 S. Ct. 675, 680-82 (2019) (Thomas, J. concurring in cert denial).

Of course, district courts must follow Supreme Court precedent, so this court must apply the *New York Times* actual malice standard. But Moore has reserved this argument should he wish to argue it to higher courts.

2. <u>Ill-will as Evidence</u> (¶ 74): The court explained in Part I that, to prove actual malice, Moore must prove that Defendants made the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80. "[I]ll-will, improper motive, or personal animosity plays no role in determining whether a defendant acted with actual malice." *Dunn v. Airline Pilots Ass'n*, 193 F.3d 1185, 1998 (11th Cir. 1999).

As this court put it, "it is not enough to show that a defendant is the type of person who would lie about the plaintiff or that he has motive to lie about the plaintiff. The question is whether the defendant *actually* lied about the plaintiff or acted with a reckless disregard for the truth." Part I at 28.

Moore disagrees. He contends that pleading ill will or animosity is enough because, "under Alabama law, actual malice can be demonstrated by circumstantial evidence and 'by evidence of previous ill will, hostility, threats, rivalry, other

actions, former libels or slanders, and the like, emanating from the defendant[.]"
Doc. 56 at 3-4, 7-8, 12-13, quoting *Brackin v. Timmer*, 897 So. 2d 207, 224 (Ala. 2004) (quoting *Kenny v. Gurley*, 95 So. 2d 34, 37 (Ala. 1923)).

But Moore is quoting a state court case that involved a **private** figure seeking to overcome a claim of conditional privilege. Alabama courts apply the *New York Times* "constitutional malice" standard to public figures and public officials:

> 'Common-law malice' and 'constitutional malice' constitute two distinct species of malice, and proof of constitutional malice is not made merely by proof of common-law malice. Constitutional malice must be shown by clear and convincing evidence. While constitutional malice "focuses on the defendant's *attitude toward the truth or falsity of his published material*," common-law malice focuses generally "on the defendant's *attitude toward the plaintiff.*
>
> The similarity in terminology is deceptively superficial. For these reasons, the two definitions have 'caused a considerable amount of confusion and ambiguity in interpretation and application of the two different standards of malice.'

*Wiggins v. Mallard*, 905 So. 2d 776, 786 (Ala. 2004) (citations omitted). Moore seizes on this "confusion and ambiguity" to argue that public figures can avoid the *New York Times* actual malice standard.[1] But this court is not fooled. Alabama courts correctly apply *New York Times* in public figure cases, as shown by the Pattern Jury Instruction for defamation cases involving a "Public Official / Public Figure":

---

[1] The United States Supreme Court similarly rues the confusion: "The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or will." *Harte-Hanks*, 491 U.S. at 666, n.7.

> [Plaintiff] must prove by clear and convincing evidence that when [Defendant] published the statement, [he] knew the statement was false or [he] published it with reckless disregard to whether it was false or not.

*Alabama Pattern Jury Instructions—Civil* 23.03 (3rd ed. 2020); *see also Finebaum*, 854 So.2d at 1124-25 (stating that public officials and public figures must prove knowledge of falsity or reckless disregard for the truth).[2]

Moore admits that he is a public figure (doc. 56 at 3), so he must plead facts that would prove falsity or reckless disregard, not just ill will or animosity. *See Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) ("the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term").

### B. Shopping Mall Ad (¶¶ 74-75)

In Part I, the court denied Defendants' motion to dismiss Moore's defamation claims about the shopping mall ad because Moore had "pleaded facts that could prove that Defendants' alteration of various media quotes 'resulted in a material change in the meaning conveyed by the statement' Defendants quoted." Part I at 46. Moore repleads these claims about the shopping mall ad in his amended complaint. Doc. 47, ¶¶ 74-75 (Count 1), 84-85 (Count 2).

---

[2] Of course, Alabama courts must apply the United States Supreme Court's interpretation of the First Amendment to the federal Constitution.

Defendants concede that the court's previous ruling applies to Moore's amended complaint, so Defendants concede that Moore can proceed on his claim that Defendants' juxtaposition of quotes creates the defamatory message that Moore solicited sex from a 14-year-old girl at the Gadsden Mall. Doc. 52 at 24.

Defendants ask the court to limit its ruling to this portion of the ad and dismiss Counts 1-2 to the extent that Moore contends that these statements from the ad were also defamatory:

- "Moore was actually banned from the Gadsden Mall…";

- "These stories have been going around for 30 years";

- "These women are being skewered for the truth"; and,

- "I actually voted for Moore…but I am basically disgusted now."

