FILED
2022 Aug-10  PM 06:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

ROY S. MOORE,

                 Plaintiff,

    v.

SENATE MAJORITY PAC (SMP)
and WATERFRONT STRATEGIES,

                 Defendants.

Civil Action

Case No. 4:19-cv-01855-CLM

## DEFENDANTS' RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW AT CONCLUSION OF PLAINTIFF'S CASE-IN-CHIEF

# TABLE OF CONTENTS

**Page**

I.      Introduction..................................................................................1

II.     Trial Evidence..............................................................................1

        A.      News Reports Prior to the TV Ad .....................................1

        B.      The TV Ad.........................................................................8

        C.      Moore's Other Trial Evidence...........................................11

III.    Legal Standard ...........................................................................12

IV.     Argument ....................................................................................14

        A.      The jury cannot issue a verdict against Waterfront because
                Moore offered no evidence about Waterfront's involvement in
                the TV Ad. ......................................................................14

        B.      Moore's claims fail because he has not presented evidence
                enabling a finding that he has proven actual malice by clear and
                convincing evidence as to either Defendant.......................16

                1.      The jury cannot conclude Moore has proven actual
                        malice by clear and convincing evidence as to
                        Waterfront. ..........................................................17

                2.      The jury cannot conclude Moore has proven actual
                        malice by clear and convincing evidence as to SMP.............18

                        a.      The jury cannot conclude Moore has proven by
                                clear and convincing evidence that SMP intended
                                the TV Ad to suggest Moore was soliciting sex
                                from Miller..................................................18

                        b.      The jury cannot conclude that Moore has proven
                                by clear and convincing evidence that SMP's
                                belief that Moore was soliciting sex from Miller
                                was unreasonable. ......................................21

V.      Conclusion ................................................................................23

## I.      Introduction

Plaintiff Roy Moore's trial case in chief did not contain sufficient evidence to enable a jury to find in his favor on either of his claims. As an initial matter, Moore offered *no* evidence about Defendant Waterfront Strategies' involvement in the TV Ad whatsoever. In the absence of any such evidence, the jury could not reasonably render a verdict against Waterfront. Separately, Moore did not offer evidence that would enable the jury to find, by clear and convincing evidence, that either Defendant (1) intended for the TV Ad to suggest Moore was soliciting sex from Wendy Miller when he approached her at the mall when she was 14 years old, or (2) acted with actual malice. As a result, Defendants are entitled to judgment as a matter of law.

## II.     Trial Evidence

### A.      News Reports Prior to the TV Ad

Moore was the Republican nominee in Alabama's December 17, 2017 special election to fill its vacant seat in the U.S. Senate. Aug. 8, 2017 Trial Tr. ("1 Tr.") 71:5.[1] On November 9, 2017, the *Washington Post* reported the accounts of four women who asserted Moore had sought relationships with them when he was in his thirties and they were in their teens. Joint Exhibit ("JX") 2. Leigh Corfman accused

---

[1] Trial transcript citations in this motion correspond to the "rough" versions circulated by the court reporter at the end of each trial day. Pursuant to the Court's prior instructions, Defendants will not file the rough transcripts on the docket.

Moore of sexually assaulting her when she was 14 and he was 32. *Id.* at 2, 5–6. She stated that, after offering to sit with Corfman while her mother attending a custody hearing, Moore asked her for her phone number. *Id.* at 2. Moore picked her up a few days later, "drove her about 30 minutes to the woods, told her how pretty she was and kissed her." *Id.* On a second visit, Corfman said, Moore "took off her shirt and pants and removed his clothes," touched her over her bra and underpants," and "guided her hand to touch him over his underwear." *Id.*

The *Post* also reported the accounts of Wendy Miller, Debbie Wesson Gibson, and Gloria Thacker Deason. Miller said that she "was 14 and working as a Santa's helper at the Gadsden Mall when Moore first approached her" and "told her she looked pretty." *Id.* at 2, 9. Two years later, "he began asking her out on dates." *Id.* at 9. Miller told the *Post* that, looking back as an adult, Moore's conduct was "disgusting" to her. *Id.* Gibson told the *Post* that when she was 17, Moore spoke to her high school class and later asked her out on several dates. *Id.* She remembered Moore had a "godlike, almost deity status" as a "hometown boy made good." *Id.* Deason said that she met Moore at the Gadsden Mall and that they dated off and on "for several months" starting when she was an "18-year-old cheerleader" and Moore was 32, and that Moore would buy her alcohol despite her being under the legal drinking age. *Id.* at 2, 7–9.