Doc. 52 at 24-27. The court finds that Moore cannot proceed with a claim on the final three quotes for three reasons: (1) Moore does not allege in Counts 1-2 of his amended complaint that these quotes were false or were made with actual malice (doc. 47, ¶¶ 74-75, 84-85); (2) Defendants accurately quoted these statements in the shopping mall ad; and, (3) Moore failed to address Defendants' argument about these statements in his opposition brief. So the court rules that none of the final three statements are subject to discovery (doc. 56).

But the court will allow discovery on the phrase "Moore was actually banned from the Gadsden Mall . . ." as part of the larger, juxtaposed statement that the court previously ruled could go forward:





Doc. 47, Ex. A.

Moore makes the phrase "Moore was actually banned from the Gadsden Mall" an integral part of his juxtaposition claim:

> [Defendants SMP and Waterfront] had the articles before them from which they extracted the four quotations and could tell that not one of them supported the proposition that Judge Moore 'was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.' The deceitful construction of the ad, juxtaposing statements from Al.com and *New Yorker* articles <u>out of context</u> against the dubious 'mall ban' claim constitutes deliberate misrepresentation. . . .
>
> **There were no prior reports that Roy Moore was actually banned from the mall for soliciting sex from young girls at the mall, so the Defendants cannot rely on 'prior reports.'** Simply perverting highly contested prior reports which did not include the narrative propagated by the Defendants should not shield the Defendants from liability.

Doc. 47, ¶¶74-75. Defendants may be correct that Moore could not prove actual malice for mentioning a mall ban if Defendants had stopped there. *See* Part I at 4-12 (outlining public reports about a mall ban). But Defendants tied the alleged ban to Moore asking a 14-year-old Santa's Helper (and others) to have sex. In that context, Moore has sufficiently pleaded actual malice about a mall ban.

* * *

In sum, Moore has sufficiently pleaded actual malice for this portion of the shopping mall ad: "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls. One he approached was 14 and working as Santa's helper." So Moore is entitled to discovery about that statement. Moore has not sufficiently pleaded actual malice for any other statement in the shopping mall ad.

### C. Digital Ad (¶¶ 76-78)

In Part I, the court dismissed Moore's claims about the digital ad for failure to sufficiently plead actual malice. *See* Part I at 34-40. Moore has repleaded the same claims about the digital ad, with these bases for actual malice:

- The threat of exposing or doxing voters;

- Use of the term "child predator" without sufficient supporting evidence; and,

- The depiction of "a young black preteen aged child," even though Moore's accusers were "teenage white girls."

Doc. 47, ¶¶ 76-78. The court rejected the first two bases for actual malice in Part I, *see* Part I at 38-40, and adopts that portion of the Part I opinion to find that neither bases would establish actual malice in Moore's amended complaint.[3]

That leaves Moore's new argument—*i.e.*, that Defendants put a picture of a "young black girl seemingly under the age of 10" in the ad "to imply that Roy Moore has, or would prey on prepubescent black girls." Doc. 47, ¶37. Moore pleads that no published reports support a statement that Moore sought sex from prepubescent black children, nor have Defendants cited any. So if the digital ad stated or implied that Moore "has or would prey on prepubescent black girls," Moore might be able to show Defendants were reckless in publishing the ad. But that's a big 'if'.

---

[3] Moore admits in his amended complaint that "legally Corfman and Nelson would be considered 'children'" (doc. 47, ¶40), an admission that dooms any argument that the use of the term "child predator" was not supported by media reports when Defendants released the digital ad.

Defendants argue that no reasonable viewer would understand the following to say or imply that "Moore molested the specific girl who appeared in the ad":










Doc. 52 at 20. Rather, Defendants contend that "the ad sought to impress on voters the message that would be sent to Alabama's children if Moore was elected to statewide office"—*i.e.* "that protecting children is not one of the electorate's political priorities." *Id.*

Under Alabama law, it's up to the court to decide whether the digital ad implied or conveyed "that Roy Moore has, or would prey on prepubescent black girls." Doc. 47, ¶37; *see Kelley v. Arrington*, 624 So. 2d 546, 548 (Ala. 1993) ("Whether a communication is reasonably capable of a defamatory meaning is a question of law."). The court must find the meaning that "[viewers] of common and reasonable understanding would ascribe to it." *Id.* If the court decides that "the communication is not reasonably capable of a defamatory meaning, there is no issue of fact," and the court must dismiss Moore's claim. *Id.*

The court finds that viewers of reasonable and common understanding who watch the digital ad would not come away with the message that Moore "has or would prey on prepubescent black girls." Doc. 47, ¶37. Nothing in the ad focuses on the pictured child's race or the race of Moore's accusers. For the brief moments that the girl appears on screen, the message is that the public will know whether the viewer voted. That message has nothing to do with the race of the child in the photo.