None of the women cited in the *Post* article "sought out" the authors, and each

was "reluctant to speak publicly but chose to do so after multiple interviews." *Id.* at 4. None of the four women donated to Moore's opponents. *Id.*

In the weeks following the *Post* article, a bevy of articles were published discussing reports by many other individuals that Moore had similarly engaged in inappropriate behavior with other teenage girls when he was in his thirties. What follows is just a sampling of those articles, all of which are in the record.

On November 12, 2017, the *New American Journal* published an article by Glynn Wilson stating that "sources tell me Moore was actually banned from the Gadsden Mall and the YMCA for his inappropriate behavior of soliciting sex from young girls." JX3 at 2. On November 13, the *New Yorker* published an article indicating the author had spoken to "more than a dozen people—including a major political figure in the state—who told me that they had heard, over the years, that Moore had been banned from the mall because he repeatedly badgered teen-age girls." JX4 at 1–2. Greg Legat said he thought Moore's ban from the mall "started around 1979." *Id.* at 2. A current Gadsden police officer said he heard Moore had been "banned" from the mall, and another said Moore had been "run off" from the mall, but perhaps not "legally banned." *Id.* at 3. The *New Yorker* article also repeated Wilson's claim that Moore was banned from the mall for "soliciting sex from young girls." *Id.* at 2.

Also on November 13, Beverly Young Nelson held a press conference where

she stated that when she was 16 years old and Moore was in his thirties, he offered to give Nelson a ride home from her job at a restaurant but instead drove her behind the restaurant, groped her, squeezed her neck and attempted to force her head onto his crotch, and tried to pull her shirt off, at which point Nelson though Moore "was going to rape" her. *E.g.*, JX72 at 1. According to Nelson, he told her that "I am the district attorney of Etowah County, and if you tell anyone about this, no one will believe you." *Id.* In an article discussing Nelson's press conference, the *New York Times* reported that "many" people in Gadsden "shared" a memory that Moore had been "barred from the mall." JX75 at 5.

Also on November 13, *AL.com* published an article asserting Moore's "penchant for flirting with teen girls was 'common knowledge' and 'not a big secret' around Gadsden." JX5 at 1. In the article, Blake Usry said "stories" about Moore flirting with and dating "much younger women and girls" had "been going around this town for 30 years"; "[n]obody could believe they hadn't come out yet"; it was "'sort of frustrating to watch' the public disbelieve the women who have come forward"; and she saw Moore "go and flirt with all the young girls" at the mall. *Id.* at 2. The article repeated Wendy Miller's assertion that Moore approached Miller when she was 14 years old at the Gadsden Mall, told her she was pretty, and then two years later tried to take her out on dates. *Id.* at 2. Jason Nelms, who lived in the Gadsden area at the time, told *AL.com* that he was "told by a mall employee that they

kept watch for an older guy who was known to pick up younger girls," and that man was Moore. *Id.* Greg Legat told *AL.com* that, around 1981, J.D. Thomas, "an off-duty Gadsden police officer," told Legat "to look out" for Moore and to tell the officer if he saw Moore at the mall. *Id.*

Sheryl Porter also told *AL.com* that Moore's "liking and dating young girls was never a secret in Gadsden"; that people "heard it all the time"; that "people at the courthouse know it was a well-known secret"; and that it was "sad how these girls (who accused Moore) are getting hammered and called liars." *Id.* at 3–4. Teresa Jones, who worked at the Etowah County District Attorney's Office with Moore, stated "it was 'common knowledge' that [Moore] pursued teenage girls" and "dated high school girls"; that "we wondered why someone his age would hang out at high school football games and the mall"; and that she was "appalled that these women are being skewered for the truth." *Id.* at 4.