Tellingly, Moore did not view the ad with racial lenses at first either. In his original complaint, Moore simply alleged that "the ad pictures a young girl who could not have been more than 10 years old." Doc. 1 ¶ 32. Moore never used the words "prepubescent" or "black" in his original complaint. *See* Doc. 1. He added them only after the court rejected his original actual malice arguments for the digital

ad (doc. 45 at 38-39) and mentioned the diagnostic definition of "pedophilia" when discussing the Priorities USA press release (*id.* at 31).

Because the digital ad is not reasonably capable of conveying the meaning that Moore gives it, the court needn't determine whether Moore sufficiently pleaded that the message was defamatory or that Defendants acted with actual malice. So the court will dismiss all counts related to the digital ad.

### D. Guy Cecil statements (¶¶ 79-80)

In Part I, the court dismissed Moore's claims about four tweets from Guy Cecil for lack of personal jurisdiction. *See* Part I at 17-21. The court then dismissed Moore's claim about the Priorities USA press release (written by Cecil) for failure to sufficiently plead actual malice. *Id.* at 21-23. Moore raises the same claims about the same tweets and press release in his amended complaint.

#### 1. Four Tweets

In his amended complaint, Moore reiterates his previous argument that the court has personal jurisdiction over Cecil's tweets because the election was in Alabama and Moore suffered harm in Alabama. Doc. 47, ¶ 55. But the court already rejected these arguments in Part I, *see* Part I at 17-21, and Moore pleads no new facts that would show Cecil aimed his tweets at Alabama. So the court adopts its previous reasoning that (a) the court lacks personal jurisdiction over the four tweets, *id.*, and (b) declines to exercise pendent jurisdiction over the tweets. *Id.* at 23-25.

### 2.  Priorities USA Press Release

In his amended complaint, Moore pleads these bases for actual malice about the December 12 press release:

- Cecil called Moore a "pedophile," which implies that Moore is sexually attracted to "prepubescent little girls (in some instances black girls)," even though Cecil knew that Moore's youngest accusers were "post pubescent white women";[4]

- Cecil could not support Corfman and Nelson's allegations that Moore assaulted them when they were teenagers; and,

- Priorities USA and SMP deceived Alabama voters about their identities until after Doug Jones won the special election.

Doc. 47, ¶79. The court rejected the second and third arguments in Part I, *see* Part I at 31-33, and Moore pleads no new facts that change the court's analysis. So the court adopts its previous opinion, *id.*, and finds that Moore fails to sufficiently plead actual malice for the same reasons in his amended complaint.

That leaves Moore's argument that Cecil acted with actual malice when he called Moore a "pedophile." And this argument boils down to how you define the word "pedophile."

In his amended complaint, Moore alleges that "pedophile" or "pedophilia" means "a mental disorder, not simply a sexual act, which involves prepubescent

---

[4] The press release does not mention race, nor does it include pictures of children of any race. So Moore's comments about race are irrelevant to showing actual malice for the press release.

children under the age of thirteen."[5] Doc. 47, ¶ 40 n.7. Moore alleges that Cecil knew that Moore's youngest accuser was 14 years old, so Cecil acted with actual malice when he called Moore a "pedophile." Doc. 47, ¶ 79.

But Cecil says that he used pedophile as "laypeople" understand it: "someone who is sexually attracted to children" of any age. Doc. 52 at 24 (quoting Black's Law Dictionary); *see also Pedophile*, Oxford English Dictionary (3rd ed. 2005) ("an adult who is sexually attracted to children"). Moore admits in his amended complaint that "legally Corfman and Nelson would be considered 'children,'" Doc. 47, ¶ 40; so Cecil argues that calling Moore an adult "who is sexually attracted to children" was supported by the published Corfman (14) and Nelson (16) allegations.

This war of words leads to two questions. First, could a reasonable reader interpret Cecil's use of the word "pedophile" to suggest that Moore suffered from a mental disorder that made him sexually attracted to prepubescent girls? If so, did Cecil act with actual malice when he called Moore a "pedophile?"

1. <u>Common Understanding</u>: As discussed with the digital ad, Alabama law requires the court to find the meaning of "pedophile" that "readers of common and reasonable understanding would ascribe to it." *Kelley*, 624 So. 2d at 548. If the court decides that "the communication is not reasonably capable of a defamatory meaning,

---

[5] Moore gives pedophilia its diagnostic meaning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 302.2 (5th ed. 2013) (stating that "pedophilic disorder" requires a person 16 years or older to have sexual fantasies about, urges for, or behaviors with a prepubescent child or children).

there is no issue of fact[.]" *Id.* But if the court finds that the press release "is reasonably capable of a defamatory meaning," then there is an issue of fact and dismissal is not proper. *Finebaum*, 854 So. 2d at 1128.