On November 15, the *Post* published an article entitled "Two More Women Describe Unwanted Overtures by Roy Moore at Alabama Mall." JX90. It quoted Gena Richardson, who stated that by 1977 Moore gained "a reputation for pursuing young women at the mall in Gadsden" and that Moore's conduct caused a store manager to tell new hires to "watch out" for Moore. *Id.* at 3. Richardson said that when she was 17 or 18 and worked at the Gadsden Mall, Moore, then 30, approached her, asked her where she went to school and for her phone number, which

Richardson refused, and that a few days later, Moore called Richardson's school to ask her out again. *Id.* Richardson stated that she finally relented after Moore asked her again while at the mall, and that the resulting date ended with Moore giving Richardson an unwanted, forceful kiss that left her scared. *Id.* Kayla McLaughlin, a classmate of Richardson's who also worked at the mall, corroborated Richardson's account and told the *Post* that after Richardson's incident with Moore, McLaughlin would warn Richardson when Moore would come into the store so that Richardson could hide. *Id.* at 3, 7–8. Phyllis Smith, who worked at a different store in the Gadsden Mall, told the *Post* that "teenage girls counseled each other to 'just make yourself scarce when Roy's in here, he's just here to bother you.'" *Id.* at 4, 6–7.

Also on November 15, *AL.com* published an article quoting Kelly Harrison Thorp that when she was 17 and working at Red Lobster, Moore—who was in his early 30s—approached her and asked her out. JX108 at 4. Thorp stated that after she asked Moore "[d]o you know how old I am?" he responded "Yeah. I go out with girls your age all the time." *Id.* Tina Johnson also stated that when she went to see Moore with her mother to handle an issue relating the custody of Johnson's son, Moore told her she was pretty, flirted with her, and groped her. *Id.* at 2–3.

The same day, the *New York Times* published a story in which Karen Lancaster, a retired schoolteacher, stated "I've known for over 20 years that [Moore] was a predator, that he preyed upon girls in the mall," and that this was "common

knowledge." JX120 at 2. The article also stated that Becky Gray claimed Moore "would not leave her alone" when she was working at the Gadsden Mall, and that after she told her manager, Moore was "banned from the mall" as a result. *Id.* at 1–2. Lancaster told the *Times* that, in the late 1980s, Gray told Lancaster about Moore's advances. *Id.* at 2. The article also discussed the claims by Richardson that Moore forcibly kissed her, by Johnson that Moore groped her, and by Thorp that Moore tried to date her when she was 17. *Id.*

On November 16, *ABC News* published a story entitled "Roy Moore Accuser: I Got Him Banned From the Mall," in which Gray accused Moore "of sexually harassing her"; said she reported Moore's behavior to her manager at the Gadsden Mall, who later told Gray "that [Moore] had been banned from the mall"; and stated she had "always said" that Moore was a "pervert." JX100 at 1, 3.

The same day, *AL.com* published an article in which Patti Spradlin stated that "middle school girls knew to avoid" Moore at the mall because he was "creepy and icky" and that they knew not to "make eye contact [with Moore] for fear that would signal something to him." JX102 at 2. Spradlin, a childhood friend of Leigh Corfman, also said "she ha[d] known since childhood that something happened between Corfman and Moore." *Id.*

On November 18, 2017, the *New York Times* published in article quoting Glenn Day, who "managed two stores at the mall in those years," who "recalled that

Mr. Moore had such a reputation for approaching young women that the mall guard asked him to let security know whenever he saw Mr. Moore there." JX232 at 4.

On November 22, former Gadsden Police Officer Faye Gary publicly stated that "[w]e were advised that [Moore] was being suspended from the mall because he would hang around the young girls that worked in the stores and, you know, really got into a place where they say [Moore] was harassing." JX265 at 1.

### B.    The TV Ad

The "TV Ad" at issue in this case was published by Highway 31, a political action committee created to support Doug Jones in Alabama's 2017 special election for the U.S. Senate. 1 Tr. 51:25–52:2. The TV Ad ran between November 26 and December 6, 2017. *Id.* at 88:20–23, 89:9–12. It was developed by personnel at SMP and was ultimately approved by SMP's President, J.B. Poersch. *Id.* at 97:6–8. Before the TV Ad was aired, SMP's research team vetted its contents. *Id.* at 62:25–63:4, 72:19–20; 108:5–17. In performing that vetting, the research team created a document citing significant factual support for each of the Ad's assertions. JX162. The articles cited in that backup document went well beyond those expressly identified in the Ad. *Id.*

As described above, before the TV Ad ran, there were widespread reports about Moore's inappropriate behavior at the mall. As a result, the Ad's purpose was simply "to take stories that were in the public domain, share them with the general

public and have them make a decision on whether or not they wanted to support []
Roy Moore." 1 Tr. 65:11–14. In other words, rather than making any new assertions
that had not yet been made publicly, the Ad was meant to "retell[] stories that were
already in the public domain." *Id.* at 68:11–12.