Here is the full press release:

### Priorities USA Congratulates Senator-elect Doug Jones

**Washington, DC** — *Priorities USA Chairman Guy Cecil released the following statement congratulating Doug Jones on his victory in the Alabama special election for US Senate:*

"Doug Jones has spent decades fighting for Alabamians and will now have the opportunity to continue to do so in the United States Senate. The people of Alabama sent a message tonight by putting country and state ahead of partisan politics and all Americans will now benefit from their decision. Unfortunately, the same cannot be said for Donald Trump and national Republicans, who supported a child molester who wants an America where being gay is a criminal offense, women shouldn't run for office, and African Americans are discriminated against at the ballot box, all in service to tax cuts for the rich. This is a stain on the Republican Party that will last forever. We will make sure of it."

"Priorities USA was proud to stand up for Doug and against a pedophile by partnering with Senate Majority PAC to run a $1.5 million digital campaign focused on persuading and mobilizing Alabama's voters, particularly those in the African American community, beginning even before the news broke about allegations against Roy Moore."

Like Cecil's tweets, Moore was not the primary target of the press release; the Republican Party was. When Cecil took his shots at Moore, he never discussed the age of Moore's accusers, nor did he add any context that made the reader assume that Moore suffered from a disorder that made him sexually attracted to prepubescent

children. Instead, Cecil matter-of-factly called Moore a "child molester" and a "pedophile" because he assumed that the reader was familiar with the allegations.

Based on the context, the court finds that readers of the press release most likely understood Cecil's use of the word "pedophile" to refer to the allegations that Moore sexually assaulted a 14-year-old and a 16-year old. Cecil was not the first to use the word this way. By election night, media pundits had used the term multiple times to describe the allegations. For example, Republican Strategist Steve Schmidt told an MSNBC host: "What we're talking about here, Chris, is a 14-year-old little girl. Roy Moore is a pedophile. He's a child molester." Brandon Carter, *GOP strategist: "There needs to be a repudiation of Roy Moore by Republicans*, the Hill, Nov. 10, 2017 (10:48pm). And Jessica Tarlov wrote this for Fox News: "The Washington Post revealed Thursday that Moore has been accused of sexual misconduct by four women, including one who was just 14 when the 32-year-old Moore allegedly assaulted her. That's the definition of pedophilia for those who are on the fence." Jessica Tarlov, *Democrats, stay out of the Senate race in Alabama if you want to win, send cash instead*, FoxNews.com, Nov. 13, 2017.

That said, Cecil's press release was at least "reasonably capable" of being read to suggest that Moore suffers from a disorder that makes him want to have sex with prepubescent girls. *Kelley*, 624 So. 2d at 548. Webster's dictionary, for example, defines "pedophilia" as "sexual perversion in which children are the preferred sexual

object, *specifically*: a psychiatric disorder in which an adult has sexual fantasies about or engages in sexual acts with a prepubescent child." *Pedophilia*, Merriam-Webster.com Dictionary (last checked March 29, 2021). And the Washington Post—the newspaper that published the Corfman allegation—had chastised persons for using the clinical terms "pedophile" and "pedophilia" to describe Moore. *See* Rachel Hope Cleves & Nicholas L. Syrett, *Opinion: Roy Moore is not a pedophile*, Washington Post, Nov. 19, 2017 (5:58pm).

Because the court finds that Cecil's use of the word "pedophile" in the press release could reasonably be read to suggest that Moore was sexually attracted to, or had sexually assaulted, prepubescent girls, the court finds that Moore has sufficiently pleaded defamation under Alabama law. So the court moves on to actual malice.

2. <u>Actual Malice</u>: The Alabama Supreme Court has held that

> [w]hen a public official or public figure alleges a defamatory meaning, a defamatory implication, or a defamatory innuendo, '[n]ot only must the plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply or were reckless toward the implications.'

*Finebaum*, 854 So. 2d at 1124-25 (quoting *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318–19 (7th Cir.1988)). Here, that means that once Moore shows that someone could read the word "pedophile" to mean that Moore suffered from a disorder that made him sexually attracted to prepubescent girls, Moore must prove

two things to establish actual malice: (1) Cecil knew that Moore had not been accused of sexually assaulting a prepubescent girl, or was reckless for not knowing, and, (2) Cecil intended that the reader believe Moore had been accused of sexually assaulting a prepubescent girl, or Cecil knew that a reader might read the word "pedophile" that way and was reckless with the implication. This case turns on the second requirement, as Cecil does not contend that someone alleged Moore approached or assaulted a prepubescent girl.