In accordance with that approach, the TV Ad began with the statement "What
do people who know Roy Moore say?" and then offered five quotations from the
articles discussed above. JX1. At issue in this case are the first two quotations that
followed. The first quotation stated: "Moore was actually banned from the Gadsden
Mall . . . for soliciting sex from young girls," quoting and attributing the quote to the
*New American Journal* article discussed above. *Id.* The second quotation stated:
"One he approached 'was 14 and working as Santa's helper,'" quoting and
attributing the quote to the November 13 *AL.com* article's discussion of Wendy
Miller. *Id.*

No one at SMP or Highway 31 intended the TV Ad to suggest that Moore was
*soliciting sex* from Wendy Miller when he approached her at the mall when she was
14 years old. Indeed, the only trial witnesses with personal knowledge of SMP's or
Highway 31's intent—SMP President J.B. Poersch and Highway 31 Spokesperson
Adam Muhlendorf—testified repeatedly that their intent was *not* for the Ad to make
that assertion. 1 Tr. 65:5–66:2 (Muhlendorf rejecting the suggesting that one should
"read those two [quotations] together and think that it makes one statement"); *id.* at

104:3–10 (Poersch: "[Tha]t wasn't the intention of the ad, sir, no."); *id.* at 106:5–7 ("Q. . . . [Y]ou didn't intend for the 14-year-old to be part of that sexual solicitation any way? A. It wasn't intended, no."); *see also id.* at 64:19–23 ("[T]he second slide refers to [Moore] *approaching* a 14-year-old as a Santa's helper." (emphasis added)); *id.* at 68:7–8 ("I believe that the ad implies that he *approached* a 14-year-old girl." (emphasis added)); *id.* at 103:11–14 ("Q. Now, in your mind, Mr. Poersch, does that say that he was soliciting sex from that young girls who was 14? A. It doesn't. These are separate frames and separate parts of the ad. No, it doesn't, sir."); *id.* at 103:24–25 ("It wasn't the intention [w]e had, sir. Those are two separate quotes given there. Two separate frames in the ad[]."); *id.* at 104:22–105:1 ("I don't think the intention of the ad was to suggest that the person [referenced in the second quote] had been – solicited sex by Mr. Moore."); *id.* at 114:12–13 (stating the quotations were "intended to be ke[pt] separate").

Both Muhlendorf and Poersch explained that they had (and still have) no reason to question the accuracy of the TV Ad's assertions. Muhlendorf "had no doubts" (and still has no doubts) that "everything in th[e] shopping mall ad is true" and "had previously been reported in other journalistic reports." *Id.* at 85:19–86:3; *see also id.* at 72:17 (stating he had "no concerns" about the Ad's accuracy). Poersch testified to the same. *Id.* at 112:18–21.

After the Ad began running, Moore's campaign publicly claimed that its

- 10 -

contents were false and threatened to sue. *Id.* at 108:22–109:1. Despite Moore's public threats, not a single television station pulled the Ad from the air. *Id.* at 70:17–22, 128:9–12.

### C.   Moore's Other Trial Evidence

Aside from Muhlendorf and Poersch's testimony, Moore's case-in-chief evidence consistent of the following. Brenda Boyle, who was a manager of the cafeteria at the Gadsden Mall and whose husband was also a manager at the mall said she had not heard that Moore was banned from the mall. Aug. 9, 2017 Trial Tr. ("2 Tr.") at 3–6. She also testified that her husband was not mentally competent in 2017, when he claimed publicly that Moore had not been banned from the mall. *Id.* at 9:6–18. Toni Martin, Moore's sister, testified about Moore's character. *Id.* at 12–21. Genia Craft, a childhood friend of Martin's and who served as a teacher to Moore's daughter, testified about Moore's character and that she was surprised to hear about the allegations against Moore. *Id.* at 22–28. Connie Wilkerson, who has known Moore since her childhood, testified to Moore's character and that she does not believe the accusations against him and that she would have known if Moore "had been in trouble" at the Gadsden Mall. *Id.* at 29–37.