Five Circuit Courts of Appeal have adopted the requirement that, when parties disagree about a word's meaning, a public figure Plaintiff must prove the Defendant intended the reader to ascribe the defamatory meaning. *See Manzari v. Assoc. Newspapers LTD.*, 830 F.3d 881 (9th Cir. 2016); *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3rd Cir. 2013); *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528–29 (6th Cir. 2007); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002); *Saenz*, 841 F.2d at 1317–18. The Third Circuit has aptly explained why:

> The Supreme Court has explained that in the libel context, '[m]alice [has been] defined in numerous ways, but in general depend[s] upon a showing that the defendant acted with improper motive.' *Herbert v. Lando*, 441 U.S. 153, 163–64, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Showing motive 'hinge[s] upon the intent or purpose with which the publication was made.' *Id.* at 164, 99 S.Ct. 1635. These statements show that the intent of the publisher is linked to determining if that publisher had the actual malice necessary to support a libel claim. *Cf. Harte–Hanks*, 491 U.S. at 688, 109 S. Ct. 2678 (explaining that actual malice involves a subjective inquiry into a defendant's mental state rather than just an objective determination of a statement's truth); *Saenz*, 841 F.2d at 1317 ('Proof of actual malice depends upon the

defendant's actual state of mind.' (citing *Herbert*, 441 U.S. at 160, 99 S.Ct. 1635)).

The need to show intent necessarily means that the actual-malice standard will have different elements of proof in ordinary defamation cases than in defamation-by-implication cases. In ordinary defamation cases, intent to defame can be established solely through knowledge that the statement was false. After all, if the defendants knew that the statement made was false and defamatory, then they must have intended to defame. And while the statement itself rarely indicates whether its publisher knew it was false, the statement does show that its publisher knew it was defamatory because it can have only defamatory meanings. So all a plaintiff needs to demonstrate in ordinary defamation cases to establish intent to defame is that the defendants knew their statement was false.

But in defamation-by-implication cases, showing known falsity alone is inadequate to establish an intent to defame. In these cases, we may no longer presume with certainty that the defendants knew they were making a defamatory statement because the statement has defamatory and nondefamatory meanings. Therefore, in such cases, plaintiffs must show something that establishes defendants' intent to communicate the defamatory meaning.

*Kendall*, 716 F.3d at 90-91. Based on this rationale, these circuit courts (and the Alabama Supreme Court) have held that to establish actual malice when a word has more than one meaning, a public figure must show "that the defendant either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it." *Id.*

Moore does not plead in his complaint, not even in a conclusory manner, that Cecil intended the December 12 press release to convey a clinical diagnosis of pedophilia—*i.e.*, that Moore suffered from a disorder that made him sexually

attracted to prepubescent girls. Nor did Moore plead facts that would show Cecil knew that a reader might understand his use of the word "pedophile" suggested that someone accused Moore of sexually assaulting a prepubescent girl and recklessly issued the press release anyway. Instead, Moore pleaded this:

> The purpose of Cecil's tweets and press release is apparent; the Defendants were supporting Doug Jones against Roy Moore and they wished to damage Roy Moore's reputation to such an extent to deter support of Roy Moore and deter voters from choosing a 'pedophile' as a Senator. This was the end goal of all defamatory statements made by Cecil[.]

Doc. 47, ¶ 56. But proving that Cecil's intent was to smear Moore so that Moore would lose the election does not prove actual malice. Moore must prove that Cecil intended the reader believe that Moore suffered from a disorder that made him assault prepubescent girls because that is the false defamatory fact that Moore alleged had no support in published reports. Moore has not pleaded those facts, so he cannot overcome Cecil's reliance on published reports of the Corfman and Nelson allegations. *See Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) (holding that actual malice cannot be proved where "the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied").

* * *

Because Moore fails to plead facts that would prove actual malice, the court must dismiss Count 1 as it pertains to the December 12 press release.

**COUNT III: Intentional Infliction of Emotional Distress / Outrage**

In Part I, the court dismissed Moore's IIED claim without prejudice because Moore admitted that he hadn't pleaded the distress element. *See* Part I at 50. Moore has re-pleaded his IIED claim, including the distress element. Doc. 47, ¶¶ 86-90.

Because IIED requires actual malice, *see Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988), the only statement that could support Moore's IIED claim is this portion of the Shopping Mall ad: "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls. One he approached was 14 and working as Santa's helper."  To prove IIED (also known as the tort of outrage), Moore must show that Defendants' release of the shopping mall ad (1) was "intentional or reckless"; (2) was "extreme and outrageous"; and, (3) caused Moore "emotional distress so severe that no reasonable person could be expected to endure it." *Wilson v. Univ. of Alabama Health Services Found., P.C.*, 266 So. 2d 674, 676 (Ala. 2017). Defendants argue that Moore deficiently pleaded the second and third elements, but the court will limit its analysis to the second—*i.e.*, whether Defendants' conduct was "extreme and outrageous."