Johnny Adams, who worked at the mall starting in 1987, testified that he never heard Moore was banned from the mall. *Id.* at 39–47. Leonard Holifield, who taught Moore's children martial arts and served as a security officer when Moore served in

the judiciary, spoke about Moore's reputation and character and that he did not believe the accusations against Moore. *Id.* at 48–56. Moore's wife, Kayla, testified about Moore's claimed damages and asserted Moore was not banned from the mall. *Id.* at 66–97. Terry White, who served as a police officer and also worked in mall security prior to being fired from that position, asserted Moore had not been banned from the mall and had not harassed girls at the mall. *Id.* at 102–120. Heather Mayo, Moore's daughter, testified about Moore's character and his claimed damages, and also asserted Moore was not banned from the mall. *Id.* at 120–138.

Moore testified about his professional background and claimed damages, denied the TV Ad's allegations, and asserted he was never banned from the mall or accused of any sexual impropriety prior to 2017. *Id.* at 149–205. Finally, J.B. Jeffers and Jimmy Flanagan testified about Moore's character and asserted Moore was never banned from the mall.

## III. Legal Standard

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may" enter "judgment as a matter of law against the party on a claim" that, "under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). A Rule 50(a) motion "may be made at any time before the case is submitted to the

jury." Fed. R. Civ. P. 50(a)(2). While a party can renew a denied Rule 50 motion after the jury issues a verdict, Fed. R. Civ. P. 50(b), the Court has a "duty to enter judgment as a matter of law . . . as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case." *Brackett v. Ala. Dep't of Transp.*, 212 F. App'x 779, 780 n.1 (11th Cir. 2006) (quoting Fed. R. Civ. P. 50(a)(1) advisory committee's note to 1991 amendment) (affirming entry of judgment as a matter of law); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (affirming trial court's entry of Rule 50(a) judgment as a matter of law prior to submitting case to the jury).

Judgment as of a matter of law should be granted in Defendants' favor if, considering "all the evidence in the light most favorable to the plaintiff and grant[ing] the plaintiff the benefit of all reasonable inferences," "reasonable people" could not enter a verdict in Moore's favor. *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998) (affirming entry of judgment as a matter of law due to plaintiff's failure to offer evidence on an essential element). Judgment as a matter of law is appropriate when "the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997) (reversing trial court's denial of judgment as a matter of law). "[A] mere scintilla of evidence" is not enough; there "must be a substantial conflict in evidence

to support a jury question." *Id.* (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

## IV.   Argument

### A.   The jury cannot issue a verdict against Waterfront because Moore offered no evidence about Waterfront's involvement in the TV Ad.

The jury cannot reasonably issue a verdict against Waterfront because Moore did not offer *any* evidence about Waterfront's involvement in the TV Ad, let alone that Waterfront played any role in "wr[iting] or publish[ing]" it. *Klayman v. City Pages*, No. 5:13-cv-143-OC-22PRL, 2015 WL 1546173, at *10 (M.D. Fla. Apr. 3, 2015) (granting summary judgment for a defendant on this ground), *aff'd* 650 F. App'x 774 (11th Cir. 2016).

For Waterfront to be held liable, Moore was required to prove that Waterfront had some "responsible participation" in the TV Ad's creation. *Tavoulareas v. Piro*, 93 F.R.D. 11, 15 (D.D.C. 1981); *see also Dongguk Univ. v. Yale Univ.*, 873 F. Supp. 2d 460, 467 (D. Conn. 2012) (granting summary judgment due to insufficient evidence that the defendant "approved and/or offered input" on the statement). And he was required to prove that participation by "clear and convincing evidence." *Dongguk Univ.*, 873 F. Supp. 2d at 467. Moore was also required to prove that Waterfront published the TV Ad. *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988) (defamation requires a showing that the defendant "communicat[ed]" the "defamatory matter to a third person"); *Schifano v. Green*

- 14 -

*Cnty. Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993) (quoting the Restatement (Second) of Torts § 652E to include "publicity" as an element of a false-light claim).