Under Alabama law, extreme means *extreme*. Moore must show that the shopping mall ad was "so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.* Here are some examples of conduct that the Alabama Supreme Court, and the

Eleventh Circuit interpreting the Alabama Supreme Court, have found ***not*** extreme

enough to support an IIED claim:

- A physician hit a nurse with a surgical drape that exposed her to potential HIV infection and said, "I don't give a damn," *see Grantham v. Vanderyl*, 802 So. 2d 1077 (Ala. 2001);

- A hospital wrongly accused a nurse of having a drug problem, leading to an investigation by the Nursing Board, *see Potts v. Hayes*, 771 So. 2d 462 (Ala. 2000);

- A supervisor asked a female employee to have dinner with him, to kiss him, and to have an affair with him, *see McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986); and,

- A coworker grabbed the Plaintiff's head and (while clothed) made pelvic thrusts into the Plaintiff's face. *See Stancombe v. New Process Steel, LP*, 652 Fed. App'x. 729 (11th Cir. 2016).

In fact, the Alabama Supreme Court has recognized a viable IIED claim in only three

circumstances, none of which apply here: (1) wrongful conduct in the family-burial

context; (2) barbaric methods used to coerce an insurance settlement; and, (3)

egregious sexual misconduct. *See Wilson*, 266 So. 2d at 677. That said, the Alabama

Supreme Court has said that a viable claim could fall outside these categories. *Id.*

So the question is this: Is running a political ad that wrongly suggested that

Moore was banned from a public mall for asking a 14-year-old girl(s) to have sex

"so extreme in degree as to go beyond all possible bounds of decency and be

regarded as atrocious and utterly intolerable in a civilized society?" *Id.* at 676. The

Alabama court has held that asking an adult subordinate to have sex is not so

outrageous, *McIsaac, supra*, so being falsely accused of doing so would also not be too outrageous. But Moore is correct that society considers an adult asking a 14-year-old for sex is much more intolerable (and, if successful, criminal).

Yet being falsely accused of asking a child for sex in a political ad is far less outrageous than the sex-related conduct the Alabama Supreme Court has found viable—*i.e.*, a family doctor giving a 13-year-old boy opiate prescriptions in exchange for performing sexual acts, a practice that lasted 7-plus years and led to the boy becoming addicted to opiates. *See O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011). And Moore has pointed to no cases in which the Alabama Supreme Court said that a false accusation in a political ad could support a viable IIED claim.

Federalism dictates that this court not create a fourth category of state-law IIED claims here. Perhaps one day Alabama courts will recognize that false accusations in a political ad are "so atrocious and utterly intolerable in a civilized society" that they can constitute a viable state-law IIED claim. But this federal court will not impose that decision on the state court.

And, federalism aside, the court would reach the same result because (for better or worse) this court cannot say that society finds political ads that twist reported facts to defame a candidate "so atrocious and utterly intolerable" that they "go beyond all possible bounds of decency." *Wilson*, 266 So. 2d at 676.

So the court will grant Defendants' motion to dismiss Count 3.

## NEW CLAIMS: Are Counts IV-V Proper?

Moore pleads two new claims in his amended complaint: Count 4 alleges voter intimidation under the federal Voting Rights Act (doc. 47, ¶ 91-100) and Count 5 alleges a state-law claim of invasion of privacy—false light (doc. 47, ¶ 101-06). Defendants argue that the court should strike both counts because Moore did not get Defendants' written consent or the court's leave to add new counts, as required by Rule 15(a)(2).

Rule 15(a)(2) says that "a party may amend his pleading only with the opposing party's written consent or the court's leave." In its September 18, 2020 order, the court said that "Moore may amend his complaint by **October 16, 2020.**" Doc. 46. Defendants are correct that the court's *intent* was to allow Moore to cure his deficient pleadings, not to add new claims. But the court did not put that limitation in its order. The court merely said Moore "may amend his complaint," which means that, under Rule 15(a)(2), Moore had the court's leave to amend by re-pleading and adding claims. So the court will consider Counts 4-5 here—and will be more precise in future orders.

## COUNT IV: Voting Rights Act

The Voting Rights Act ("VRA") says that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52

U.S.C. § 10307(b). Moore alleges that the following portion of the digital ad intimidated voters in violation of § 10307(b):

 

 

 

Moore alleges that "the intent of the ad was to target Alabama voters to seek votes for Jones through intimidation, misinformation, and threats[;]" by "threaten[ing] to expose or dox Alabama voters who chose the wrong candidate." Doc. 47, ¶ 92.