The jury cannot reasonably find that Moore satisfied his burden because Moore offered *no* evidence about Waterfront playing any role in the Ad's creation or publication whatsoever. Indeed, not a single witness uttered Waterfront's name at trial. Nor did Moore's counsel. The only times Waterfront's name was ever mentioned during the proceedings were during the Court's opening jury instructions and Defendants' counsel's opening statement, *see* 1 Tr. 18:8–9, 30:18, 44:15, neither of which constitutes evidence.

In the absence of any trial evidence about Waterfront's involvement with the Ad, no reasonable jury could issue a verdict in Moore's favor against Waterfront. The jury certainly could not find, by clear and convincing evidence, that Waterfront "approved" the ad or otherwise exercised such significant "participation" in the TV Ad's creation that it could be held liable. Nor could it find that Waterfront in any way "published" the TV Ad. Thus, because it is now "apparent that [Moore] is unable to carry a burden of proof that is essential to [his] case" against Waterfront, it is the Court's "duty to enter judgment as a matter of law" in Waterfront's favor. *Brackett*, F. App'x at 780 n.1.

**B.      Moore's claims fail because he has not presented evidence enabling a finding that he has proven actual malice by clear and convincing evidence as to either Defendant.**

In denying Defendants' motion for summary judgment, the Court explained that it would hold a trial *solely* to adjudicate Moore's claims with respect to the TV Ad's potential "message that Moore solicited sex from a 14-year-old girl working as Santa's Helper at the Gadsden Mall." *Moore v. SMP* (*Moore III*), No. 4:19-cv-1855, 2022 WL 1749245, at *4 (N.D. Ala. May 31, 2022). Aside from Muhlendorf's and Poersch's testimony, Moore's case-in-chief evidence focused almost entirely on a wholly separate issue: whether Moore was banned from the Gadsden Mall. But this Court has already held that the TV Ad's assertion that Moore was banned from the mall for soliciting sex from young girls is not actionable. *Moore III*, 2022 WL 1749245, at *4 ("[T]he court [has] previously held that Moore cannot prove that the Defendants had actual malice in publishing the statement that 'Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.'"). Due to Moore's focus on that irrelevant issue at trial, his case-in-chief evidence was insufficient to enable the jury to find actual malice by clear and convincing evidence as to the only statement left at issue in this case: that he was soliciting sex from Miller when he approached her at the mall. As a result, Defendants are entitled to judgment as a matter of law.

Actual malice is an essential element of both of Moore's claims. *N.Y. Times*

*Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (defamation); *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 496 n.1 (Ala. 2004) (false light/invasion of privacy). And Moore must prove actual malice by "clear and convincing" evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (defamation); *see also Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So. 2d 306, 348–50 (Ala. 2007) (affirming summary judgment on false-light claim due to plaintiffs' failure to meet clear and convincing standard). That clear-and-convincing-evidence standard governs this motion. *Anderson*, 477 U.S. at 252.

As this Court has explained, to satisfy the actual-malice element as to either Defendant, Moore must prove two separate propositions by clear and convincing evidence. First, he must prove either Defendant intended for the TV Ad's viewers to believe Moore was soliciting sex from Miller at the mall when he approached her. *Moore v. Cecil* (*Moore II*), No. 4:19-cv-1855, 2021 WL 1208870, at *7–8 (N.D. Ala. Mar. 31, 2021). Second, that same Defendant must have "had [no] reason to believe the statement was true." *Moore v. Cecil* (*Moore I*), 488 F. Supp. 3d 1144, 1161 (N.D. Ala. 2020). Moore has failed to provide evidence enabling a finding of either issue in his favor.

### 1.   The jury cannot conclude Moore has proven actual malice by clear and convincing evidence as to Waterfront.

Again, for Waterfront, the analysis is simple. Moore offered no evidence whatsoever about Waterfront's involvement in the Ad. He offered no evidence that

Waterfront helped create the ad or even knew of its contents. As a result, there is no evidence Waterfront intended the TV Ad to assert Moore was soliciting sex from Miller or that anyone at Waterfront had no reason to think that assertion was true. In the absence of any such evidence, the jury cannot reasonably find that Moore met his burden of proving actual malice by clear and convincing evidence as to Waterfront.