Moore does not, however, allege how the intimidation tactic injured him, which implicates standing. Because standing is a threshold, jurisdictional issue, *see*

*Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020), the court must start there. And the court is looking for three things: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id.*

1. Injury as a candidate: Moore does not allege in his amended complaint that the ad injured him as a candidate. While Moore alleges that Defendants' "campaign intimidated, threatened, and/or attempted to intimate or coerce the voters of Alabama from exercising their right to cast a ballot in secrecy," Doc. 47, ¶ 99, Moore does not allege that any person failed to vote because the ad intimidated him, much less the 21,925 votes it would take to change the election result.[6]

Nor does the VRA give candidates standing. Section 10302(a) says that "the Attorney General or an aggrieved person" can institute a proceeding to enforce § 10307. But the "aggrieved person" under § 10307(b) is the voter who suffers the intimidation, threat, or coercion, not the candidate favored by the aggrieved voter. *See Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) ("We conclude that an unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act."). So if Moore has standing, it comes from being an aggrieved voter.

---

[6] The election results are available at http://www.sos.alabama.gov/alabama-votes/voter/election-night-official-results.

2. <u>Injury as a voter</u>: Moore does not allege in his complaint that he failed to vote because the ad intimidated him. When Defendants challenged Moore's standing for failing to plead injury, Moore failed to tackle the standing issue head-on. In fact, this is the only passage about harm in Moore's argument on the VRA claim: "The false accusations levied against Plaintiff Moore are now forever archived on the internet for further viewing and dissemination. This harm suffered by Plaintiff Moore is a direct result of the Defendants false and intimidating ads targeted at the voters of this State." Doc. 56 at 18. But Moore's talk of "false accusations" makes no sense as a standing argument for two reasons: (1) Moore alleged that the digital ad was removed from the internet in December 2017 (doc. 47, ¶¶ 44, 95-96) and, (2) this is a Voting Rights claim, so the harm must be tied to voters not voting. Or, as Defendants put it in their reply: "this argument confuses Moore's Section 11(b) [of the Voting Rights Act] claim with his tort claims." Doc. 57 at 15.

So the court asked Moore to specify his injury at the motion hearing. Moore argued vote dilution:

> It is well-established in the law in all the States that diluting his vote by virtue of the fact that people were kept away, that diluted his vote, made it less important, and it affected and injured him. There's a number of case authority on that. And we did allege the injury. It is not Rule 9 notice pleading. We don't have to have everything in the complaint. We said he was injured, and that is the primary injury, the dilution of his vote.

Of course, this means Moore voted in the election, so he was not personally injured by the intimidation.

Plus, Moore does not allege vote dilution in his amended complaint. Nor would vote dilution provide Moore with a particularized injury, if he alleged it. Let's assume the digital ad intimidated 100 people into staying home. That result did not dilute the weight of Moore's vote; Moore's vote carried the same weight as every other vote cast on December 12, 2017. That means that Moore's dilution complaint is a "generalized grievance [that] is undifferentiated and common to all members of the public." *Wood*, 981 F.3d at 1314. In fact, Moore affirmed at the hearing that he believed "every registered Alabama voter would have standing to bring this suit, even if [his] candidate won."

The Eleventh Circuit recently held that "vote dilution in this context is a paradigmatic generalized grievance that cannot support standing." *Wood,* 981 F.3d at 1314-15. The court must follow this holding and find that Moore has failed articulate a theory of standing for his voter intimidation claim.

3. <u>Redressability</u>: Moore's failure to plead an injury in fact is enough to divest the court of jurisdiction over his VRA claim. But Moore also fails to ask for a remedy that can redress his harm. Moore does not ask for the digital ad to be taken down (it already has been, *see* doc. 47, ¶¶ 44, 95-96), nor does Moore ask the court to overturn the 2017 election results (nor could it). Moore just asks for money damages. Doc.

47, ¶ 107. But the statutory remedy for a violation of §10307(b) is a $5000 civil fine, imprisonment, or both. 52 U.S.C. § 10308. The VRA does not provide compensatory and punitive damages. *See Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (stating in a voter intimidation case that "[t]he [VRA], however, does not specify any statutory damage remedies. No case has been cited nor have we found one in which damages were recovered.").

\* \* \*

In short, Moore fails two of the three prerequisites for standing: (1) an injury in fact and (2) redressability. So the court dismisses Count 4 for lack of standing.

## Count V: Invasion of Privacy—False Light

Moore's final count alleges a state-law invasion of privacy (false light) claim. Doc. 47, ¶ 101-06. A false light claim requires the same proof of actual malice that defamation claims required. *See Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 496 n.1 (Ala. 2004). So for the reasons stated in Counts 1-2, the court dismisses all claims for false light except Moore's claim that the following portion of the shopping mall ad put him in a false light: "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls. One he approached was 14 and working as Santa's helper." Defendants concede that Moore's false light claim on this portion of the shopping mall ad should not be dismissed. Doc. 52 at 35.