## 2. The jury cannot conclude Moore has proven actual malice by clear and convincing evidence as to SMP.

Moore did offer *some* evidence relating to SMP, such as its role in creating and approving the Ad. 1 Tr. 97:6–8. But he did not target that evidence to what he must prove to prevail on his claims. His evidentiary showing falls far short of enabling a finding, by clear and convincing evidence, that SMP (1) intended the TV Ad to assert Moore was soliciting sex from Miller by approaching her at the mall, and (2) knew or recklessly disregarded the risk that such an assertion was false.[2]

### a. The jury cannot conclude Moore has proven by clear and convincing evidence that SMP intended the TV Ad to suggest Moore was soliciting sex from Miller.

The trial record overwhelmingly demonstrates that neither Defendant intended the TV Ad to suggest Moore was soliciting sex from Miller when he approached her at the mall. As further described in Section II.B above, the only two

---

[2] In the event the Court denies this motion, Defendants intend to present evidence demonstrating the truth (and substantial truth) of the TV Ad. Defendants target this motion, brought before Defendants have presented their case-in-chief, to the issue of actual malice.

witnesses with personal knowledge regarding the intent behind the Ad repeatedly and emphatically denied that the Ad was intended to make that assertion. 1 Tr. 64:19–23, 68:7–8, 65:5–66:2, 103:11–25, 104:10, 104:22–105:1. Instead, the TV Ad's creators intended the Ad to convey exactly what it said: that Moore "approached a 14-year-old girl" at the mall when he was in his thirties and began flirting with her. *Id.* at 68:7–8; *see also id.* at 65:20–21, 104:22–105:1. As Muhlendorf testified, that fact alone was "upset[ting]" enough. *Id.* at 91:1–5.

Moore's *only* evidence to the contrary is the mere fact that the Ad's second quotation appeared after the first. Because Moore must prove Defendants' intent by clear and convincing evidence, however, that fact alone does not enable the jury to reasonably find in Moore's favor on this question. The clear-and-convincing standard requires that the jury to conclude it is "*highly* probable" one of Defendants intended the Ad to suggest Moore was soliciting sex from Miller at the mall. *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (emphasis added); *see also Gaines v. Greene Cnty. Dialysis*, No. 7:18-cv-1465-RDP, 2018 WL 5112011, at *2 (N.D. Ala. Oct. 19, 2018) ("Clear and convincing evidence means evidence indicating that the thing to be proved is highly probably or reasonably certain . . ." (cleaned up)). It is "a heavy burden, far in excess of the preponderance sufficient for most civil litigation." *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015) (quoting *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186–87 (9th

Cir. 2001)).

The difference between the traditional civil standard of preponderance of the evidence and Moore's heightened clear-and-convincing standard is not just a matter of semantics; in defamation cases, it often makes the ultimate difference. In *Long v. Arcell*, 618 F.2d 1145 (5th Cir. 1980), for example, the court affirmed an entry of judgment as a matter of law against the plaintiff on the ground that while the evidence created a triable issue under a preponderance standard, it did not do so under the higher clear-and-convincing standard.[3] *See id.* ("If the applicable burden of proof had been a preponderance of the evidence, a jury verdict either way would have to stand," but the "record simply d[id] not contain *clear and convincing* evidence [of actual malice].").

That is also the case here. While the Court held at the pretrial phase that the Ad's ordering of the first and second quotations was enough to produce a triable question, the trial record differs from the pretrial record. As noted, Muhlendorf and Poersch repeatedly and emphatically denied at trial that the TV Ad was intended to suggest Moore was soliciting sex from Miller. In light of those repeated denials, and the clear-and-convincing standard's requirement that Moore offer evidence that allows the jury to reasonably conclude that it is *highly* probable that SMP intended

---

[3] As a pre-1981 Fifth Circuit decision, *Long* is controlling on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

viewers of the TV Ad to come away with that impression, the mere positioning of the Ad's quotations is no longer enough to send the question to the jury. If Moore had evidence, for example, of a communication among the TV Ad's creators indicating that SMP in fact *did* intend the ordering of the first two quotations to suggest Moore was soliciting sex from Miller, the jury might be able to find Moore proved the requisite intent by clear and convincing evidence. But Moore has not offered any such evidence—no such evidence exists. As a result, the only record evidence of SMP's intent is sworn testimony flatly denying that SMP intended the interpretation of the Ad Plaintiff proffers. Accordingly, the jury cannot reasonably find in Moore's favor on this issue.

> **b.    The jury cannot conclude that Moore has proven by clear and convincing evidence that SMP's belief that Moore was soliciting sex from Miller was unreasonable.**

Moore's failure to offer evidence enabling a finding by clear and convincing evidence that either Defendant intended the TV Ad to suggest Moore was soliciting sex from Miller at the mall dooms his claims. Even had Moore offered such evidence, his claims still fail as a matter of law because he failed to offer evidence enabling a finding by clear and convincing evidence that either Defendant would have "[no] reason to believe" that Moore was, in fact, soliciting sex from Miller. *Moore I*, 488 F. Supp. 3d at 1161. Based on the evidence Moore has offered at trial, the jury cannot reasonably conclude that he has satisfied that burden.

As discussed above, there was an avalanche of reporting regarding Moore's misconduct with teenage girls, including that he picked up multiple girls in public places (including a 14-year-old) and later sexually assaulted them, and that he was known well in the Gadsden area for harassing and trying to pick up teens at the mall. *Supra* § II.A. Given that reporting, Defendants had plenty of reason to believe Moore *was* soliciting sex from Miller when he approached her at the mall.

The live testimony at trial confirmed this belief. Poersch testified about the important "context" of the reporting about Moore, in particular that "over those 18 days between the initial *Washington* [*P*]*ost* story and when our ad got ran, there were stories that showed that girls had alleged sexual assault" and other "stories about Mr. Moore wandering around the mall," "flirting" with and "harass[ing]" teenage girls. 1 Tr. 113:8–13. Muhlendorf testified similarly: When asked why he believed Moore's approaching Miller and offering to buy her "a Coke" at the mall was not merely innocent flirting, Muhlendorf explained that "you would have to ask what was the intent behind" Moore's actions. *Id.* at 67:12–13. Muhlendorf explained that, here, there were "accusations that had previously been made by a 14-year-old and a 16-year-old who claim [Moore] sexually molested them." *Id.* at 66:21–23. Given that context, Defendants reasonably believed that Moore was seeking sex from Miller.

In response, Moore has offered a single piece of evidence to suggest it was

unreasonable for Defendants to believe he was soliciting sex from Miller: the fact that none of the news reports about which SMP was aware when the TV Ad ran used the phrase "solicit sex" when referring to Moore's interactions with Miller. But the specific terminology used in those news reports is not the sole determinant of whether it was reasonable for Defendants to think Moore was trying to develop a sexual relationship with Miller. The reasonableness determination must take account of *all* facts known to Defendants at the time the TV Ad ran. *See Herbert v. Lando*, 441 U.S. 153, 165 (1979) (noting that, in defamation cases, courts consider "any direct and indirect evidence relevant to the state of mind of the defendant"). Considering all of the allegations asserted against Moore at the time, *supra* § II.A, the jury cannot reasonably conclude that Moore proved, by clear and convincing evidence, that Defendants had no "reason to believe" Moore was soliciting sex from Miller by approaching her at the mall. *Moore I*, 488 F. Supp. 3d at 1161.

## V.   Conclusion

Moore's trial evidence cannot support a verdict in his favor. The Court should enter judgment in favor of Defendants.

Filed: August 10, 2022

Respectfully submitted,

/s/ *William B. Stafford*

Barry A. Ragsdale (RAG003)
**Dominick Feld Hyde, PC**
1130 22nd Street South, Suite 400
Birmingham, AL 35205
Tel.: (205) 536-8888
BRagsdale@dfhlaw.com

Marc E. Elias (admitted *pro hac vice*)
Alexi M. Velez (admitted *pro hac vice*)
Melinda K. Johnson (admitted *pro hac vice*)
**Elias Law Group LLP**
10 G St. NW, Suite 600
Washington, DC 20002
Tel.: (202) 968-4490
MElias@elias.law

William B. Stafford (admitted *pro hac vice*)
**Elias Law Group LLP**
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Tel.: (206) 656-0176
BStafford@elias.law

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2022, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and Plaintiff.

*/s/ William B. Stafford*
William B. Stafford