**Dismissal with or without prejudice**

As explained above, these claims are due to be dismissed:

- Counts 1, 2, 5: all claims about the digital ad;
- Counts 1, 2, 5: all claims about Cecil's tweets and press release;
- Count 3; and,
- Count 4.

As for the shopping mall ad, the court limits Counts 1, 2, and 5 to the following portion of the ad: "Moore was actually banned from the Gadsden Mall … for soliciting sex from young girls. One he approached was 14 and working as Santa's helper." Any claim arising from other portions of the ad are also dismissed.

The court will dismiss these claims with prejudice for three reasons. First, the court gave Moore a chance to cure the deficiencies in his original complaint, along with a 54-page opinion explaining the court's rationale for its original ruling. The Eleventh Circuit has said that, in cases requiring actual malice, "the plaintiff should have *the* opportunity to amend his complaint to plead further facts," *Michel*, 816 F.3d at 706 (emphasis added), not multiple or unlimited opportunities.

Second, the case needs to move forward. The court stayed discovery pending its ruling on the motion to dismiss Moore's amended complaint out of respect for the Eleventh Circuit's statement that:

> Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the

absence of the actual malice standard altogether. Thus, a public figure bringing a defamation suit must plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly*.

*Id.* at 702. Moore's counsel commented on the resulting discovery delay multiple times at the motion hearing. Counsel is right; the case needs to move to discovery. And the only way to do that while respecting the Circuit's admonition in *Michel* is to fully dismiss those Defendants against whom there is no pending claim.

Third, the court finds that a third bite at the apple would be futile. As the court said in Part I, proving that "Defendants Cecil, Priorities USA, or Bully Pulpit had a relationship with, or connection to, Corfman or Nelson in 2017" or that "those Defendants had 'a high degree of awareness of probably falsity' of Corfman or Nelson's allegations in 2017 may well be futile." Part I at 52 (quoting *Gertz*, 418 U.S. at 332). But the court gave Moore the chance to plead those facts. He has not, which suggests that he cannot. So another round of re-pleading defamation and false light claims against those Defendants (*i.e.*, Counts 1,2,5) would be futile.

As for IIED (Count 3), pleading different facts would not change the fact that Alabama courts have not recognized that false accusations in a political ad are "so atrocious and utterly intolerable in a civilized society" that they can constitute a viable state-law IIED claim. So re-pleading Count 3 would be futile.

As for the Voting Rights Act claim (Count 4), it is due to be dismissed without prejudice for lack of jurisdiction. But the court finds that it would be futile for Moore

to replead the claim because he cannot overcome two standing problems: (a) Moore voted, so the alleged voter intimidation did not injure him, and (b) the 2017 election cannot be overturned, so the court cannot redress Moore's vote-related grievance.

## CONCLUSION

This chart summarizes the court's ruling on the motion to dismiss (doc. 52):

| Count | Defendants | Statement | Ruling on Motion |
|---|---|---|---|
| Count 1, ¶74 | SMP, Waterfront Strategies | TV ad | Motion denied |
| Count 1, ¶76 | Priorities USA, Bully Pulpit | Digital ad | Dismissed w/ Prejudice (deficient pleading) |
| Count 1, ¶79 | Cecil | Tweets | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 1, ¶79 | Cecil | Press Release | Dismissed w/ Prejudice (deficient pleading) |
| Count 2 | SMP, Waterfront Strategies | TV ad | Motion denied |
| Count 2 | SMP, Waterfront Strategies | Digital ad | Dismissed w/ Prejudice (deficient pleading) |
| Count 3 | All Defendants | TV ad, digital ad, and press release | Dismissed w/ Prejudice (deficient pleading) |
| Count 3 | Cecil | Tweets | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 4 | Priorities USA, Bully Pulpit | Digital ad | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 5 | SMP, Waterfront Strategies | TV ad | Motion denied |
| Count 5 | Priorities USA, Bully Pulpit | Digital ad | Dismissed w/ Prejudice (deficient pleading) |
| Count 5 | Cecil | Tweets | Dismissed w/out Prejudice (lack of jurisdiction) |
| Count 5 | Cecil | Press Release | Dismissed w/ Prejudice (deficient pleading) |

The court lifts its stay on discovery, which will proceed on Counts 1, 2, and 5 limited to the following portion of the shopping mall ad: "Moore was actually banned from the Gadsden Mall … for soliciting sex from young girls. One he approached was 14 and working as Santa's helper." The parties must file a Rule 26 report no later than **May 7, 2021.** The contents of the report are governed by the court's initial order (doc. 26).

      **DONE** on March 31, 2021.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE