FILED
2022 Oct-04  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



```
                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ALABAMA
                          MIDDLE DIVISION


                        4:19-cv-01855-CLM


ROY S. MOORE,

          Plaintiff,

vs.

SENATE MAJORITY PAC, et al.,

          Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

     REPORTER'S OFFICIAL TRANSCRIPT OF JURY TRIAL - VOLUME I
               UNITED STATES DISTRICT COURTHOUSE
                      ANNISTON, ALABAMA
                      AUGUST 8, 2022


               BEFORE THE HONORABLE COREY L. MAZE
                  UNITED STATES DISTRICT JUDGE


                      *R E D A C T E D*
```

COURT REPORTER:
Carrie M. Robinson, RPR, CRR, CRI
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203
(205)278-2063

(Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.)

```
 1              A P P E A R A N C E S

 2  FOR THE PLAINTIFF:

 3       JEFFREY SCOTT WITTENBRINK
         Attorney at Law
 4       Wittenbrink Law Firm
         331 St. Ferdinand Street
 5       Baton Rouge, Louisiana  70808
         225-308-6850
 6       Jwittenbrink@TheLawyerBR.com

 7       TALMADGE BUTTS
         Attorney at Law
 8       Foundation for Moral Law
         1 Dexter Avenue
 9       Montgomery, Alabama  36104
         334-262-1245
10       Talmadge@morallaw.org

11  FOR THE DEFENDANTS:

12       BARRY A. RAGSDALE
         Attorney at Law
13       Dominick Feld Hyde, PC
         1130 22nd Street South
14       Suite 4000
         Birmingham, Alabama  35205
15       205-536-8888
         BRagsdale@dfhlaw.com
16
         MELINDA JOHNSON
17       ALEXI MACHEK VELEZ
         Attorneys at Law
18       Elias Law Group, LLP
         10 G St. NW
19       Suite 600
         Washington, D.C.
20       202-968-4654
         mjohnson@elias.law
21       avelez@elias.law

22  ALSO APPEARING:

23       ROY S. MOORE
         CALEB MOORE
24       J.B. POERSCH

25
```

1                                INDEX

2                                                          PAGE

3   FINAL PRETRIAL DISCUSSIONS . . . . . . . . . . . . . . . 4

4   (VOIR DIRE PROCEEDINGS CONTAINED IN A SEPARATE TRANSCRIPT)

5   PRELIMINARY JURY INSTRUCTIONS BY THE COURT. . . . . . .  24

6   OPENING STATEMENT BY MR. WITTENBRINK . . . . . . . . . .  37

7   OPENING STATEMENT BY MR. RAGSDALE . . . . . . . . . . .  40

8   EVIDENTIARY MOTION . . . . . . . . . . . . . . . . . . .  57

9

10                          EXAMINATION INDEX

11  ADAM MUHLENDORF
         DIRECT BY MR. WITTENBRINK . . . . . . . . . . . . . 62
12       CROSS BY MR. RAGSDALE . . . . . . . . . . . . . . . 96
         REDIRECT BY MR. WITTENBRINK . . . . . . . . . . . . 103

13

14  J.B. POERSCH
         DIRECT BY MR. WITTENBRINK . . . . . . . . . . . . . .108
15       CROSS BY MR. RAGSDALE . . . . . . . . . . . . . . . 142
         REDIRECT BY MR. WITTENBRINK . . . . . . . . . . . . 145
16       RECROSS BY MR. RAGSDALE . . . . . . . . . . . . . . 156

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2   August 12, 2022                          12:03 p.m

 3         THE COURT:  This is 4-19-CV-1855, Moore versus SMP

 4   and Waterfront Strategies.  We are here before jury

 5   qualification and voir dire just to handle any last-minute

 6   matters.

 7         The first one is I over the weekend received a note

 8   from the defendants with Mr. Moore copied that they are

 9   withdrawing their objection to Terry White as a witness in

10   Moore's case in chief.  Is that correct, Mr. Ragsdale?

11         MR. RAGSDALE:  Yes, sir, it is.

12         THE COURT:  All right.  So as you can see on the

13   screen now, I have moved Terry White into Moore's facts and

14   damages witness list.  I also issued a ruling this weekend.  I

15   read both parties' submissions on the punitive damage issue,

16   and I agree with the defendants that the statute is clear, you

17   have to make a written demand on the defendants -- and it very

18   specifically says "defendants" -- at least five days before

19   filing the complaint.  That was not done.  So the statute

20   requires that I preclude punitive damages.

21         I assume, Mr. Wittenbrink, you would like to at

22   least lodge an objection just to preserve it for the record?

23         MR. WITTENBRINK:  Just to preserve it for the

24   record, yes, Your Honor.

25         THE COURT:  All right.  It is preserved.
```

1          I also issued rulings on all of what I believe the

2 remaining outstanding objections to exhibits were.  Are there

3 any that I have missed?  Is there any document number that I

4 need to look at, or are we good?

5          MR. RAGSDALE:  I must look to my exhibit geniuses,

6 but I think we are covered.

7          MS. JOHNSON:  I believe we are good, Your Honor.

8          THE COURT:  Good.  So all I want y'all to do --

9 and doesn't have to be right now, although, if y'all work on

10 it once I step out, that would be great.  If by the time we do

11 opening instructions and statements, if Mr. Wittenbrink would

12 have a list of exhibits that are either joint exhibits or

13 exhibits I have ruled to be admissible in case in chief so

14 that you can read that off before the first witness, then we

15 are just going to mass move them all in and that will speed

16 along trial significantly.

17          So like I said, that doesn't need to be done now.

18 Just as long as we have it before we call the first witness.

19          All right.  Any other questions before I go

20 downstairs and start getting everything ready?

21          MR. RAGSDALE:  I apologize, Your Honor.  There are

22 two issues that I do need to raise.

23          THE COURT:  Okay.

24          MR. RAGSDALE:  First of all, we would ask for a

25 motion in limine on this issue.  We did not raise it.  I'm

```
 1   sorry.
 2           THE COURT:  Okay.
 3           MR. RAGSDALE:  During the campaign, Mr. Moore
 4   claimed that he had taken a polygraph.
 5           THE COURT:  Okay.
 6           MR. RAGSDALE:  We have obviously not been provided
 7   with any of that information.  We would ask that he not be --
 8   not elicit any testimony or talk about the fact that he might
 9   have taken a polygraph.
10           THE COURT:  All right.  Mr. Wittenbrink?
11           MR. WITTENBRINK:  Well --
12           THE COURT:  I'm going to go ahead and tell you I am
13   going to grant it just because that -- we don't introduce
14   polygraph evidence.
15           MR. WITTENBRINK:  I know polygraph evidence is not
16   usually admissible.
17           THE COURT:  Right.
18           MR. WITTENBRINK:  I don't know if whether or not his
19   willingness to take a polygraph would be something that he
20   could talk about.
21           THE COURT:  If you want to look into that between
22   now and lunchtime, I will let you do it.
23           MR. WITTENBRINK:  We will do that.
24           THE COURT:  But we are not going to let him testify
25   I took a polygraph and it showed that I was telling the truth.
```

1          MR. WITTENBRINK:  Certainly he couldn't admit the
2   results of any polygraph.
3          THE COURT:  And your client is standing up behind
4   you if you want to talk to him.
5          Yes, sir?
6          MR. MOORE:  I am not standing up to talk to him.
7          THE COURT:  Oh, okay.
8          MR. MOORE:  I have got to go --
9          THE COURT:  Oh, you are fine.  Go ahead.
10         But, obviously, I mean, the best evidence is going
11   to be he's going to be on the stand, and they are going to get
12   to judge his credibility here, so.
13         MR. WITTENBRINK:  Sure.
14         THE COURT:  All right.  The judge issue is the other
15   one, I assume.
16         MR. RAGSDALE:  No.
17         THE COURT:  No.  Oh, so it's two completely new
18   things.
19         MR. RAGSDALE:  This is not new, Your Honor.  You had
20   ruled, obviously, in a motion in limine that comments about
21   defense counsel or the defense is off limits.
22         THE COURT:  It is.
23         MR. RAGSDALE:  I just wanted to make it clear that
24   that would include the size of our relative law firms, the
25   size of our trial team, how many people we have here --

1        THE COURT:  Right.

2        MR. RAGSDALE:  -- those kind of comments, which we

3  think --

4        THE COURT:  Yeah, just don't make comments -- if you

5  want to say, I'm a small town attorney from Louisiana or

6  whatever, just let's not do a comparison between the two,

7  like, the Army has come to get us.

8        MR. WITTENBRINK:  I understand that, Judge.  I'm

9  kind of surprised Mr. Barry brought it up since he was the one

10 that brought it up.  I asked him how many people were on his

11 team, and he told me 300.  I thought that was a pretty amazing

12 reply.

13       THE COURT:  That's a big team.

14       MR. WITTENBRINK:  I don't see 300 people here, but

15 that's a pretty big team.

16       THE COURT:  What is fair, obviously -- and I am

17 hoping y'all work this out over the weekend -- to talk about

18 the amount of money spent by defendants, et cetera.  If we are

19 going to do comparison in size, that's where it is relevant,

20 not on the trial teams.

21       MR. WITTENBRINK:  Yes, Your Honor.

22       MR. RAGSDALE:  I'm sorry.  I don't mean to

23 interrupt.

24       THE COURT:  You're fine.  Go ahead.

25       MR. RAGSDALE:  And the last issue is on the judge

issue.  Frankly, I thought about what your comment was, and
we withdraw any request for any kind of instruction.  We
obviously think it is improper for him to call him "judge,"
but if he's going to call him "judge" or his witnesses are
going to call him "judge," we don't think there should be any
further comments.

THE COURT:  All right.  Based on the defendants'
withdrawal of their request for an instruction, I am not going
to give one.  We are going to stand with the same rules.  I
will not refer to him as Judge Moore.  The defendants will
not.  But if you do, you do.  I understand having lived in
this area a long time that that is what people call Roy Moore
who know Roy Moore is Judge Moore.  So even if you didn't do
it, I know witnesses will, so -- and we will learn pretty
quickly in voir dire what the jurors already knew going in,
all right?

MR. WITTENBRINK:  All right.

THE COURT:  We are good to go.

MR. RAGSDALE:  That's all we had, Your Honor.

THE COURT:  Anything from the plaintiff's side?

MR. WITTENBRINK:  Judge, I had made a large
objection motion in limine earlier.  You Honor said that you
would just stick to the rules.

THE COURT:  Yes.  I think that's --

MR. WITTENBRINK:  That's just a general objection.

1          THE COURT:  That's right.  Obviously if you think

2   something happens in the moment that you need to object to,

3   you object --

4          MR. WITTENBRINK:  Thank you.

5          THE COURT:  -- and I will rule in the moment.

6          MR. WITTENBRINK:  All right.

7          THE COURT:  All right.  Y'all can be seated.  I am

8   going to go downstairs.  We have entered the pretrial order,

9   so everything is set.

10          All right.  Anything else before I head downstairs?

11          If y'all will wait here, we will send somebody to

12   get you as soon as the jury is qualified and we are ready for

13   y'all to come set up at the tables.

14          Do you remember how you were seated and how to get

15   in there?

16          MR. RAGSDALE:  Yes, sir.

17          MS. JOHNSON:  Yes, Your Honor.

18          THE COURT:  All right.  We are off the record.

19    (Voir dire proceedings contained in a separate transcript)

20                        ***

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2  August 8, 2022                              12:18 p.m.
 3      (Jury not present)
 4          THE COURT:  Y'all can stay seated.
 5          I am assuming you are ready to talk about what we
 6  needed to do on the record?
 7          MR. WITTENBRINK:  Yes, Your Honor.
 8          THE COURT:  Okay.  Mr. Wittenbrink, what have you
 9  got?
10          MR. WITTENBRINK:  Well, a couple of things real
11  quick.  There's some confusion about Exhibit 27.
12          THE COURT:  Okay.  27.
13          MR. WITTENBRINK:  So 27 was marked out -- I think
14  there is a contradiction between the PowerPoint and the --
15          THE COURT:  Hold on a second.  Let me pull up 27 on
16  my screen.
17          MR. WITTENBRINK:  -- and the last e-mail that we
18  got.  And we are thinking it is in, and they are thinking it
19  is out.  And so we have kind of got a -- since we need to give
20  you all the exhibits --
21          THE COURT:  27 I intended to be out.  My
22  understanding was is that y'all were going to talk about, over
23  the weekend, stipulations on precise numbers of contributions,
24  where it came from, et cetera.
25          Did y'all get that done?
```

1          MR. WITTENBRINK:  Okay.  So we did do -- not about

2    contributions or where they came from.  We were able to do a

3    stipulation with regard to how much money was spent on this

4    particular ad.

5          THE COURT:  Okay.

6          MR. WITTENBRINK:  And that's it.

7          THE COURT:  All right.  So I'm looking at this.

8    What -- what from in here is it that you want -- is it

9    basically where the funding source of Highway 31 came from?

10         MR. WITTENBRINK:  Right.  Where the funding -- so

11   the treasurer would have been able to tell us, you know, where

12   the money came from, how they spent the money, and that -- we

13   have a stipulation on the actual money that came in.

14         THE COURT:  For the shopping mall ad.

15         MR. WITTENBRINK:  For the shopping mall ad.

16         Your Honor, I want to reraise sort of an idea that,

17   you know, the effort that was made in spending all of the

18   money goes toward the veracity of the defendants.

19         THE COURT:  Well, let's do it like this.  I know

20   where you are going, and I think the best and the most

21   appropriate way to do it is obviously -- I'm assuming --

22   Mr. Muhlendorf is our first witness, correct?  And that is who

23   you would like to get this in through.

24         MR. WITTENBRINK:  Yes.

25         THE COURT:  Let's ask him the question about how it

1  was funded.  And if he want can't answer the question, I'm

2  going to let you do it for impeachment.

3          MR. WITTENBRINK:  Okay.

4          THE COURT:  But we are not going to move it in

5  wholesale from the beginning.  But all the other numbers, we

6  are good on?

7          MR. RAGSDALE:  Yes, Your Honor.  And I would say, I

8  don't think there's any dispute that Highway 31 was funded by

9  SMP.

10         THE COURT:  All right.

11         MR. RAGSDALE:  I don't think that's -- if we need to

12 stipulate to that, we can.

13         THE COURT:  But I think his point is a little

14 larger, that it wasn't just SMP.  There were two or three

15 different entities, and it was about four or five million, if

16 I remember right.

17         MR. WITTENBRINK:  That's right.

18         THE COURT:  Let's ask him and see what he says.  And

19 if he says he doesn't remember or he needs to have his

20 recollection refreshed, then you can go that way.

21         MR. WITTENBRINK:  Thank you, Judge.

22         THE COURT:  All right.

23         MR. WITTENBRINK:  And then the last thing was, you

24 know, I understand that you are letting Leigh Corfman come to

25 testify in the case.

1    THE COURT:  Correct.

2    MR. WITTENBRINK:  And so the original objection to

3 Leigh Corfman was that she could not be relevant to a mall ban

4 for soliciting sex.

5    THE COURT:  True.  Well, she --

6    MR. WITTENBRINK:  And so reports of Leigh Corfman

7 being assaulted were, we thought, relevant for damages, and I

8 thought that's where we had left it that, you know, that she

9 was relevant for damages.  In other words, his reputation had

10 been damaged already by allegations of the women that were

11 reported in the news.

12    THE COURT:  That's part but not all of it.  Part of

13 their defense is that when they use the term "soliciting sex,"

14 their intention and what they believed the reasonable viewer

15 would take it as was not necessarily walking up to someone and

16 saying, I want to have sex right now, but being a pattern that

17 started with what might seem more innocent and progressed and

18 that that was consistent with the Corfman allegation.

19    MR. WITTENBRINK:  Okay.

20    THE COURT:  And for that purpose, it would be

21 relevant.

22    MR. WITTENBRINK:  Well, so two things:  The first

23 thing is, you know, Corfman never alleged he asked for sex.

24 She just said he assaulted her, basically.  There was no

25 solicitation involved.

1    The second thing is that -- and so it is not

2    consistent with some kind of solicitation for sex.  But then

3    the second thing is that, you know, Corfman didn't allege a

4    long process, didn't allege, you know, several steps involved

5    or anything like that.  And then, you know, so her testimony

6    also wouldn't be relevant for that either.

7          In other words, it is not about a pattern of

8    grooming with Ms. Corfman.  This is just an attack.  And it is

9    an attack that's been litigated for nine days in another

10   court, and we did get a verdict, as confusing as it is.  But I

11   would say if we have got to let her testify at all, then we at

12   least have to bring in the results of what happened the last

13   time she testified.  Unless -- I mean, so that's my issue with

14   it.  They had a nine-day trial with Ms. Corfman and had, you

15   know, tons of other people and all that kind of stuff, and it

16   was three rings.  And I don't think you want -- I thought --

17   so I thought we had narrowed this down to this particular

18   defamatory statement.  In fact, that's the way I read your

19   rulings.  And so that's why the Leigh Corfman reports are

20   relevant but not for the truth but for the fact that they

21   damaged Judge Moore's reputation, and then how do you get past

22   that?

23            THE COURT:  All right.  Mr. Ragsdale, response.

24            MR. RAGSDALE:  Well, they are also relevant to

25   actual malice, Judge.

1            THE COURT:  Right.

2            MR. RAGSDALE:  If you know there are allegations

3   that he sexually molested a 14-year-old, it makes going up to

4   a 14-year-old in the mall different than if it is somebody you

5   have never had those kind of allegations involved with or how

6   you view it.  So the fact that these previous reports -- you

7   know, those articles are all going to come in, right?  Those

8   reports are already going to come in.  I will say this:  We

9   are -- we are uncertain about whether we are going to call

10  Ms. Corfman.  That kind of depends on whether or not Mr. Moore

11  launches into an attack on Ms. Corfman as part of his case in

12  chief.  If he does, then I think she's entitled to defend

13  herself and come in and testify.

14            If all that comes in is here are the reports, he

15  denies it, I am not sure we would call Ms. Corfman.  But, you

16  know, if it -- if they want to attack her credibility or her

17  believability or whatever it might be, I think we are entitled

18  to call her as a witness.

19            If, on the other hand, all we do is the reports,

20  here is what they are, but I think those are all relevant to

21  actual malice, Judge, that we were aware of these allegations

22  days and days before we ran that ad.  It doesn't just come out

23  of the blue that we run an ad that says he approached a

24  14-year-old.

25            THE COURT:  All right.  Then we can revisit it,

1    then, at the close of the case in chief.

2          MR. WITTENBRINK:  One more thing, Judge, just in

3    response to what Mr. Ragsdale said.

4          So Ms. Corfman's credibility, unless there's

5    evidence that the defendants, before they ran this ad, spoke

6    to Ms. Corfman personally or had someone interview her

7    personally, then I think that that is right out.  In other

8    words, they can't say reasonable reliance based on Ms. Corfman

9    sitting here talking to everybody because that's a completely

10   different kind of --

11         THE COURT:  But certainly they did not view her 2022

12   testimony before they ran the ad.

13         MR. WITTENBRINK:  Right.  And they didn't -- or did

14   they speak to her even.  I mean, none of that stuff had

15   happened.  They didn't have her testimony.  They didn't have

16   sworn testimony.  They had reports in the newspaper before

17   they ran the ad, and that's what we had.

18         And so to allow her to come, clearly Ms. Corfman's

19   sitting here before this jury is retrying those issues of that

20   allegation of assault from 40 years ago as opposed to two

21   women came from 40 years ago and said Mr. Moore assaulted

22   them -- that's what was reported in the paper -- and how

23   reasonable their reliance is on that.

24         THE COURT:  All right.  Let's take it up -- after

25   the case in chief, we will bring this back up.  In the

1 meantime, let's not have either side say in opening statements

2 that you are going to hear from --

3          MR. WITTENBRINK:  Right, okay.

4          THE COURT:  -- either of them because we haven't

5 made that final decision yet, understood?

6          MR. RAGSDALE:  Understood.

7          MR. WITTENBRINK:  Yes, Your Honor.

8          THE COURT:  All right.  Anything else?

9          MR. RAGSDALE:  Yes, Your Honor, only because we had

10 mentioned the polygraph.  Mr. Wittenbrink, I think, reserved

11 the right to make an argument or at least maybe bring cases or

12 something?

13          THE COURT:  Yeah, if you want to make any arguments,

14 like I told you Friday, I'm not going to just allow you to

15 say, Here are the results of a polygraph, but if he got up and

16 testified I would be willing to take one, that's different.

17          MR. WITTENBRINK:  Or that he was willing and did

18 take one, not talk about the results, but say that he brought

19 himself forward to do that.  And, again, you know, it's more

20 about Judge Moore's sincerity and his willingness to be

21 examined to any degree, including a polygraph, you know,

22 however that's admissible or not admissible, this is what he

23 was willing to do.

24          THE COURT:  All right.  I think the line is you can

25 get up to the point of saying I was willing to and subjected

1  myself to it, but we are not going to introduce any results.

2          MR. WITTENBRINK:  Okay.

3          THE COURT:  All right?  Mr. Ragsdale looks --

4          MR. RAGSDALE:  I except to that ruling, but, I mean,

5  the problem with that, Your Honor, is --

6          THE COURT:  It begs the question or the answer of

7  what it was.

8          MR. RAGSDALE:  Right.  And we have never seen those

9  results, don't know anything about the examiner.  I mean --

10         THE COURT:  But I do think that it is -- well,

11 because he's not going to be able to say what the results

12 were.  I think it is fair for him to say there has never been

13 a moment when I wasn't willing to tell everyone what my story

14 was and to sit down and testify or do anything else.  Like, I

15 have not been hiding it.

16         MR. RAGSDALE:  I'm fine with all of that.  I'm

17 troubled by the word "polygraph."  You know that lie detector

18 sends a different message to a court.  I understand Mr. Moore

19 is going to say, I've denied it from the beginning.  I have

20 always been willing to tell people my story.  I have never

21 backed away from that.

22         But throwing out that word is prejudicial to the

23 defendants under these circumstances.

24         THE COURT:  All right.  Your first two witnesses are

25 going to be Mr. Muhlendorf and Mr. Poersch?

1          MR. WITTENBRINK:  That's correct.

2          THE COURT:  All right.  During the break, Mindy and

3    I will -- if you want to submit to me anything, what the

4    current 11th Circuit rule on discussing the polygraph or if

5    you can either say the word or not versus the results, please

6    send it.  Otherwise, we will have something for you during the

7    next break.

8          MR. RAGSDALE:  Okay.  The only other thing -- and I

9    may let Ms. Velez address this, Your Honor.  We believe

10   there's already been a ruling on the total expenditures by

11   Highway 31 that -- and in fact, Mr. Wittenbrink just said,

12   This is only about one ad.  This is only about one ad.

13         THE COURT:  All right.

14         MR. RAGSDALE:  But he wants to make it about money

15   that was spent on things completely unrelated to this ad,

16   including get-out-to-vote efforts, voter-registration efforts,

17   any of those kind of things.  And we believe there's been a --

18   and I just said I was going to let her speak.  I'm sorry.

19         MS. VELEZ:  Yes, Your Honor.  If I may, I think that

20   allowing for evidence of all of Highway 31 spending, for

21   example, speaks to your prior rulings on the digital

22   advertisement, for example, Priorities, parties who have been

23   dismissed from this case.  And I think Exhibit 27 illustrates

24   the 403 argument that we had made.  It's talking about dark

25   money, about overall spending, you know, the volume of

1 spending in the state of Alabama, and it goes far beyond the

2 spending on this actual television ad, which I think that we

3 were hoping that the jury would be limited in their exposure

4 to.

5      THE COURT:  I think what we are going to do and what

6 I had said is limit your questioning just to sort of an

7 overall -- clearly, this was a group of people who were

8 against my client.  You spent approximately four million or

9 whatever and just leave it.  Let's not get into specifics

10 about how many ads, what the ads said, et cetera.  I'm going

11 to give you the right to at least ask the -- again, the

12 relevant point is that the defendants -- you're going to

13 attack their veracity or you are going to that they had a

14 reckless disregard for truth because they wanted to win.

15      MR. WITTENBRINK:  Right.

16      THE COURT:  I am going to let you get close enough

17 to the line to ask:  Isn't it true that you essentially

18 conspired together to spend X million dollars, and part of

19 that you spent this exact amount on this one ad?

20      MR. WITTENBRINK:  That's correct.

21      THE COURT:  And we are not going into any other ads.

22 You can't talk about what the other ad said or how much those

23 ads cost, et cetera.  So a very generic, you teamed up, but

24 then after that, everything else has to be about this one ad.

25 Understood?

1            MR. WITTENBRINK:  Yes, Your Honor.

2            THE COURT:  And if he steps over that line,

3  Mr. Ragsdale, I know you will object.

4            MR. RAGSDALE:  I'm trying not to be troubling.

5            THE COURT:  It's fine.

6            MR. RAGSDALE:  But this is one organization.  It

7  didn't conspire with anybody else.  I mean, that argument is

8  the argument that they conspired or whatever with --

9            THE COURT:  I don't mean it in the conspiracy as in

10 a crime or a civil conspiracy.  I just mean -- his point is

11 going to be that Highway 31 was created to run attack ads

12 against my client.  That's all I mean.

13           MR. RAGSDALE:  Okay.  The last thing, Your Honor:

14 We would invoke Rule 615, sequestration.

15           THE COURT:  All right.  Is anyone in here scheduled

16 to testify as a witness?

17           MR. RAGSDALE:  I'm sorry.  This is our client.  The

18 one person I don't want --

19           THE COURT:  He is excepted from the rule, obviously,

20 as Mr. Moore is excepted from the rule.

21           MR. RAGSDALE:  Thank you, Your Honor.

22           THE COURT:  All right.  Anything else?

23           MR. WITTENBRINK:  I think that's it, Judge.

24           THE COURT:  All right.  So we are going to bring

25 them in.  I am going to do opening instructions first and

1  then, Mr. Wittenbrink, I assume you are going to give opening

2  for the plaintiff?

3          MR. WITTENBRINK:  Yes, Your Honor.

4          THE COURT:  Mr. Ragsdale for the defendant?

5          MR. RAGSDALE:  Yes, sir.

6          THE COURT:  Okay.  Are y'all ready?

7          MR. RAGSDALE:  You bet.

8          MR. WITTENBRINK:  Yes, Your Honor.

9          THE COURT:  All right.  Let's bring them in.

10     (Brief pause)

11         THE COURT:  If the openings get to 20 minutes, I

12  will just give you just a warning of something, like, two or

13  three minutes.

14         MR. RAGSDALE:  I don't own a watch, so it is a

15  little bit hard for me --

16         THE COURT:  I'll do that.

17         MR. RAGSDALE:  Okay.

18     (Discussion off the record)

19     (Jury in at 12:35 p.m.)

20         THE COURT:  I'll tell you the same joke I tell all

21  my jurors:  I don't care where you sit, but I have determined

22  that this is like Baptist church, the moment you pick that

23  chair the first time, you end up sitting there the whole week,

24  so choose wisely.

25         Everybody can be seated.

```
 1              I will tell you the witness sits here (indicating),
 2   so that podium will go away.  So when the witnesses are
 3   testifying, they will sit here, if that makes your choice any
 4   different.
 5              I hope you enjoyed lunch.  My favorite lunch is a
 6   free lunch, so hopefully y'all enjoyed that part of it.
 7              All right.  Mr. Wittenbrink, are you ready?
 8              MR. WITTENBRINK:  I am, Your Honor.
 9              THE COURT:  Mr. Ragsdale, is the defendant ready?
10              MR. RAGSDALE:  Yes, sir.
11              THE COURT:  All right.  Ladies and gentlemen, now
12   that you have been sworn in, I am going to explain to you some
13   basic principles about a civil trial and about your duty as
14   jurors.  These are preliminary instructions.  I am going to
15   give you more detailed instructions at the end of the trial.
16              It is your duty to listen to the evidence, decide
17   what happened, and apply the law to the facts.  It is my job
18   to prevent -- or to provide that law to you.  And you must
19   follow the law that I give you, even if you disagree with it.
20              You must decide the case only on the evidence that
21   is presented here in the courtroom.  Evidence comes in many
22   forms.  It can be testimony about what someone saw, heard, or
23   smelled.  It can be an exhibit.  It can be a photograph.  It
24   can be someone's opinion.  Some evidence may prove a fact
25   indirectly.  So I will give you an example.  Let's say that a
```

1  witness saw wet grass outside and people walking into the

2  courthouse carrying a wet umbrella.  That is indirect evidence

3  that it was raining outside.

4          In other words, that witness didn't see it was

5  raining, but the wet grass and the wet umbrellas is indirect

6  evidence that it was raining outside.  We call this kind of

7  evidence "circumstantial evidence."  It's simply a chain of

8  circumstances that could prove that an event or a fact

9  happened.  As far as the law is concerned, there is no

10 difference between direct or indirect, that is, circumstantial

11 evidence.  You can choose to believe or disbelieve either

12 kind.  Your job is to give each piece of evidence whatever

13 weight that you think it deserves.

14         Now, during the trial, you are going to hear certain

15 things that are not evidence, and you cannot consider those

16 things.  The first one is the lawyers' statements and their

17 arguments.

18         In a few minutes, you are going to hear opening

19 statements, and what they say during that time is not

20 evidence.  The lawyers are going to get up and discuss the

21 case.  And those remarks could help you follow what the case

22 and the arguments are going to be.  But the remarks themselves

23 are not evidence, and you shouldn't let them play a role in

24 your deliberations at the end of the case.

25         Second, the lawyers' questions and their objections

1  are not evidence.  Only the witnesses' answers are evidence.

2  So don't decide that something is true just because a lawyer's

3  question suggests that it is true.  For example, if a lawyer

4  asked a witness:  You saw Mr. Jones hit his sister, didn't

5  you?  That question is not evidence that Mr. Jones did or

6  didn't hit his sister, unless the witness agrees or disagrees

7  with it.

8         Again, it is the witness' answer, not the lawyer's

9  question that is evidence.

10        Now, there are certain rules of evidence that

11 control what I can receive into evidence and what I cannot.

12 When a lawyer asks a question or presents an exhibit, the

13 opposing lawyer may object if he thinks the rules of evidence

14 don't allow that exhibit.

15        If I overrule the objection, then the witness can

16 answer the question or the exhibit can be admitted.  If I

17 sustain the objection, then the witness cannot answer the

18 question and the Court will not receive the exhibit.

19        If I sustain an objection to a question, you must

20 ignore the question and not try to guess what the witness

21 would have answered.

22        Now, sometimes I may disallow evidence, which I call

23 striking evidence that you have already heard and order you to

24 disregard it.

25        In other words, if a witness answers a question and

1   someone objects and I say "sustained, strike the answer," then

2   you cannot consider what that witness just said.

3          Now, there are certain types of evidence that I

4   could allow for a limited purpose.  When I instruct you that I

5   have admitted an item of evidence for a limited purpose, you

6   must consider it for that purpose and nothing else.

7          To reach your verdict, you are going to have to

8   decide which testimony you believe and which testimony you

9   don't believe.  You may believe everything that a witness

10  says, you can believe part of what a witness says, or you can

11  believe none of it.

12         When considering a witness' testimony, you may

13  consider the witness' opportunity and ability to see, hear, or

14  know the things the witness is testifying about, the witness'

15  memory, the witness' manner while testifying, any interest the

16  witness has in the outcome of the case, any bias or prejudice

17  the witness might have, any other evidence that contradicts

18  the witness' testimony, the reasonableness of what the witness

19  testified to in light of all of the evidence and any other

20  factors that affect believability.

21         Now, when we get done at the end of the trial, I am

22  going to give you additional guidelines for determining a

23  witness' credibility.

24         Now, like I told you earlier, this is a civil case,

25  so to help you follow the evidence, I'm going to again

1  summarize what this case is about and I'm going to play for

2  you the advertisement in question.

3          The plaintiff in this case is Roy S. Moore.  The

4  defendant Senate Majority PAC is a federally registered

5  political action committee, and Defendant Waterfront

6  Strategies is a media buying firm.

7          Moore has sued SMP and Waterfront for creating and

8  airing a political advertisement called "the shopping mall ad"

9  that Moore says defamed him and placed him in a false light.

10         Moore was a candidate for the United States Senate

11 during the 2017 special election.  On November the 9th, 2017,

12 The Washington Post published an article that detailed four

13 women's allegations about Moore.

14         One accused Moore of sexual assault when she was 14

15 and he was 32.  The other said that an adult Moore approached

16 or dated them when they were teens.

17         Over the next few weeks, other media outlets

18 published reports that Moore acted inappropriately towards

19 teenage girls, including allegations from additional women.

20         One of the allegations was that Moore's conduct

21 resulted in Moore being banned from the Gadsden Mall.

22         The defendant started airing the shopping mall ad on

23 November 27, 2017, 18 days after the initial Washington Post

24 article.

25         I will now play the shopping mall ad for you.

1    (Video played)

2         THE COURT:  Moore's lawsuit focuses on the

3    juxtaposition, which means the combination of these two

4    quotes:  Moore was actually banned from the Gadsden Mall for

5    soliciting sex from young girls.  One he approached was 14 and

6    working as Santa's helper.

7         Moore denies that he solicited sex from any girl at

8    the Gadsden Mall, including a 14-year-old working as Santa's

9    helper, and he denies that he was banned from the Gadsden

10   Mall.

11        Moore alleges that when the defendants combined

12   these quotes, they created a false statement that defamed him

13   and put him in a false light.

14        Moore seeks compensatory damages for the emotional

15   distress and mental anguish that the defendants' ad caused.

16        The defendants say that Moore's claims fail for any

17   of these reasons:  First, the shopping mall ad was true or it

18   was substantially true.  Second, the defendants did not

19   publish the ad with actual malice because they did not know

20   and had no reason to know that the statement was false.

21   Third, the shopping mall ad did not harm Moore because many

22   media outlets had already published similar allegations about

23   Moore.  And, fourth, Moore cannot prove that his emotional

24   distress and mental anguish was caused by the shopping mall ad

25   as opposed to other similar ads and articles about the

1 allegations.

2        Now I am going to briefly tell you about the burden

3 of proof.  Please know that I will give you more detailed

4 instructions about the parties' burdens in my final

5 instructions after you have heard all of the evidence.

6        Moore is the plaintiff.  And with one exception that

7 I will discuss shortly, he has the burden of proving his case

8 by what the law calls a preponderance of the evidence.  That

9 means that Moore must prove that in light of all of the

10 evidence, what he claims is more likely true than not.

11        And here's the easiest way to think about it:  If

12 you could put all of the evidence that favors Moore's position

13 on one side of the scale and you put all of the evidence

14 favoring the defendant's position on the other side of the

15 scale, Moore needs to tip the scales in his favor.

16        If the scales tip in Moore's favor, then he has

17 proved that fact by a preponderance of the evidence.

18        If it doesn't tip at all or it tips in the

19 defendants' favor, then Moore has failed to meet his burden.

20        To decide whether any fact has been proved by a

21 preponderance of the evidence, you may, unless I instruct you

22 otherwise, consider the testimony of all of the witnesses,

23 regardless of which party called that witness, and all

24 exhibits that the Court has allowed, regardless of which party

25 brought that exhibit.

1    After considering all of the evidence, if you decide

2  that a claim or a fact is more likely true than not, then the

3  claim or fact has been proved by a preponderance of the

4  evidence.

5    Now, I told you there was one exception.  Because

6  the law considers Moore a public figure, he must prove that

7  the defendants acted with actual malice when they aired the

8  shopping mall ad.

9    To prove that the defendants acted with actual

10  malice, Moore must prove that when the defendants published

11  the shopping mall ad, they knew that a statement in the ad was

12  false or that they recklessly disregarded whether the

13  statement was false.

14    And, again, the statement at issue in this case is

15  the combination of those two quotes that I showed you earlier.

16    Moore must prove actual malice by clear and

17  convincing evidence, which is a degree of proof that is

18  greater than a preponderance of the evidence.  Clear and

19  convincing evidence is proof that establishes that it is

20  highly probable that when the defendants published the

21  shopping mall ad, they knew that the combination of the quotes

22  was false or they acted with reckless disregard as to whether

23  it was false or not.

24    The defendants have pleaded the affirmative defenses

25  of truth and substantial truth.  This means that if the

1  defendants prove to your reasonable satisfaction from the

2  evidence that the statement they made in the shopping mall ad

3  was true or substantially true, then Moore cannot recover.  I

4  will give you a more detailed definition of substantial truth

5  in my final instructions.

6          Now, when you are serving on the jury, you cannot

7  talk with anyone about anything related to the case.  You can

8  tell people that you are a juror, and you can give them

9  information about when you are going to be in court.  In other

10  words, you can call your employer and say, hey, I'm going to

11  be here serving all week on the case, or you can call your

12  wife and say, I will be home at 6:00 or 7:00 o'clock tonight.

13  What you can't do is talk about what you heard in the case

14  that day.  Do y'all understand the difference?

15          All right.  It is even stricter than you think.  You

16  can't talk with each other about the case during the trial

17  either.  You want to make sure that you have heard everything,

18  all of the evidence, the lawyers' closing arguments, and my

19  instructions on the law before you begin deliberating.  You

20  should keep an open mind until the end of the trial.

21  Premature discussions may lead to a premature decision.

22          Now, in this age of technology, I want to emphasize

23  that in addition to not talking face to face with anyone about

24  the case, you cannot communicate with anyone about the case by

25  any other means.  That includes e-mails, text messages, phone

1 calls, and the internet, including social networking websites

2 and apps such as Facebook, Instagram, Snapchat, TikTok, and

3 all of the other ones I'm not cool enough to know about.

4          The point is pretty simple:  Don't use technology to

5 talk about the case or disclose facts about the case.  And by

6 the same token, don't use technology to look up or do any of

7 your own investigation about the case either, which means

8 don't use Google or any search online or offline to find

9 information about the case or the parties or the law.

10          Don't read or listen to the news about this case.

11 Don't visit anyplace related to the case or research any fact,

12 issue, or law related to the case.  The law forbids jurors to

13 talk with anyone else about the case and forbids anyone else

14 from talking to you about the case.  It's very important that

15 you understand why these rules exist and why they are so

16 important.

17          You must base your decision based only on the

18 testimony and other evidence that is presented here in the

19 courtroom to you this week.

20          It would not be fair to the parties if you base your

21 decision on any information that you acquire outside the

22 courtroom.

23          For example, the law often gives or uses words and

24 phrases in special ways, so it is important that any

25 definition that you get comes only from me and not from any

1  other source.

2            Again, only you eight jurors can decide the verdict
3  in this case.

4            The law sees only the eight of you as fair, and you
5  are the only eight that have taken the oath to be fair in this
6  case.  That means literally no one else is qualified to render
7  a verdict in this case, and that includes me.

8            You are the only eight that can do it, so we need to
9  make sure that you follow the rules so that you can.

10            Now, if you wish, you may take notes to help you
11  remember what the witnesses say.  If you do take notes, please
12  don't share them with anyone else until you go to the jury
13  room to decide the case.  And don't let your note-taking
14  distract you from paying attention and carefully listening to
15  and observing the witnesses.

16            When you leave the courtroom, you should leave your
17  notes hidden from view in the jury room.  In other words, at
18  the end of each day, the room you just came out of, we are
19  going to lock those doors.  So you can just take them and
20  leave them in there on the table each night and they will be
21  just where you left then when you come back the next day.

22            Remember, when you are taking notes, you should rely
23  on your memory of the testimony.  Your notes are only there to
24  help your memory.  They are not entitled to any greater weight
25  than your memory or the impression of the testimony.

1          Now, let's walk through how the trial works.  First,

2    each side may make an opening statement, but they don't have

3    to.  Remember, opening statements are not evidence, and it is

4    not supposed to be argumentative.  It's just an outline of

5    what each party believes that they will prove during the

6    trial.

7          Next, Mr. Moore will present his witnesses, and he

8    will ask them questions.  After he presents or questions the

9    witnesses, the defendants may ask the same witnesses

10   questions.  This is what we call cross-examining a witness.

11   Then, the defendants will present their witnesses, and Moore

12   may cross-examine them.

13         You should base your decision on all of the

14   evidence, regardless of which party called the witness or

15   presented the exhibits.

16         After all the evidence is in, the parties' lawyers

17   will present their closing arguments to summarize and

18   interpret the evidence for you, and then I will give you

19   instructions on the law.  At that time, you will go to the

20   jury room and deliberate.

21         Now, one other thing that I haven't stressed, or at

22   least if I have, not stressed enough, I told you from the

23   beginning we will probably be here all week.  During that

24   time, I have instructed the parties and their attorneys and

25   others not to speak to or interact with you.  So if there

1  comes a time during the week where you are coming in the door
2  with one of the attorneys or parties and they don't talk to
3  you or they kind of walk away, it is not because they are
4  mean.  It is not because they don't like you or are acting
5  like a jerk.  If you want to think that, it's my fault.  I
6  told them to do it.  And let me explain why.  What I don't
7  want to have happen is something innocent where an attorney
8  for one party is holding the door for you and you say "good
9  morning."  While that is totally innocent and a very Southern
10 thing to do, the other side might see it and wonder if you are
11 saying something to that party that is inappropriate.  So I
12 have instructed them just not to interact with you while the
13 case is going on.
14         Does everybody understand?  Very good.
15         So now at this time, I am going to turn the case
16 over to the parties' attorneys.  They are going to give their
17 opening statements now.  These statements are the lawyers'
18 view of the evidence or what they anticipate that the evidence
19 will be.  Remember that what the lawyers are about to say to
20 you is not evidence in the case.
21         Mr. Wittenbrink, are you ready?
22         MR. WITTENBRINK:  I am, Your Honor.
23         THE COURT:  All right.  The floor is yours.
24         MR. WITTENBRINK:  Would you prefer me to stand in a
25 certain place, Judge.

```
 1              THE COURT:  We have created that space for you so
 2    that you will not be blocked.
 3              MR. WITTENBRINK:  Thank you.
 4              THE COURT:  Thank you.  And you may proceed.
 5              MR. WITTENBRINK:  Good afternoon, ladies and
 6    gentlemen of the jury.  I'm glad you are here this afternoon.
 7    I hope you had a good lunch.
 8              I hope you know that it is very important what you
 9    are doing.  You really represent the best part of America, and
10    we come before a jury to have you decide these cases so I am
11    glad you are here.  I'm glad that you have all made the cut
12    and you are going to decide this case for us.
13              Madame Court Reporter, I would like to ask you to
14    play Exhibit 1 again, please.
15              THE COURT:  Sarah, I have got it.  That will
16    probably be the easiest to do.
17              All right.  Mr. Wittenbrink, when you are ready,
18    just tell me.
19              MR. WITTENBRINK:  Go ahead and play it.
20              THE COURT:  Hold on.  Sorry.  I was not -- give me
21    just a second.
22         (Video played)
23              THE COURT:  I am going to replay it.  Now we are
24    ready.
25         (Video played)
```

1    MR. WITTENBRINK:  So what we believe the evidence is

2  going to show you after we are finished is that absolutely

3  none of that advertisement is true.  Not a word.

4           We are going to bring to you witnesses who know Roy

5  Moore, who have known him for many years, who know his

6  character, who know his reputation.  We are going to bring

7  several law enforcement officers and people who have worked at

8  the Gadsden Mall for many years, and they will tell you he was

9  never banned from the Gadsden Mall.  He was never banned, and

10 he was never banned for soliciting sex at the Gadsden Mall.

11 He was never banned for soliciting sex from young girls.  We

12 will show you evidence that this advertisement was very

13 carefully crafted, constructed, put together in a very

14 deceptive manner.  And when you see the actual source material

15 that the parties have used to put this ad together, you will

16 see exactly how the deception was created.

17          We will tell you that -- we will bring evidence that

18 the 14-year-old girl involved, no one solicited sex from her.

19 No one approached her for sex.  It was an innocent

20 transaction, and we will tell you it was never said before 40

21 years later that anything like that ever happened.

22          We will show you that the way that they changed the

23 words, even in the sources that they used, make it not only

24 deceptive but clearly that they knew what they were doing and

25 that they knew that what they were doing was making an ad that

1   was not true.

2          We are going to bring you people who have known Roy

3   Moore all his life, who care about him, and can tell you what

4   kind of damage this advertisement did.

5          It is a heinous thing to accuse someone of

6   soliciting sex from young girls.  It's a heinous thing to

7   accuse someone of approaching a 14-year-old girl for sex.  And

8   if it is not true, then I believe that you will render a

9   judgment accordingly.

10          What we will also bring is evidence of how much

11   effort -- you know, Roy Moore was running for the Senate in

12   2017.  His popularity and his reputation was at its zenith.

13   And we will show you the evidence that 32 days before the

14   election, this campaign of smears came out.  And we will show

15   you evidence that the defendants set up an organization for

16   this specific ad and for other ads, and they spent a lot of

17   money and they have a lot of incentive.

18          We will bring you evidence to show the story of Roy

19   Moore.  You know, Roy Moore was a good person.  We will bring

20   you evidence to show that he accomplished things in his life,

21   that he did good things in his life, that he had a good

22   reputation until these things came about.  And we will show

23   you the difference between this advertisement and the other

24   things that were alleged about Roy Moore, the difference that

25   this advertisement made, and the difference that this damage

1   that this advertisement caused to his reputation, and that --

2   we will bring you evidence to show that even though he was far

3   ahead in the election race before this, that afterward, he

4   lost the race by a small margin and that the effect of these

5   advertisements being run caused him to lose that election and

6   to lose his reputation forever probably.

7             I want to thank you for being here.  I want to thank

8   you for your time and your patience.  And I intend to show you

9   that all of the things I am telling you are the truth.

10            Thank you very much.

11            THE COURT:  All right.  Thank you, Mr. Wittenbrink.

12            Mr. Ragsdale.

13            MR. RAGSDALE:  Thank you, Your Honor.

14            THE COURT:  Mr. Ragsdale, do you intend to use the

15  monitor at all?

16            MR. RAGSDALE:  I do.

17            THE COURT:  All right.  I'm going to give y'all

18  control now -- or Sarah has got it.  You may proceed.

19            MR. RAGSDALE:  Thank you.  I appreciate it.

20            Good afternoon.  I have introduced myself about a

21  hundred times, but I'm Barry Ragsdale.  I represent the

22  defendants in this case along with my two co-counsel who are

23  seated there with me at the table.

24            I represent Senate Majority PAC, or SMP, and

25  Waterfront Strategies.  SMP is, as I think the judge has told

1  you, a political action committee.

2        Mr. J.B. Poersch, who I would like to stand here, if

3  you don't mind, is the president of SMP, and you will hear

4  from him testify today, I think, about what SMP did when they

5  ran this ad, what they did before they ran this ad.  And

6  that's really what this case is about is whether or not my

7  client in the midst of a heated political campaign had the

8  right to run an ad that repeated allegations and accusations

9  and published reports that had already been made.  And that's

10  very important because we are going to say -- and I believe we

11  are going to prove to you -- that nothing in that ad had --

12  was something we made up.  It had all been said before.  It

13  had all been published before.

14        The important time frame I think -- and the judge

15  has talked about it -- on November 9th, 2017, The Washington

16  Post, not us, not SMP, not my clients, but The Washington Post

17  published an article that we are going to talk about in just a

18  minute that included allegations and accusations against

19  Mr. Moore, and it was not until 18 days later that our ad ran

20  on television.  It started running on November 27th.

21        So that 18 days is very important because I am going

22  to show you some of the things that got published, reported,

23  and said about Mr. Moore during that time period, none of

24  which we are responsible for.  There is going to be zero

25  evidence presented that we caused reporters to tell stories or

1  report stories.  There's going to be zero evidence that we
2  caused these women to come forward.  We didn't.  We ran a
3  political ad in a political campaign, which is our right under
4  the First Amendment to the Constitution.  And that is what we
5  think we will ultimately be able to show to you.
6          Now, having said that, I want to talk about the fact
7  that this case really is going to focus on two important
8  points in Mr. Moore's life, 40 years apart.
9          The first one is 1977.  It seems like forever ago.
10 It does to me.  But in 1977, Mr. Moore graduated from law
11 school and came to Etowah County.  He was single.  He didn't
12 have a girlfriend.  He lived alone.  He was a brand new
13 assistant district attorney, and he started hanging out at the
14 Gadsden Mall.  And at that point in time, the Gadsden Mall was
15 a couple of years old, and it was probably overrun -- I don't
16 know -- but I have seen malls about that time period with
17 teenagers and young people who would hang out at the mall.
18 And so did Mr. Moore.  And that, ladies and gentlemen, I will
19 tell you is when the trouble started.
20         Now, I want you to flash forward 40 years.  It is
21 2017.  Mr. Moore is running for political office.  He's
22 running for the United States Senate to represent all
23 Alabamians in Congress.  And that is not an unusual thing for
24 Mr. Moore.  The evidence is going to show that Mr. Moore is a
25 politician.  He's run for office nine times, so this is his

1   business.   It is what he does for a living.   He runs for

2   political office.

3            And during that 2017 campaign, on November 9th --

4   and that's a very important date, and you are going to hear me

5   say it probably a hundred times until you are sick of hearing

6   it -- but on November 9th, The Washington Post published an

7   article.

8            And if we can go ahead and pull that up, Mitch.

9            You should be able to see it.   If anybody can't see

10   their monitor, please let us know, but you will see -- and let

11   me just say:   These articles are all going to be in evidence.

12   You are going to have an opportunity to read every word of it,

13   so you don't have to necessarily read them right now.   You are

14   going to have -- all of them are going to go back with you,

15   and you will have an opportunity to look at them, read them,

16   decide for yourself.

17            But on November 9th, Mr. Moore's troubles really

18   started because on November 9th, this article appeared in The

19   Washington Post.   And this article talked about -- and you can

20   see the headline -- it says, Woman says Roy Moore initiated

21   sexual encounter when she was 14 and he was 32.

22            And ladies and gentlemen, again, I want to make it

23   clear:   My clients had nothing to do with this report coming

24   out in The Washington Post.   There's zero evidence that we

25   planted the story or did something to somehow cause the paper

1   to report this, and there's going to be zero evidence that we

2   had anything to do with these four women coming forward.  So

3   this happened independently.

4           This young lady whose picture you see there is Leigh

5   Corfman, and the article says that she was 14 years old when

6   an older man approached her outside a courtroom in Etowah

7   County.  That's Gadsden.  Y'all know that.  She was sitting on

8   a wooden bench with her mother, they both recalled, when the

9   man introduced himself as Roy Moore.

10          The article goes on to say, Alone with Corfman,

11  Moore chatted with her and asked for her phone number, she

12  says.  Days later, she says, he picked her up around the

13  corner from her house in Gadsden, drove her about 30 minutes

14  to his home in the woods, told her how pretty she was, and

15  kissed her.

16          On a second visit, she says, he took off her shirt

17  and pants and removed his clothes.  He touched her over her

18  bra and underpants, she says, and guided her hand to touch him

19  over his underwear.

20          Those are the allegations, that she was 14 and he

21  was 32 at the time.

22          It goes on, She remembers that Moore kissed her and

23  that she took off her pants -- excuse me -- he took off her

24  pants and shirt and then he touched her through her bra and

25  underpants.  She says that he guided her hand -- his hand --

excuse me -- her hand to his underwear and that she yanked her hand back.

Now, this article, as I have mentioned, appeared in The Washington Post.  That's obviously a newspaper that's published out of Washington.  It's distributed everywhere. But in this article, it goes on to say that they didn't publish this article until talking to more than 30 people in and around Gadsden who said they knew Moore between 1977 -- that's the year he got out of law school and started coming back -- or came back to Etowah County -- and 1982.  And I will tell you that the evidence is going to show that in 1982, Mr. Moore left Gadsden for a period of time.  So the period of time we are talking about is 1977 to 1982, and that he served as a district attorney for Etowah County.

I want to say one more thing about this Washington Post article.  It ultimately, we believe the evidence is going to show, was awarded the Pulitzer Prize, the highest award you can get in journalism, for the investigation that they did. And the reporters that did this report, as I said, talked to more than 30 people.

THE COURT:  Hold on a second, Mr. Ragsdale.

Mr. Wittenbrink?

MR. WITTENBRINK:  Judge, I do think it is appropriate to interject at some point the purpose of the introduction of the articles, that we have stipulated to these

1  articles being entered but that they are not offered for the

2  truth of what is in them.  And that's been the limitation that

3  we have been under.  I wanted the jury to understand that

4  early.

5          THE COURT:  I think Mr. Ragsdale has told the

6  jury -- and if not, I am sure he will -- that the point is to

7  show the knowledge that was held by the defendants at the

8  moment they published the ad.

9          All right.  You may proceed.

10          MR. RAGSDALE:  Thank you.

11          Absolutely.  What I am trying to talk to you now is

12  about what happened in that 18 days between this article

13  coming out and the ad that Mr. Moore is suing about?  18 days

14  of the worst publicity any human being could ever go through.

15  I will tell you that.  Every newspaper, every television

16  station around the state was carrying the allegations of these

17  women who had alleged sexual misconduct by Mr. Moore.

18          As these women came forward, the evidence is going

19  to show, more women started to get the courage to come

20  forward.  It ended up being a total of eight women.

21          And, again, the evidence is going to show, we had

22  nothing to do with encouraging these women to go forward.  We

23  didn't find these women and ask them to come talk to The

24  Washington Post.  We had no relationship with these women, nor

25  did they have any relationship with each other.

1      This article, by the way, in addition to talking
2  about the sexual misconduct of Mr. Moore regarding Leigh
3  Corfman, identified three other women.  And as the judge has
4  indicated, they didn't have the same exact experience with
5  Mr. Moore.  Instead, what they did is they had experience with
6  him wanting to date them or asking them out on dates or
7  kissing them or hugging them when they were teenagers.  That's
8  what the evidence was.
9      One of those is identified in this story as Gloria
10 Thacker Deason.  She worked in the Pizitz store.  Most of
11 y'all remember Pizitz is a department store that was in the
12 Gadsden Mall.  I think they are all gone now.  And Ms. Deason
13 went on to say that she had dated Moore on and off and that he
14 took her to his house at least two times.  She says their
15 physical relationship did not go further than kissing and
16 hugging.
17     In addition to that, there is a story in The
18 Washington Post about a young woman named Wendy Miller, and
19 you are going to hear from Wendy Miller testifying today.
20 She's obviously not 14 or 16 anymore.  She's grown up.  But in
21 this story, The Washington Post goes on to report that she was
22 approached by Mr. Moore at the mall while she was working as a
23 Santa's helper.  It also says that he asked her out on a date
24 when she was 16 years old and he was 32 years old.
25     So when Mr. Wittenbrink told you it was completely

innocent that he approached her at the mall, keep in mind that
two years later, he asked her out on a date and her mother
wouldn't let her go out on the date.  In fact, it says in this
quote, "Her mother Martha Brackett" -- and that was her maiden
name -- "I would say you're too old for her.  Let's not rob
the cradle."

Now, as I said, you will hear from Wendy Miller.
She will testify about her experience with Mr. Moore.  You are
also going to see -- and I am going to go through some of them
today and you are going to probably get irritated with how
many of them I do -- but I want to talk about these articles
because they all, I think, establish that my client -- by the
time we get 18 days down the road to November 27th, my client
was reasonable in believing that these allegations, which had
stacked up against Mr. Moore, which it included multiple
women, which it included multiple allegations, multiple
reports, sometimes talking to dozens of people before they
said anything in those reports, that my client was justified
and reasonable in repeating those allegations, in reporting on
them so voters could make a decision.  And that's ultimately
what you will be called on to do.

Now, I think it's important to recognize that this
November 9th article of The Washington Post was a bombshell.
In the middle of a political campaign, this went off, and
Mr. Moore had to deal with it.  And he denied the allegations.

1  I think the evidence is going to show that's what politicians
2  do, but they denied the allegations.  In addition to that, the
3  reporters kept digging in.  More women came forward.  More
4  women talked about the fact that Mr. Moore had a propensity
5  for dating teenage girls.  And I want you to look back to that
6  ad -- and you are going to have an opportunity to see that ad
7  several times, obviously.  That ad has five quotations in it.
8  Every one of those has a citation to a report that was already
9  in the press.  In other words, there are five things with
10  quotation marks around them because they are quotes from
11  published articles.
12          Now, Mr. Moore only takes issue in this lawsuit with
13  two of them.  But there are other quotes in that article
14  which, frankly -- or in that ad which are, to me, just as
15  disturbing.  But he only takes issue in this case with two of
16  them.
17          Now, you may ask yourself, Well, wait a minute.
18  What happened with those 40 years?  If he was accosting and
19  harassing young women in 1977, why did it wait until 2017 to
20  come out?  And the easy answer for that is:  Mr. Moore -- and
21  we believe the evidence will show -- was a very powerful
22  person.  He was a district attorney.  He was a judge.  He was
23  on the Alabama Supreme Court.  He was not somebody that a
24  woman who didn't know there were other women, maybe, would
25  come forward and complain about.  And we believe there's going

1  to be evidence that it came out at this time only because of

2  the hard work of some reporters and then the courage that

3  other women were able to take from the fact that some women

4  came forward.

5          Now, if you could, Mitch, go to my next article.

6          Another article that came out talked about a second

7  woman that Mr. Moore had sexually assaulted.  This woman's

8  name -- and the title of this article is "Woman accuses Moore

9  of assaulting her when she was 16."  This woman's name was

10 Beverly Young Nelson.  And if you see in that article -- part

11 of it we have pulled out -- she talks about an encounter in

12 which Moore forced himself on her in his car behind the

13 restaurant in Gadsden.  After she screamed to him to stop, she

14 said, Instead of stopping, he began squeezing my neck,

15 attempting to force my head onto his crotch.  I continued to

16 struggle.  I thought he was going to rape me, Nelson said.

17         Again, that was published independently, having

18 nothing to do with our client, before we ran the first

19 shopping mall ad on November 27th.

20         The accusations kept coming.  Two more women come

21 forward with Roy Moore accusations.  These women say that they

22 also had similar encounters with Mr. Moore and that, at one

23 point, there was an unwanted forceful kiss that left one of

24 these women scared.

25         They keep coming.  Four more women accused Roy Moore

1  of misconduct.  Again, independent reporting.  Nothing to do

2  with our client.  Nothing to do with the fact that we ran a

3  shopping mall ad 18 days later.  And in this particular

4  instance, those women say they were groped, forcibly kissed,

5  or subjected to unwanted advances.

6          In addition to that, there were articles in which

7  local people in Gadsden were interviewed and talked about, not

8  necessarily these women but other people in Gadsden, and they

9  said, We have been hearing about this for years.  We have been

10  hearing about the fact that Mr. Moore liked teenage girls.  He

11  liked to hang out at the mall.  He liked to hit on teenage

12  girls at the mall.  And in fact, those articles say locals

13  were troubled by Roy Moore's interactions with teen girls at

14  the Gadsden Mall.

15          This particular article says, This past weekend, the

16  person who wrote the article messaged or spoke with more than

17  a dozen people, including a major political figure in the

18  state, who told me that they had heard over the years that

19  Moore had been banned from the mall because he repeatedly

20  badgered teenage girls.

21          In addition to that, articles were published that

22  said, Gadsden locals say Moore's predatory behavior at mall

23  and restaurants was never a secret.  And there it says that

24  Moore's penchant for flirting with teenage girls was common

25  knowledge and not a big secret around Gadsden, according to

1  some residents.

2          And, again, these are folks that live here, or at

3  least in Gadsden.  These are folks that live in Etowah County

4  and lived in that area, and they have been hearing about these

5  allegations and these rumors down kind of secret for a long

6  time.

7          But in 2017, we believe the evidence is going to

8  show, Mr. Moore's dark secrets became public, and they became

9  public through reporting, and they became public through brave

10  women who came forward, one or two of which I think you are

11  going to hear from during this trial, and were able to tell

12  what had happened to them when they were teenagers.

13          The last one, I will just show you, is a former

14  Alabama police officer who says, We were told to make sure

15  Moore didn't hang around cheerleaders.  A retired Alabama

16  police officer said, Police were told in the 1970s to make

17  sure now GOP Senate candidate Roy Moore stayed away from high

18  school cheerleaders.

19          But that was just the beginning.  There was an

20  avalanche of articles, and you are going to see -- the good

21  news is I am not going to read you anymore.  But you are going

22  to see all of those articles, dozens and dozens of reports in

23  various different places, various different outlets, on TV, in

24  newspapers, in magazines, every place you could imagine

25  reporting on the fact that Mr. Moore had engaged in

1  misconduct, in sexual abuse, in sexual assault, all of which

2  happened and all of which was reported before my client ever

3  ran the first advertisement in the campaign.  And that's

4  important, because, as the judge has told you, Mr. Moore,

5  because he's a political figure, a politician, a public

6  figure, has to prove more than, say, you or I if we wanted to

7  sue somebody for slander or for defamation.

8          Because he's a public figure and has put himself out

9  in the public domain, he has to prove something called "actual

10  malice."

11          Now, let me tell you, lawyers are terrible about

12  making up words that don't mean what they seem to mean.

13  Actual malice doesn't mean malice like we hated him or that we

14  were malicious about it.  Actual malice, as the judge is going

15  to instruct you and has already instructed you, is a

16  constitutional-based principle that says, In order for a

17  politician or a public figure, like Mr. Moore, to sue and win

18  a defamation case, which is what this is, he has to prove that

19  my client knew that what was being published was false, not

20  just that we didn't know, but that we knew it was false or

21  that we acted so recklessly that we disregarded what was

22  obvious about the fact that it was false.  And that's the

23  burden he has to carry, and he has to carry it, according to

24  the judge, by that higher standard.

25          Remember the scales of justice?  Well, this is a

1  higher standing called "clear and convincing evidence," which

2  means he's got to prove to you that it is highly probable that

3  we knew it was false when it was published.

4        Let me tell you some of the things that the evidence

5  is going to show in this case.  The evidence is absolutely

6  going to show that we researched this advertisement before it

7  ran.  We read all these articles, not all of them, but most of

8  them.  We read dozens and dozens of articles and found all the

9  reports that had come out.  We had every reason to believe

10  they were true.  Mr. Moore denied it.  Mr. Moore attempted to

11  refute it.  That's what you do, right?  But there were

12  multiple, multiple reports that we looked at before we ran

13  this ad on November 27th.

14        Secondly, I think that you are going to find that

15  the ad does not say anything that hadn't already been said

16  before.  In fact, that's why there's quotes around those

17  statements, and that's why those were taken from published

18  reports because they were repeating, summarizing, and

19  synthesizing for voters what had already happened over those

20  18 days between The Washington Post article on November 9th

21  and our ad on November 27th.

22        Third, I think you are going to find evidence that

23  says TV stations won't run campaign ads unless they are

24  provided the backup information to show that the allegations

25  in them are true.  TV stations don't want to get sued any more

1   than anybody else does.

2              THE COURT:  You have three minutes, Mr. Ragsdale.

3              MR. RAGSDALE:  Thank you.

4              They have rules about that.  And one of the rules is

5   you have got to provide us with the backup that backs up what

6   you say.  We did that.  The TV stations around the state

7   agreed to run these ads.  None of the TV stations took them

8   down.  We complied with those rules.

9              I think the evidence is also going to be clear that

10  SMP absolutely believed that what was said in those ads was

11  true based on the dozens of people that had come forward,

12  based on all the research that had been done by the reporters,

13  based on all the women that had come forward.

14             SMP and Waterfront absolutely believed they were

15  true.  They didn't know they were false.

16             And, lastly, I would say that you are going to have

17  to find, in order to rule for Mr. Moore, that he's the only

18  person telling the truth.  Everybody else must be lying.  All

19  these women must be lying.  All these reporters must be lying.

20  The dozens of people that got interviewed must be lying.  Only

21  Mr. Moore is telling the truth.

22             Now, the last thing I would say, you are going to

23  hear from a couple of these women.  I don't think you are

24  going to hear from all of them.  We, as SMP, don't have the

25  responsibility of trying to prove to you that all of those

1  allegations are true.  We only must show, according to the

2  law -- and it is a protection in the Constitution, the First

3  Amendment of the Constitution, which protects the right of

4  people to criticize the government.  It protects the right to

5  criticize politicians.  And it says, if you are going to get

6  sued for defamation, you have got to prove that I knew or that

7  my client knew it was false.  And we don't believe you are

8  going to find anything close to that evidence.

9          To the contrary, I believe you are going to find

10 that we believed, along with a lot of other people, that these

11 allegations were true.

12         Now, the last thing I will say is this:

13 Mr. Wittenbrink said, Look at all these advertisements.  Look

14 at all these things.

15         Wait a minute.  We are only responsible for this ad.

16 We are not responsible for the other negative things that got

17 said about Mr. Moore, and I want you to be very careful, and I

18 know you will be, because I know we went through the whole

19 process of picking you, that you limit what you are concerned

20 about in terms of this publicity and adverse allegations to

21 this one ad and ask yourself:  With all the bad publicity that

22 happened between November 9th and November 27th, did it

23 really -- did the damage to his reputation, did everything

24 he's claiming happen by this one ad?  By that time, there had

25 been this avalanche of articles.

```
 1              I thank you for your time.  I appreciate your
 2    attention.  I know you may say you are excited about being
 3    here, but it's a week sitting in a courtroom, and I do
 4    appreciate your time.  Thank you.
 5              THE COURT:  Thank you, Mr. Ragsdale.
 6              All right.  Before you call your first witness,
 7    Mr. Wittenbrink, do you have exhibits that you would like to
 8    move into admission?
 9              MR. WITTENBRINK:  I'm sorry, Judge.
10              THE COURT:  Do you have the list?
11              MR. WITTENBRINK:  We do have a list.  I think we
12    made a joint list together.
13              THE COURT:  Okay.  I don't mind who reads it.  Just
14    somebody needs to read the numbers into the report.
15              MR. RAGSDALE:  The exhibit genius is ready here to
16    talk about it.
17              THE COURT:  All right.
18              MS. VELEZ:  Your Honor, and this reflects both
19    parties' exhibits:  1 through 5, 18, 28 through 65, 67 through
20    93, 95 through 172, 174, 177 through 196, 198 through 212, 215
21    through 240, 242 through 243, and, finally, 246 through 254.
22              THE COURT:  All right.  Preserving the objections
23    that have been made by both parties to those exhibits
24    previously, I am going to admit Exhibits 1 through 5, 18, 28
25    through 65, 67 through 93, 95 through 172, 174, 177 to 196,
```

1    198 to 212, 215 to 240, 242 to 243, and 246 to 254.

2           Did I get that correct?

3           MS. VELEZ:  Yes.  Thank you, Your Honor.

4           THE COURT:  All right.  All of those -- correct?

5           MR. WITTENBRINK:  That's correct, Your Honor.

6           THE COURT:  All of those exhibits are admitted.

7           Now, let me explain to you what I just did.  I think

8    I saved us probably a couple of hours of headache this week.

9    I have worked very hard and the attorneys have worked hard

10   with me over the last few weeks to be able to admit nearly all

11   of the exhibits that you will see this week at one time so

12   that we don't have to do it one at a time as the week goes.

13   So that's what we have done.  We have admitted all of the

14   exhibits that they jointly agreed to or that I have ruled on.

15   So now they will just be able to show them on the screen

16   immediately.

17          I do want to make one caveat with that.  As you

18   heard the attorneys talking about during the opening

19   statements, many of the exhibits you are going to see are

20   newspaper articles or other kinds of published reports from

21   the time period in November of 2017.  I have not admitted

22   those exhibits to prove the truth of the allegations in them,

23   and you cannot use them for that purpose.

24          In other words, when you read those articles, you

25   can't use them to say, I believe that this happened or I

1  disbelieve that it happened.  It cannot be used for that

2  purpose.

3           The purpose of the articles is to prove or disprove

4  that the defendants knew -- and I am going to put it back up

5  on the screen -- that the defendants knew that the combination

6  of these two quotes conveyed a message that was either false

7  or they were reckless in disregarding the falsity of this

8  statement.  That is the limited purpose for which you are to

9  consider the articles that I have just admitted.

10          All right.  Any other things regarding exhibits we

11 need to take care of before we start with witnesses?

12          Mr. Wittenbrink?

13          MR. WITTENBRINK:  I think that's it, Judge.

14          THE COURT:  Mr. Ragsdale?

15          MR. RAGSDALE:  That's all.

16          THE COURT:  All right.  Where is our first witness?

17 Is he in the witness room?

18          MR. WITTENBRINK:  Mr. Muhlendorf?

19          THE COURT:  Yeah.  If somebody will go get him, in

20 the meantime, I want to see Mr. Ragsdale and Mr. Wittenbrink

21 up here just for a second.

22          And, Chadwick, if you don't mind, can you push

23 the monitor -- I mean, the podium?

24     (Sidebar conference)

25          THE COURT:  Just real quick:  Whichever party is

1  presenting evidence at the time, we are going to give control

2  of the screen to that party.

3          MR. WITTENBRINK:  Okay.

4          THE COURT:  Ms. Sarah is not able to pull up

5  exhibits on demand.

6          MR. WITTENBRINK:  I thought -- see, I had a huge

7  misunderstanding.

8          THE COURT:  That's okay.

9          MR. WITTENBRINK:  I thought that they were pulling

10 up the exhibits, so I need to have a --

11         THE COURT:  If you have got somebody at your

12 table --

13         MR. WITTENBRINK:  I do.  I am going to have to have

14 him --

15         THE COURT:  We are just going to give control to

16 your table.  So when you are the one asking questions,

17 whatever your table pulls up will immediately go on the

18 screen.

19         MR. WITTENBRINK:  Okay.  I have a --

20         THE COURT:  If you need a couple of minutes to talk

21 to him about it, that's fine.

22         MR. WITTENBRINK:  Yeah, I probably need about 15

23 minutes to make sure we have got all that stuff on the thumb

24 drive and ready to go to talk.

25         THE COURT:  Let's do it in ten.

```
 1              MR. WITTENBRINK:  Because I made a huge
 2  misunderstanding about -- I thought Sarah was going to be
 3  controlling the exhibits.
 4              THE COURT:  That's fine.
 5              MR. WITTENBRINK:  And in fact, I told the team that,
 6  So they are going to pull up the exhibits for us as we go.
 7              THE COURT:  Let's take ten minutes, and we will test
 8  it, okay?
 9              MR. WITTENBRINK:  Thank you very much.
10              THE COURT:  All right.
11              MR. RAGSDALE:  Thank you, Judge.
12          (End sidebar conference)
13              THE COURT:  We are going to take about a ten-minute
14  break real quick to work on some technology issues that will
15  help speed this along significantly.  So what I'm going to do
16  now is I'm going to let y'all retire back to your deliberation
17  room.  You can use the restroom, make coffee, et cetera.  But
18  in about ten minutes, we will come back and get you, and we
19  will start with the first witness.
20          (Jury out at 1:28 p.m.)
21              THE COURT:  Everybody in the room is free to take a
22  break.  Just try to be back in the room in about seven or
23  eight minutes.
24          (Recess taken from 1:29 p.m. to 1:40 p.m.)
25              THE COURT:  Sarah, you can go get the jury.
```

```
 1        (Jury in at 1:41 p.m.)
 2              THE COURT:  Everyone may be seated.
 3              All right.  The plaintiff may call its first
 4  witness.
 5              MR. WITTENBRINK:  We call Adam Muhlendorf.
 6              THE COURT:  Mr. Muhlendorf, if you will please
 7  stand, Ms. Sarah is going to administer the oath.
 8        (Witness sworn)
 9              COURTROOM DEPUTY:  State your name for the record.
10              THE WITNESS:  Adam Muhlendorf.
11              COURTROOM DEPUTY:  Can you please spell that?
12              THE WITNESS:  Sure.  A-D-A-M, M-U-H-L-E-N-D-O-R-F.
13              COURTROOM DEPUTY:  Thank you.
14              THE COURT:  You may proceed.
15                        DIRECT EXAMINATION
16  BY MR. WITTENBRINK:
17  Q.    Mr. Muhlendorf, you have already told us your name.
18  Can you tell us where you are from?  Where do you live?
19  A.    I currently live in Montgomery, Alabama.
20              THE COURT:  Mr. Wittenbrink, if you will do me a
21  favor, just pull the mic -- there you go.  Just like that.
22              MR. WITTENBRINK:  And usually I don't have trouble.
23  I am having a little hoarseness today, Judge.  Sorry about
24  that.
25              THE COURT:  That's okay.  You may proceed.
```

1  Q.     (By Mr. Wittenbrink) Mr. Muhlendorf, can you tell us:

2  What is Highway 31?

3  A.     Highway 31 was a political action committee.

4  Q.     Okay.  And you say it was a political action committee.

5  Can you tell us when it was created?

6  A.     Yes, sir.  It was created in 2017 for the special

7  election for U.S. Senate.

8  Q.     Do you know around what month?

9  A.     In Novemberish.

10  Q.     Okay.  So created around November of 2017, and then

11  when was it terminated?  When did it end?

12  A.     After the election concluded.

13  Q.     And do you know exactly when that was?

14  A.     No, sir.

15  Q.     Do you know what month it was?

16  A.     It was -- the election was in December.  I don't know

17  if the termination paperwork was filed in December or January.

18  I'm sorry.

19  Q.     December or January, but you don't know which?

20  A.     Yes.

21  Q.     It was a very short-lived operation; is that correct?

22  A.     Yes, sir.

23  Q.     Can you tell the Court:  Was this a grassroots

24  committee that sprung up in Alabama?

25  A.     It was a committee that -- made up of multiple people

1    and organizations.

2    Q.     Multiple people and organizations?

3    A.     Yes, sir.  I don't really know what you mean by

4    "grassroots" in this circumstance.

5    Q.     Well, did you have a lot of small donors and

6    participants from around this area in Alabama?

7    A.     I believe we had some, but I don't know the exact

8    number.

9    Q.     Some.  More than five?

10   A.     That, I don't know.

11   Q.     You don't know the answer to that?

12   A.     No, sir.

13   Q.     Can you tell the Court:  Isn't it true that your major

14   political donor or major donor of funds was the Senate

15   Majority PAC?

16   A.     They were one of the major donors, yes, sir.

17   Q.     Okay.  And you say "one of the major donors."  What

18   percentage of the funds that you had to run your ads and do

19   your work came from them?

20   A.     I don't know the answer to that.

21          MR. WITTENBRINK:  We have a stipulation as an

22   exhibit.  Is there an exhibit number for that stipulation we

23   made?

24          MR. RAGSDALE:  I don't think we did an exhibit

25   number for the stipulation.

```
 1            THE COURT:  I don't have it.  I can read it if
 2  someone will it give to me or if you want to do it yourself.
 3  Q.    (By Mr. Wittenbrink) Well, before we get there, do you
 4  have any idea how much money you spent in the campaign in the
 5  short existence of Highway 31?
 6  A.    No, sir.
 7            MR. RAGSDALE:  Excuse me, Your Honor.  We object to
 8  expenditures beyond this one ad that Mr. Wittenbrink has
 9  indicated is the basis of his case.
10            MR. WITTENBRINK:  Well, part of this was about
11  finding out what this witness actually knew about this.  You
12  know, we had a stipulation for part of this, but then we also
13  had other evidence that we wanted to introduce with regard to
14  that.  And with regard to the effort that was made to defeat
15  Judge Moore in this election, it goes to some of the
16  credibility of these witnesses and their intentions and
17  motive, Judge.
18            THE COURT:  I am going to let you ask the question
19  of how much Highway 31 spent total --
20            MR. WITTENBRINK:  Okay.
21            THE COURT:  -- and not go beyond that.  The rest of
22  the questions need to focus on this particular ad.
23            MR. RAGSDALE:  Thank you.
24  Q.    (By Mr. Wittenbrink) How much did Highway 31 spend
25  total, Mr. Muhlendorf?
```

A.      I am not aware.  That was not part of my job
responsibilities.

Q.      Well, tell us what your job responsibilities were,
Mr. Muhlendorf.

A.      Yes, sir.  I was the spokesperson for Highway 31.

Q.      So you are the spokesperson, but you didn't know how
much they spent or what they spent their money on or anything
like that?

A.      I am -- I don't remember the exact amounts and how much
went -- I mean, that wasn't part of my job.

Q.      Well, if you don't remember the exact amounts, can you
give the jury an approximation of the amounts?

A.      I know it was in the millions.

Q.      In the millions.  More than four million?

A.      Possibly, yes, sir.

Q.      Okay.  Can you tell -- did you have a named position
with Highway 31?

A.      I was the spokesperson.

Q.      Was there -- was there a corporate entity or an
organizational position that you had?

A.      No, sir.

Q.      So there wasn't a president, CEO, or anything like that
for Highway 31?

A.      No, sir.

Q.      Just a treasurer?

1  A.      Yes, sir.

2  Q.      And -- but there was no president?

3  A.      Correct.

4  Q.      Was there a board of directors?

5  A.      Not to my knowledge.

6  Q.      So all you did was talk to the public?

7  A.      To the media.

8  Q.      To the media.

9          So you don't know -- as the spokesperson, the only

10 other person involved in Highway 31 in making decisions was

11 the treasurer?

12 A.      The treasurer was the only official named, as you said,

13 organizational representative in the filing.

14 Q.      So there was one organizational representative, and

15 that was the treasurer and that was it.  And you weren't in

16 that?

17 A.      Correct.

18 Q.      And you spoke to the media.  Did you ever tell the

19 media how much money you spent?

20 A.      Not that I recall.

21     (Brief pause)

22         MR. WITTENBRINK:  If you can pull up, but don't show

23 it on the screen, Number 27.

24         THE COURT:  Just tell me when you are ready to pull

25 it up on the screen.  I will keep it blacked out until then.

1          MR. WITTENBRINK:  Okay.

2      (Brief pause)

3  Q.     (By Mr. Wittenbrink) While he's pulling that up,

4  Mr. Muhlendorf, can you tell me -- so who made the decisions,

5  then, the day-to-day operational decisions?  You had a

6  treasurer and yourself was the spokesperson.  Who made the

7  operational decisions for Highway 31?

8  A.     It depended on the activity.

9  Q.     Who decided what ads were going to run?

10 A.     The Senate Majority PAC.

11 Q.     Okay.  Who decided when they would be on television?

12 A.     The ad buyers that worked with Senate Majority PAC.

13 Q.     So no one in Highway 31 made any of these decisions.

14 Is that what you are telling the Court?

15 A.     No, sir.  I mean, they were part of Highway 31.

16 Q.     So Senate Majority PAC, to your knowledge, was part of

17 Highway 31?

18 A.     Yes, sir.

19 Q.     Okay.  And so when you say Senate Majority PAC, the

20 organization, will make decisions, was that Mr. Poersch, who

21 is here?

22 A.     Yes, sir.

23 Q.     Okay.  If Mr. Poersch previously testified otherwise,

24 that Highway 31 was its own entity and that they intended

25 Highway 31 to --

1              MR. RAGSDALE:  Objection, Your Honor.

2              THE COURT:  I don't think he's finished the question

3    yet.  Let me look.

4              MR. RAGSDALE:  I'm sorry.

5              THE COURT:  Finish your question, and then I will

6    see if there's an objection.

7    Q.    (By Mr. Wittenbrink) If Mr. Poersch testified

8    previously that Highway 31 was an independent organization and

9    that it was in no way captive by Senate Majority PAC, would

10   you say that's a fair characterization?

11             THE COURT:  I will let him answer.

12   A.    Highway 31 was an independent PAC.  It was filed with a

13   P.O. Box in Birmingham, Alabama.  Senate Majority PAC was a

14   part of that but so were other organizations.

15   Q.    Okay.  But there wasn't an independent Highway 31

16   organization that made independent decisions apart from your

17   partners; is that correct?

18   A.    I guess I don't understand your definition of

19   "independent."

20   Q.    Well, if you had no operational decisions, which you

21   have testified already, and Mr. Still, the only other officer

22   of the organization that was filed, really made decisions

23   of -- what?  Did he decide where the money was going to go?

24   A.    I mean, I wasn't involved with his job, so I can't tell

25   you when he did his job and how he did it.

```
 1   Q.      Who decided the contents of the ad, Mr. Muhlendorf?
 2   A.      I'm sorry?
 3   Q.      Who decided the contents of the ads?
 4   A.      Which ad in particular?  All the ads or --
 5   Q.      All the ads.  Who decided?
 6   A.      The research team.
 7   Q.      Okay.  So you had -- who was on the research team?
 8   A.      There were individuals from Senate Majority PAC, from
 9   other entities involved who were on the research team.
10   Q.      And I am watching you look at Mr. Poersch, or Poersch.
11   Is he helping you with your answers, Mr. Muhlendorf?
12           MR. RAGSDALE:  Object, Your Honor.  I am not even
13   sure he can see Mr. Poersch through this giant podium.
14           THE COURT:  Well, I am going to let him answer
15   whether or not.  I mean, I can't tell either.
16   A.      I actually can't see Mr. Poersch.  I was actually
17   looking at my attorney and trying to look at you.
18   Q.      I see.  Your attorney is in the courtroom?
19   A.      Yes, sir.
20   Q.      Okay.  Who is your attorney?  Who is that person for
21   the record?
22   A.      His name is Freeman Fite.
23   Q.      Okay.  So you have no knowledge of how the ads were
24   created, who decided on who was going to play them, or
25   anything else?
```

```
 1  A.      No, sir.

 2  Q.      And all you did was talk to the media?

 3  A.      Yes, sir.

 4  Q.      Do you remember who you talked to?  Do you

 5  remember talking to any --

 6  A.      Specific reporters?

 7  Q.      -- particular newspapers or particular television

 8  stations with regard to the -- pull up that Number 1, please,

 9  the shopping mall ad, just the slide.

10          Can you see that, Mr. Muhlendorf?

11  A.      Yes, sir.

12  Q.      Are you familiar with the ad that that's a part of?

13  A.      Yes, sir.

14  Q.      Did you have a part in creating that ad?

15  A.      No, sir.

16  Q.      Okay.  Do you remember who you spoke to about the ad,

17  about -- in the media?

18  A.      Not specifically, but I know that I did do media

19  interviews with this ad.

20  Q.      Okay.  Did you talk to news organizations?

21  A.      Yes, sir.

22  Q.      Newspapers?

23  A.      Yes, sir.

24  Q.      This -- the ad, the two lines that are there, Moore was

25  actually banned from the Gadsden Mall for soliciting sex from
```

```
 1  young girls, did you have any knowledge of that fact?
 2  A.     I was aware of the article that that ad cites.
 3  Q.     And the article that ad cites, where is that?
 4  A.     The New American Journal.
 5  Q.     New American Journal.  And what kind of media is that?
 6  A.     It's an online publication.
 7  Q.     An online publication.  Is it fair to say that's a blog
 8  by Mr. Glynn Wilson?
 9  A.     What is your definition of a blog?
10  Q.     Okay.  Let me -- can we pull up that New American
11  Journal?  Just that article.
12         MR. RAGSDALE:  Do you have an exhibit number,
13  Mr. Wittenbrink?
14         MR. WITTENBRINK:  We changed the exhibit numbers a
15  couple of times, Judge.  It is in the first five.  Hold on.
16         Exhibit 3 on the joint exhibit list.
17         And, Your Honor, am I correct, did you say we can
18  mark on the actual screen and highlight things?
19         THE COURT:  You can.  You can touch that screen.
20         MR. WITTENBRINK:  Great.  Trade places with me,
21  please, Mr. Talmadge.
22     (Brief pause)
23         MR. WITTENBRINK:  Please accept my apologies, ladies
24  and gentlemen.
25         THE COURT:  I'll put it up for us, Mr. Wittenbrink,
```

1   I believe, unless you tell me that you have it.

2          MR. WITTENBRINK:  Okay.  That's it, Judge.  Thank

3   you very much.  Can I move it up and down, scroll?

4          THE COURT:  Which way do you want it?

5          MR. WITTENBRINK:  Pull it down.  Okay.

6   Q.    (By Mr. Wittenbrink) Am I correct, Mr. Muhlendorf, that

7   the line from the ad --

8          MR. WITTENBRINK:  How do I do the -- I am looking

9   for the tool to highlight it, Judge.  Here we go.  I think

10  that's it.  That little box came up right away the other day.

11  Q.    (By Mr. Wittenbrink) Mr. Muhlendorf, look down at the

12  cite toward the end of the page that says "breaking news."

13  Can you read that?  Can you see that?

14  A.    Yes, sir.

15  Q.    It says -- can you just read the sentence after the

16  colon, "breaking news"?

17  A.    "Sources tell me Moore was actually banned from the

18  Gadsden Mall and the YMCA for his inappropriate behavior of

19  soliciting sex from young girls."

20  Q.    Okay.  Now, that line -- the first word is -- the first

21  three words are "sources tell me;" is that correct?

22  A.    Yes, sir.

23  Q.    And that -- they don't identify who any of those

24  sources are; is that correct?

25  A.    Yes, sir.

1 Q.     You didn't make any editorial decision with whether or

2 not that was an appropriate statement to put in that ad, did

3 you, Mr. Muhlendorf?

4 A.     I did not make editorial decisions.

5 Q.     So that would have been someone with SMP?

6 A.     That would have been someone from the research team.

7 Q.     The research team for Highway --

8 A.     31.

9 Q.     -- 31.  Did -- let me -- do you know what input

10 Highway 31 had for the ad -- I mean, excuse me -- SMP had for

11 the ad?

12 A.     No, sir.

13 Q.     No knowledge at all?

14 A.     (Witness shakes head.)

15    (Brief pause)

16 Q.     (By Mr. Wittenbrink) Did you, yourself, read any of the

17 source articles, Mr. Muhlendorf?

18 A.     The research team provided me with documentation to

19 support which articles were pulled for the ad.  And I read

20 those articles or kept the documentation nearby.

21 Q.     Go back to the slide.  The second statement there, "One

22 he approached was 14 and working as Santa's helper," did you

23 look at the source article for this particular statement,

24 Mr. Muhlendorf?

25 A.     I am sure I did at the time.

1  Q.     You believe you did at the time?

2  A.     Yes, sir.

3         MR. WITTENBRINK:  Pull up the source article,

4  please.  It is the al.com.  It is Exhibit Number 5.

5         That is not it.  That is not the right exhibit list.

6         I believe that's it.  Exhibit 5, al.com.

7         THE COURT:  Is this it, Mr. Wittenbrink?

8         MR. WITTENBRINK:  Yes.  Thank you, Judge.

9         THE COURT:  You may proceed.

10        MR. WITTENBRINK:  Can you scroll down to the portion

11  about Wendy Miller, Judge?  This is it.

12  Q.    (By Mr. Wittenbrink) Can you read that section that

13  starts with the term "Wendy Miller"?

14  A.     "Wendy Miller told the Post that she was 14 and working

15  as Santa's helper at the Gadsden Mall in 1977 when Moore first

16  spoke with her and told her she looked pretty.  Two years

17  later" --

18  Q.    Wait.  Okay.  Stop with "looked pretty."  That is when

19  she was 14.

20        Does anything in that sentence look to you,

21  Mr. Muhlendorf, like Mr. Moore was soliciting sex?

22  A.     The ad doesn't say he was soliciting sex from the

23  14-year-old at the mall.

24  Q.    Well, the ad says -- go back to the ad.  The ad says,

25  "One he approached was 14 and working as Santa's helper."

```
1              Are you telling the jury, the ladies and gentlemen
2   of the jury, that that sentence does not refer to the
3   immediately previous sentence that he was banned from the mall
4   for soliciting sex from young girls?
5   A.     That's not how I read it.
6   Q.     So you read the second sentence as completely a
7   standalone, and you are going to tell these ladies and
8   gentlemen of the jury that the 14-year-old that's referred to
9   here was not one of the young girls that he was banned from
10  the mall for soliciting sex from?
11  A.      No, sir.  What I am going to say is I read these posts
12  separately in that he was banned -- the first slide says he
13  was banned from the Gadsden Mall for soliciting sex from young
14  girls, and the second slide refers to him approaching a
15  14-year-old working as Santa's helper.
16             MR. WITTENBRINK:  Okay.  Your Honor, I am going to
17  ask that we play the actual ad again.  Not the slide, but the
18  video of the ad.  Can you pull that up?
19             THE COURT:  It is on the screen now.  Hold on.
20      (Video played)
21             MR. WITTENBRINK:  Pause right here.
22  Q.     (By Mr. Wittenbrink) So you are telling the ladies and
23  gentlemen of the jury that you don't read those two sentences
24  together and think that it makes one statement?
25  A.      I do not believe it makes one statement.
```

1  Q.    Okay.  And that's -- that was not the intention of

2  Highway 31 when they put out that ad?

3  A.    I believe the intention of this ad was to take stories

4  that were in the public domain, share them with the general

5  public, and have them make a decision on whether or not they

6  wanted to support Roy Moore.

7  Q.    You don't think the placement of those two things

8  together make a statement that he was soliciting sex from

9  young girls and that one of them was the 14-year-old Santa's

10  helper?

11  A.    I believe that what the ad says is that he was

12  soliciting sex from young girls, and I believe it says that he

13  approached a 14-year-old as well.

14  Q.    And even though the 14-year-old that was the Santa's

15  helper, that was identified in the article that you cited,

16  didn't say that she was solicited for sex, correct?

17  A.    Well, the next sentence in the article talked about how

18  he asked her out for dates and offered to buy her Cokes, so I

19  don't really know what else he was doing.

20  Q.    Well, let me ask you this:  Have you ever bought a Coke

21  for a young girl, a niece, nephew, friend?

22  A.    Not someone that's 20 years younger than me --

23  Q.    Really.

24  A.    -- and under the age of consent.

25  Q.    You don't have any -- do you have any relatives that

1   are younger than the age of consent?

2   A.      Sure, but they are relatives.

3   Q.      So -- okay.  I am not going to go into that.  You are

4   saying if he bought a Coke or if he asked her out on a date

5   even when she was 16, that he was soliciting sex?  Is that

6   what you are telling the ladies and gentlemen of the jury?

7   A.      I think that, because there are other articles at the

8   time that did show that he was soliciting sex from

9   14-year-olds and 16-year-olds, that that is a reasonable

10  conclusion.

11  Q.      Okay.  So you are saying that there were other articles

12  besides this article that said he was soliciting sex from

13  14-year-olds?

14  A.      I believe there are accusations that had previously

15  been made by a 14-year-old and a 16-year-old who claim that he

16  sexually molested them.

17  Q.      Well, is there a difference between molesting and

18  attacking somebody and soliciting sex?

19  A.      I mean, she is still below the legal age of consent.

20  Q.      That wasn't an answer to my question, Mr. Muhlendorf.

21  A.      Then I guess I don't understand your question.

22  Q.      So there's a difference between asking someone --

23  that's what soliciting is -- asking someone for sex and

24  attacking them, right?  That's two different allegations.

25  A.      Yes.

```
 1  Q.     And in the same vain, there's a difference between
 2  buying somebody a Coke and asking them for sex, wouldn't you
 3  agree?
 4  A.     You would have to ask what was the intent behind buying
 5  someone a Coke.
 6  Q.     Really.  So -- okay.
 7         Did you know that solicitation for sex is -- can be
 8  a crime in Alabama if you ask somebody that's 14 years old?
 9         MR. RAGSDALE:  Your Honor, I object.  He's not a
10  lawyer.  There's no allegation in this lawsuit that this is
11  about the criminal definition of soliciting sex.
12         MR. WITTENBRINK:  Oh, no, Your Honor, we did allege
13  in our -- in one of our pleadings that this is defamation per
14  se, that when you solicit sex from someone who is underage,
15  that that's a crime in Alabama.  There is a state statute on
16  it.
17         THE COURT:  Well, we are not going to read the law.
18  Let's just -- let's ask him what he knows, if anything, and
19  then move on.
20  Q.     (By Mr. Wittenbrink) Do you know whether or not it's a
21  crime to ask a 14-year-old for sex in the State of Alabama?
22  A.     I'm not a lawyer, no, sir.
23  Q.     Okay.  Would you agree -- you don't agree that that ad
24  implies that Mr. Moore was seeking sex from that 14-year-old
25  Santa's helper?
```

1  A.      I believe that the ad implies that he approached a

2  14-year-old girl.

3  Q.      Okay.  And that the putting of the two -- those two

4  things together don't have any meaning?

5  A.      They were retelling stories that were already in the

6  public domain.

7  Q.      Okay.  The first part, the first half -- show the slide

8  again, please.

9          The first statement that he was actually banned from

10  the Gadsden Mall, did you-all -- did you-all research to find

11  out if he was actually banned?

12  A.      I was not a part of the research team.

13  Q.      Okay.  Did you ask the research team whether or not he

14  was actually banned?

15  A.      There were multiple articles at the time that pointed

16  to him being banned from the mall, and I trusted the research

17  team's work.

18  Q.      Isn't it true, Mr. Muhlendorf, that most of the

19  articles that reported that, were rereporting Mr. Wilson's

20  blog that said he -- that had unnamed sources?

21  A.      I don't recall.

22  Q.      Okay.  So you don't have any personal knowledge that he

23  was actually banned?

24  A.      Only what was reported in the news media.

25  Q.      Okay.  And because you don't have any personal

```
 1  knowledge that he was actually banned, you also don't have any
 2  personal knowledge that he was soliciting sex from young
 3  girls?
 4  A.     Only what was reported in the news media.
 5  Q.     Okay.  And the news media reports that you referred to,
 6  though, isn't it true they don't talk about soliciting sex?
 7  I mean, you talked about two ladies that were, quote,
 8  "attacked," basically, and they didn't have anything to do
 9  with the mall, did they?
10  A.     There were multiple articles, so if there's one you
11  would like me to review, I would be happy to review it.  But
12  there were multiple articles at the time.  I can't remember
13  everything that was published.
14  Q.     All right.  Did Mr. Poersch from SMP, he was actually
15  the one that reviewed these ads from Highway 31?  Isn't that
16  correct?
17  A.     I believe he was one of the people who reviewed the
18  ads.
19  Q.     So you don't know whether or not Mr. Poersch had the
20  final say-so in whether or not an ad was going to go out or be
21  published?
22  A.     I do not.
23  Q.     Mr. Muhlendorf, did you communicate with Mr. Poersch
24  that Mr. Moore was trying to have this ban -- this ad pulled
25  off the air?
```

1    A.      I mean, we received media requests about it at the

2    time, but the ad was already off the air by the time that the

3    requests were made.

4    Q.      So your testimony is you did receive media requests.

5    What do you mean by "media requests"?

6    A.      Mr. Moore held a press conference or his campaign team

7    held a press conference demanding the ad be taken down.  We

8    received requests for comment.  I believe at the time my

9    statement was something along the lines of, you know, the ad

10   has already been taken down.  It has run its course, and we

11   have started airing a different ad.

12   Q.      So your ad was not taken down in response to

13   Mr. Moore's request?

14   A.      That is correct.

15   Q.      It was just taken down because the ad had finished

16   running?

17   A.      Yes, sir.

18   Q.      Was it before the election?

19   A.      Yes, sir.

20   Q.      How long?

21   A.      A couple weeks.

22   Q.      Really?

23   A.      I don't remember exactly.

24   Q.      Okay.  Do you recall when the election was?

25   A.      I believe it was on December 17th.

1   Q.      Okay.   And you don't recall when the last shopping mall

2   ad ran?

3   A.      Not the exact date.   But I remember that it did

4   conclude prior to his press conference.

5   Q.      Okay.   Did you have any requests besides media requests

6   for comment to have the ad pulled down?   Did you have anybody

7   from the media contact you and say, Should we pull this ad

8   down?

9   A.      No, sir, not that I recall.

10  Q.      Did you ever contact Mr. Poersch to see whether or not

11  SMP would pull the ad?

12  A.      I don't recall.

13  Q.      Do you recall speaking to Mr. Poersch about the ad?

14  A.      I'm sure we did.

15  Q.      Do you recall whether or not you spoke to Mr. Poersch

16  about the media comments?

17  A.      What do you mean?

18  Q.      You said you had media requests.

19  A.      Uh-huh.

20  Q.      Requests for comment on pulling down the ad.   So did

21  you talk to Mr. Poersch about that?

22  A.      I think I might have spoken to him and other members of

23  the team to confirm that the ad had completed its run.

24  Q.      Did you have any concern about Mr. Moore's objections?

25  A.      Which objections, sir?

1  Q.     The objections to the ad, the objections to continuing

2  to run the ad, the objections about this ad needed to be

3  pulled or retracted?  Did you have any response to that or

4  concerns about that?

5  A.     Can you be more specific?

6  Q.     Well, you said you were aware that Mr. Moore had gone

7  on the air and said the ad needed to be pulled down or

8  retracted.  Did you personally have any concerns about

9  Highway 31 or liability or anything like that?

10  A.     No, sir.

11  Q.     Did you -- and why not?

12  A.     I know that the research team vetted the ad as well as

13  others.

14  Q.     Did you, yourself, ever respond to Mr. Moore?

15  A.     In what way?

16  Q.     Did you ever speak to Mr. Moore or anyone from his

17  team, tell them that the thing had been pulled or that it was

18  already run, done, finished?

19  A.     No one from Mr. Moore's team ever reached out to

20  contact me.

21  Q.     Okay.  When you read this first sentence, does it seem

22  to you that Mr. Moore, Judge Moore, was actually banned from

23  the mall for soliciting sex from young girls?

24  A.     That's what the --

25  Q.     Do you believe that to be a true statement?

```
 1  A.     Yes, sir.

 2  Q.     Did you -- did you ever think:  Well, he solicited sex

 3  from girls elsewhere but not at the mall?

 4  A.     I don't know if I understand.

 5  Q.     Well, so do you think that this statement means that he

 6  was banned from the mall for soliciting sex from young girls

 7  at the mall?  It doesn't say "at the mall," but would you read

 8  that to say "at the mall"?

 9  A.     No, sir.  I mean, he was -- it says that he was banned

10  from Gadsden Mall, and part of the reason why he was banned

11  from the Gadsden Mall was for soliciting sex.

12  Q.     Okay.  So you want to tell the ladies and gentlemen of

13  this jury that the intent of this ad was not to say that he

14  was banned from the mall for soliciting sex from young girls

15  at the mall, but it may have been banned for soliciting sex

16  from young girls somewhere else?

17  A.     No, sir.  Once again, the intent of the ad was to take

18  stories that had already been printed and curate those stories

19  that we have accumulated and share them with the general

20  public so that they could make a decision on whether or not to

21  support Mr. Moore.

22  Q.     Wouldn't it be fair to make -- give the public all of

23  the information?  In other words, if you say, Moore was

24  actually banned from Gadsden Mall for soliciting sex from

25  young girls, do you think a reasonable person would interpret
```

1 that to mean it was at the mall that he was soliciting sex?

2 A.    We provided the citation from where the quotes were

3 pulled from, and we invited people to investigate, read more,

4 learn more for themselves.

5 Q.    So you are saying that the viewer should have looked at

6 that little blurb you have under there, New American

7 Journal -- it doesn't have a website, does it?

8 A.    No, sir.

9 Q.    But they should have looked for the New American

10 Journal to decide whether or not that statement meant that

11 they were banned from the Gadsden Mall -- whether or not Judge

12 Moore was banned from the Gadsden Mall and whether or not he

13 was soliciting sex from young girls there or anywhere else?

14 A.    Well, we only have 30 seconds per ad, so there were a

15 lot of allegations that were made against Mr. Moore, so I

16 don't know how we could have gotten them all in a 30-second ad

17 without taking statements.

18 Q.    So your contention is that these statements were put

19 together for expediency, in other words, so you could get all

20 that information into the ad without necessarily

21 discriminating about whether the ban from the mall was for

22 soliciting sex from young girls there or elsewhere or whether

23 or not the 14-year-old Santa's helper was one of the young

24 girls he was soliciting sex -- you just put all that

25 information in there, but you didn't intend it all to be read

1  together as one statement?

2  A.      That is how I read the ad.  You know, the research team

3  is who wrote the ad.

4  Q.      Okay.  Would you agree that the ad might have been more

5  accurate if it said something like "sources say" or, you know,

6  "it is a rumor that Moore was banned from the Gadsden Mall"?

7  A.      I don't believe the ad is inaccurate.

8  Q.      Okay.  Well, the words "sources say" was left off.  Is

9  that just because you didn't have room or time?

10 A.      You would have to ask the research team.

11 Q.      Okay.  And so your testimony to these ladies and men

12 here is that the research team would have made that decision,

13 and that's purely a factual decision, right?  In other words,

14 they didn't think that fact was pertinent; they just wanted to

15 get all this information out there?

16 A.      No, sir.  I'm saying the research team creates ads, and

17 that is their specialty.

18 Q.      Is there a creative aspect to making these ads,

19 Mr. Muhlendorf?

20 A.      I mean, it is a creative activity.

21 Q.      Is the research team separate from the creative team?

22 Do they work together?

23 A.      They work together.

24 Q.      Who is on the research team?

25 A.      I don't recall the specific names.

1  Q.     You don't know any -- how many were there?

2  A.     I mean, I know that there were at least two or three

3  that I interacted with at various points throughout the

4  campaign.

5  Q.     Well, there were two or three that you interacted with.

6  What were their names?

7  A.     I mean, I haven't spoken to them in five years, so, I'm

8  sorry, I don't remember their names.

9  Q.     You don't remember anyone's name that you worked with?

10  A.     If you have -- if you have a staff list in front of

11  you, I can tell you.

12  Q.     No.  I am just sitting here amazed that you worked on

13  this campaign and you worked with two or three different

14  people and you don't remember one name.

15  A.     I had very limited interactions with the research team.

16  Q.     Did you work with any people on the creative team?

17  A.     I know that they were involved in some of the

18  conversations and phone calls that we might have had.  But I

19  didn't -- I worked with them on some different ads that they

20  created.

21  Q.     Do you remember any of the names of any of the people

22  on the creative team?

23  A.     Mark Putnam was one person.

24  Q.     Mark Putnam?

25  A.     Putnam, yes, sir.

1  Q.    Putnam.

2  A.    Yes, sir.

3  Q.    Anybody else?

4  A.    He would be who I primarily interacted with from the

5  creative team.

6  Q.    How many people were on the creative team?

7  A.    I couldn't tell you.

8  Q.    Now, you said that this Highway 31, they were gone by

9  late December, early January, correct?

10  A.    Yes, sir.  As soon as the election was over, it had

11  fulfilled its purpose, and so it was terminated.

12  Q.    How would someone find out, you know, who to send a

13  letter to to retract this ad?

14  A.    Their contact information, which is still available on

15  the governing body's, the FEC's website.  So, I mean, there is

16  still contact information --

17  Q.    Well, if Mr. Still is the only officer --

18  A.    Yeah.

19  Q.    -- that's on there, so they would have to go through

20  Mr. Still?

21  A.    Yes, sir.

22  Q.    Any other contact information on the FEC website that

23  you are aware of?

24  A.    Not that I am aware of.

25  Q.    But publicly -- publicly, SMP came out and took credit

1  for your ad.  Isn't that correct?

2  A.      I believe so.

3  Q.      And you know who their spokesman was.  That was -- what

4  is his name?  Do you know his name, the spokesman for SMP?

5  A.      Chris Hayden.

6  Q.      Chris Hayden.  That's right.  He came out and he

7  bragged about the effectiveness of the ad; isn't that correct?

8  A.      I -- if you have a comment that you would like me to

9  see --

10  Q.      Do you know?

11  A.      I'm sorry?

12  Q.      Do you know?  You were the spokesman for Highway 31.

13  A.      Uh-huh.

14  Q.      Do you know what public comments were made by other

15  people about your organization?

16  A.      I know that Chris made public comments after the

17  campaign was over, but I can't quote them to you.

18  Q.      Okay.  And you -- again, you have no information about

19  the financial arrangements, for example, how the ads were paid

20  for or anything like that?

21  A.      No, sir.

22  Q.      And you have no information on -- so -- and you don't

23  have personal information about the due diligence that was

24  done by the creative team, do you?

25  A.      No, sir.

1    Q.      Did you send an e-mail to Mr. Poersch indicating that

2    Mr. Moore would file suit?

3    A.      I don't recall.

4    Q.      Do you remember any of the public statements made by

5    Mr. Putnam from your team?

6    A.      I'm sure he made some, but I don't recall.

7    Q.      Do you remember Mr. Putnam saying, This ad will rock

8    Alabama?

9    A.      No, sir, I do not.

10   Q.      Does it sound inconsistent with something that

11   Mr. Putnam would say?

12   A.      I don't recall him saying that.

13   Q.      Why was the PAC named Highway 31?

14   A.      It was actually my suggestion.

15   Q.      Really?

16   A.      Yes, sir.  It was an Alabama-based PAC, and we wanted a

17   name that was representative of Alabama.  I personally don't

18   like things like "Alabama this" or "Alabama that."  And so we

19   were going through different options that we could have had

20   and settled on Highway 31.

21   Q.      When you say it was an "Alabama-based PAC," you had one

22   named officer and a P.O. box, and you didn't have any

23   decision-making authority.  How is it an Alabama-based PAC?

24   A.      The PAC was based in Alabama, in Birmingham, and its

25   officers were Alabama based.

1  Q.     Where were your physical offices?

2  A.     My office was in Montgomery, Alabama.

3  Q.     Where were the physical offices of the PAC?

4  A.     There were various offices across the country.

5  Q.     I see.  So the creative team didn't have an office

6  building or something where they worked together here in

7  Alabama?

8  A.     No, sir.

9  Q.     And how about the -- you were the spokesman, so you

10  were here in Alabama.  Mr. Still, the treasurer, he was here

11  in Alabama.

12  A.     Uh-huh.

13  Q.     What about Mr. Poersch who reviewed these ads, was he

14  based in Alabama?

15  A.     He was based in Washington D.C. or Northern Virginia.

16  Q.     Where was -- the creative team in difference offices

17  around the country, where were they?

18  A.     I am not sure where Mr. Putnam's offices are.  But I

19  know that we -- you know, it is not uncommon to have teammates

20  who work in different offices across the country.

21  Q.     Okay.  Well, that's fair, except that you said that you

22  wanted to have the name "Highway 31" to show that it was an

23  Alabama-based company.  So when you say an "Alabama-based

24  company," you were there as the spokesperson and the chairman

25  was there, but nobody else, it sounds like, they were actually

1   in Alabama; is that correct?

2   A.      The political action committee itself was based in

3   Alabama, in Birmingham.

4   Q.      When you say "the political action committee itself,"

5   what you are talking about is the P.O. box and you and

6   Mr. Still, right?

7   A.      Yes, sir.

8   Q.      Okay.  Do you think -- do you think that that is

9   deceptive, Mr. Muhlendorf?

10  A.      No, sir.

11  Q.      Okay.  Do you think the results of the ad may have been

12  different if the ad said, This ad is sponsored by the Senate

13  Majority PAC from Washington D.C.?

14  A.      No, sir.

15  Q.      Okay.

16  A.      But that would be an inaccurate statement.

17  Q.      I understand your opinion.

18          Don't you think, really, the choice of an Alabama

19  name and, quote, an "Alabama-based PAC" for defeating Judge

20  Moore was just a choice intended to shield the fact that

21  out-of-state people were involved in funding this and

22  controlling it?

23  A.      No, sir.

24  Q.      Okay.

25          MR. WITTENBRINK:  Judge, I would like to pull up

1  this exhibit and look at it before it being shown to the jury.

2          THE COURT:  All right.  Just tell me when you are

3  ready.

4      (Brief pause)

5          MR. WITTENBRINK:  Let me find out what exhibit

6  number that is, Judge, and make sure I am still on ones that

7  have been admitted.  It was 27 on the original list, I think.

8          Do you have a number on this somewhere?

9          MR. CALEB MOORE:  This was 21.

10         MR. WITTENBRINK:  I'm looking for 27.  That's the

11 one we talked about.  No, no, no.

12         We have scrambled our numbers all up, Judge.  I'm

13 sorry.

14         THE COURT:  Are you looking for the NBC News

15 article?

16         MR. WITTENBRINK:  I'm looking for -- the exhibit was

17 27, and it was --

18         THE COURT:  27 is not presently admitted.

19         MR. WITTENBRINK:  Right.  That's the one that we

20 spoke about, and you -- so I was just going to pull it up for

21 myself to look at to ask him questions.

22         THE COURT:  Okay.

23         MR. WITTENBRINK:  That is the NBC News article,

24 Judge.  Thank you.  I have got it pulled up now here.

25     (Brief pause)

1  Q.    (By Mr. Wittenbrink) So the Highway 31 PAC was created,

2  basically, one month before election day.  Isn't that correct?

3  A.    Yes, sir.

4  Q.    And then closed right afterwards?

5  A.    Yes, sir.

6  Q.    And it was only the single issue.  It was only about

7  making sure that Doug Jones defeated Judge Moore, correct?

8  A.    Yes, sir.

9  Q.    And isn't it correct it was publicly reported -- you

10  can tell me whether or not you believe it -- that --

11        MR. RAGSDALE:  Your Honor, if he is fixing to read

12  from an exhibit that has been disallowed by this court, that's

13  no different than --

14        THE COURT:  I am going to wait and see what the

15  question is and then -- we are not going to introduce the

16  exhibit by reading it, obviously.

17        MR. WITTENBRINK:  That's right, Judge.  I'm sorry.

18  Q.    (By Mr. Wittenbrink) So you testified before you

19  thought it was around 4 million, a little over 4 million.  If

20  I were to tell you it was 5.1 million, would you argue that

21  that?

22  A.    What I testified was that I wasn't aware of the total

23  value.  You mentioned a number, and I said it wouldn't

24  surprise me.

25  Q.    Okay.

```
 1      (Brief pause)
 2   Q.     Do you know whether or not Highway 31 actually did
 3   their business on credit?
 4   A.     I did not make any of the purchasing, so I don't know
 5   how it was made.
 6   Q.     So you don't have any knowledge of that?
 7   A.     No, sir.
 8              MR. WITTENBRINK:  I think that's all I have for this
 9   witness, Judge.
10              THE COURT:  All right.  Questions from the defense.
11              MR. RAGSDALE:  Thank you, Your Honor.
12              THE COURT:  I am turning control over to defense
13   table.  Which table has control?
14              MR. RAGSDALE:  This handsome gentleman in the back.
15              THE COURT:  Very good.  All right.  You may proceed,
16   Mr. Ragsdale.
17              MR. RAGSDALE:  Thank you.
18                        CROSS-EXAMINATION
19   BY MR. RAGSDALE:
20   Q.     Good afternoon, Mr. Muhlendorf.
21   A.     Good afternoon.
22   Q.     Just to be clear, you were subpoenaed to be here today
23   by Mr. Moore's team, right?
24   A.     Yes, sir.
25   Q.     Okay.  We didn't ask you to come here today, right?
```

```
 1  A.      Yes, sir.
 2  Q.      So to the extent that Mr. Wittenbrink asked you
 3  question after question that you don't know the answer to,
 4  that's not our fault, is it?
 5  A.      No, sir.
 6  Q.      Now, the -- and Mr. Wittenbrink asked you a series of
 7  questions about how long Highway 31 existed.  It was only
 8  created for the purpose of this one election, right?
 9  A.      That's correct.
10  Q.      So it is hardly surprising that it would be dissolved
11  after the election was over, right?
12  A.      That's common practice.
13  Q.      And this isn't the only time this has ever happened, is
14  it, where a PAC is created for one election and then later
15  dissolved?
16  A.      It's common practice.
17  Q.      Now, Mr. Wittenbrink showed you repeatedly the shopping
18  mall ad and played it for you, right?
19  A.      Yes, sir.
20  Q.      Do you have any doubt that everything in that shopping
21  mall ad is true as we sit here today?
22  A.      I don't have any doubts.
23  Q.      Did you have any doubts at the time that the shopping
24  mall ad was true?
25  A.      I did not have any doubts.
```

1  Q.     And did you have any doubts that everything in that

2  shopping mall ad had previously been reported in other

3  journalistic reports?

4  A.     Yes, sir.  I had no doubts.

5  Q.     And, for example, the article he asked you to look at,

6  which was Exhibit 3, the New American Journal, it does say,

7  does it not -- can we pull up Number 3?  I'm sorry.

8          MR. RAGSDALE:  And if you would scroll down to the

9  part that we looked at that says "breaking news" -- I think it

10 is right at the end.

11 Q.     Do you see that part?

12 A.     Yes, sir.

13 Q.     Okay.  It actually says, Sources tell me Moore was

14 actually banned from the Gadsden Mall and the YMCA for his

15 inappropriate behavior of soliciting sex from young girls.

16          Do you see that?

17 A.     Yes, sir.

18 Q.     So the ad accurately reported that there were reports

19 that Mr. Moore had been banned from the mall for soliciting

20 sex, right?

21 A.     Yes, sir.

22 Q.     And the part that Mr. Wittenbrink asked you about that

23 we left out, "sources tell me," do you see that?

24 A.     Yes, sir.

25 Q.     You are used to dealing with reporters, aren't you?

```
 1  A.     Yes, sir.

 2  Q.     Don't almost all reporters rely on sources?

 3  A.     Yes, sir.

 4  Q.     I mean, otherwise, it would be just one person's

 5  opinion, right?

 6  A.     Yes, sir.

 7         MR. RAGSDALE:  Now, if you would pull up Number 5,

 8  please.  And if you would -- let's see.  Where is the Wendy

 9  Miller quote?  I walked up here without my glasses, Judge.  I

10  am an unarmed man.  Excuse me.

11         THE COURT:  He's pulling it up now.

12  Q.     (By Mr. Ragsdale) This says -- in fact, this article

13  did accurately say, Wendy Miller told The Post that she was 14

14  and working as Santa's helper at the Gadsden Mall in 1977 when

15  Moore first spoke with her and told her she looked pretty,

16  right?

17  A.     Yes, sir.

18  Q.     Okay.  And so that's accurately reported in the

19  shopping mall ad, isn't it?

20  A.     Yes, sir.

21  Q.     And in fact, Mr. Wittenbrink didn't want you to read

22  this next line, but it says, Two years later when she was 16,

23  he asked her out on dates, although her mother wouldn't let

24  her go.

25         Do you see that?
```

```
 1  A.      Yes, sir.

 2  Q.      So both of the quotes that are in those two still

 3  photos accurately quote the sources that they come from; is

 4  that right?

 5  A.      Yes, sir.

 6  Q.      And those were previously reported before the ad ever

 7  ran, right?

 8  A.      Yes, sir.

 9  Q.      Now, Mr. Wittenbrink also asked you if it was a crime

10  to solicit sex in Alabama, and I objected.  You are not a

11  lawyer, right?

12  A.      I am not.

13  Q.      Do you have an opinion or do you know whether it is a

14  crime to sexually assault a 14-year-old?

15  A.      I am not --

16          MR. WITTENBRINK:  Objection.  The question assumes

17  facts not in evidence.  Remember the reason for entering the

18  articles, Judge.  There's no evidence that that's happened.

19          THE COURT:  He's testified he doesn't -- he is not a

20  lawyer and doesn't know what is or isn't legal.  I think your

21  point is made.

22  Q.      (By Mr. Ragsdale) Do you have an opinion about whether

23  or not soliciting sex is worse or better than sexual assault?

24  A.      I would think that sexual assault is worse than.

25  Q.      Now, there is a stipulation, but I want to ask you
```

1   about this.  If I told you that the ad only ran from

2   November 27th and ceased on December 5th, would you dispute

3   those dates?

4   A.      No, sir, I would not.

5   Q.      Okay.  And as I understand your testimony, by the time

6   Mr. Moore had held a press conference and asked that the ad be

7   pulled, it had run its course, right?

8   A.      That is correct.

9   Q.      There was nothing left to pull, right?

10  A.      That is correct.

11  Q.      To your knowledge, did any television station in the

12  state of Alabama pull that ad because of Mr. Moore's

13  complaints?

14  A.      I am not aware of any ad that was pulled because of

15  Mr. Moore's complaints.

16  Q.      Oh, I'm sorry.  I messed up.  It is December 6th, not

17  December 5th.  I apologize.  It is December 6th, but would you

18  agree with me that that's the date if we stipulated to that?

19  A.      Yes, sir.

20  Q.      Okay.  Now, Mr. Wittenbrink also asked you about the

21  $5 million or $4 million that was spent by Highway 31.  Do you

22  remember that?

23  A.      Yes, sir.

24  Q.      Highway 31 did more than just run this ad, right?

25  A.      That's correct.

1  Q.      Did it also the do voter registration efforts?

2  A.      Yes, sir.

3  Q.      Did it also do efforts to get out to vote?

4  A.      Yes, sir.

5  Q.      And also, there might have been other ads that it ran,

6  right?

7  A.      That's correct.

8  Q.      So that $5.1 million figure includes all the efforts

9  that were undertaken by Highway 31 on behalf of Mr. Jones in

10  that election; is that right?

11  A.      If that is how much money was spent, yes, sir, that's

12  everything.

13  Q.      Mr. Muhlendorf, do you have children?

14  A.      I do.

15  Q.      Do you have a daughter?

16  A.      Yes, sir.

17  Q.      How old is your daughter?

18  A.      She's four.

19  Q.      And has she started school?

20  A.      Tomorrow is her very first day.

21  Q.      Very first day of kindergarten?

22  A.      Pre-K but her very first day.

23  Q.      Pre-K.  I am going to ask you to do something that you

24  don't ever want to do which is think ahead for your children,

25  but instead of being her first day of pre-K, ten years from

1  now might be her first day of high school, right, 14?

2  A.     Yes, sir.

3  Q.     And if you became aware that a 32-year-old man had been

4  coming up to your 14-year-old daughter and telling her that

5  she looked pretty --

6          MR. WITTENBRINK:  Objection.  Again, it is still

7  facts not in evidence, Judge, and --

8          THE COURT:  I am going to let him finish asking the

9  question.

10          Go ahead, Mr. Ragsdale.

11  Q.     (By Mr. Ragsdale) If you became aware that your

12  14-year-old daughter had been approached by a 32-year-old man,

13  told that she looked pretty, brought drinks and flirted with

14  her, would that upset you?

15  A.     Yes, sir.

16          MR. RAGSDALE:  I am done with this witness, Your

17  Honor.

18          THE COURT:  All right.  Mr. Wittenbrink, any

19  follow-up?

20                    REDIRECT EXAMINATION

21  BY MR. WITTENBRINK:

22  Q.     Mr. Ragsdale asked you about other activities and other

23  ads that you did.  Did you also have a digital campaign?

24  A.     Yes, sir.

25  Q.     And did you have a digital ad that ran?

```
 1            MR. RAGSDALE:  Objection, Your Honor.  We have
 2   covered this in pretrial rulings.
 3            THE COURT:  Where are we going with it?
 4            MR. WITTENBRINK:  Well, I mean, I feel like
 5   Mr. Ragsdale opened the door by talking about these other ads.
 6            THE COURT:  Let's come up here.
 7       (Sidebar conference)
 8            THE COURT:  You did ask the question:  Did you spend
 9   money on other ads.  What are you intending to ask him?
10            MR. WITTENBRINK:  Well, was other --
11            THE COURT:  I don't want to get into the specifics,
12   and we are certainly not getting into the fact that it,
13   basically, as I have put it, doxed -- could say we would dox
14   voters on how they voted.  If you just want to get into
15   general -- how did you intend to ask the question because we
16   are not going to cross the line.
17            MR. WITTENBRINK:  Well, Judge, you know -- I'm going
18   to ask him how many -- does he know if he ran more than one
19   digital ad.
20            THE COURT:  Okay.  That's fine.
21            MR. WITTENBRINK:  And then I don't know if he knows
22   the total amount of money that was spent on the digital ad.
23   We have already got the total amount of money.  And, you know,
24   from my point of view, Mr. Ragsdale opened the door asking
25   about other ads, and I feel like I could go ahead and just
```

1  play the ad.  Did you run this ad too?

2          THE COURT:  I am not going to let him play the ad

3  for the same reasons we ruled previously.  He didn't say

4  anything about the ad being -- in other words, nothing was

5  asked that would have said that this wasn't controversial or

6  anything else.  I will allow you to ask if you ran any other

7  ads that were also asked to be pulled down, but we are not

8  getting into the content of them.

9          MR. WITTENBRINK:  Or that they were negative --

10          THE COURT:  I know you would object to that too.

11          MR. RAGSDALE:  This started with him being allowed

12  to bring the total amount of spent.

13          THE COURT:  I understand.  And we are not going to

14  play the ad or get into the specifics of the ad.  Now, I

15  really don't know where you are wanting to go beyond playing

16  the ad, which I am not going to let you do.  If there's no

17  where else to go, then let's move on.

18          MR. WITTENBRINK:  Well, I guess that's all there is,

19  Judge.

20          THE COURT:  All right.  Your objection again to the

21  digital ad not being played is noted, but it does not open

22  that far.

23          MR. WITTENBRINK:  Okay.  Thank you.

24          MR. RAGSDALE:  Thank you, Your Honor.

25      (End sidebar conference)

```
 1                THE COURT:  You may continue.
 2  Q.     (By Mr. Wittenbrink) Mr. Ragsdale asked you about
 3  whether or not you believed that entire ad was completely
 4  truthful, and you have already given us the context for that
 5  truth.  Isn't that correct, Mr. Muhlendorf?
 6  A.     Yes, sir.
 7                MR. WITTENBRINK:  That's all I have, Judge.
 8                THE COURT:  Mr. Ragsdale?
 9                MR. RAGSDALE:  No more questions, Your Honor.
10                THE COURT:  Does the defendant intend to call
11  Mr. Muhlendorf in its case?
12                MR. RAGSDALE:  We do not.
13                THE COURT:  So is he free to go?
14                MR. RAGSDALE:  He is free to go.
15                THE COURT:  Do you agree, Mr. Wittenbrink, that he
16  can be released?
17                MR. WITTENBRINK:  I do.
18                THE COURT:  All right.  Sir, you are free to go.
19  Thank you for coming.
20                THE WITNESS:  Thank you, Your Honor.
21          (Witness excused)
22                THE COURT:  Mr. Wittenbrink, you can call your next
23  witness.
24                Do you need a break?
25                MR. WITTENBRINK:  Just a very brief break.
```

```
1              THE COURT:  That's fine.

2              It is 2:45.  We will come get you at 2:55.

3              All right.  See you in ten minutes.

4         (Jury out at 2:45 p.m.)

5              THE COURT:  All right.  We will see everybody back

6    at 2:55.

7         (Recess taken from 2:46 p.m. to 2:57 p.m.)

8              THE COURT:  Just for the record, all I'm doing is

9    copying over the flash drive y'all gave me Friday onto his

10   flash drive so everybody is working off the same copy.

11             MS. JOHNSON:  Judge, I believe this one I have has

12   updated numbers --

13             MS. VELEZ:  That's correct.  Because some were

14   withdrawn and some were --

15             THE COURT:  Well, if you want to give them that one,

16   if you've got it on yours.

17             MS. VELEZ:  There's nothing on it except the

18   exhibits, so that's fine.

19             THE COURT:  That will work.  Then I will stop this

20   copy and hand it back to you with nothing in it -- or nothing

21   added.

22             All right.  Very good.  Anything else we need to

23   take up?

24             MR. WITTENBRINK:  Thank you very much, Judge.  We

25   appreciate it.
```

1    THE COURT:  Sarah, I think we can go get the jury.

2    (Brief pause)

3    (Jury in at 3:01 p.m.)

4    THE COURT:  Plaintiff may call its next witness.

5    MR. WITTENBRINK:  J.B. Poersch.

6    THE WITNESS:  Poersch, yes, sir.

7    THE COURT:  Mr. Poersch, if you will stand,

8  Ms. Sarah is going to give you the oath.

9    (Witness sworn)

10    COURTROOM DEPUTY:  State your name for the record.

11    THE WITNESS:  J.B. Poersch.

12    COURTROOM DEPUTY:  Will you spell that for us?

13    THE WITNESS:  Yes.  It's P-, as in Patrick,

14  O-E-R-S-C-H.

15    COURTROOM DEPUTY:  Thank you.

16    THE COURT:  All right.  Mr. Wittenbrink, you may

17  proceed.

18    MR. WITTENBRINK:  Thank you.

19                    DIRECT EXAMINATION

20  BY MR. WITTENBRINK:

21  Q.    Mr. Poersch, will you please give us your name and

22  address for the record?

23  A.    Yes.  It's J.B. Poersch.  My address is -- my home

24  address, sir?

25  Q.    Yes, sir.

```
 1  A.      ███████████████████████████████████.
 2  Q.      Okay.  And what is your position with the defendant
 3  SMP?
 4  A.      I am the president of Senate Majority PAC.
 5  Q.      And can you tell the Court -- what is -- so what is
 6  Senate Majority PAC?
 7  A.      It's a super PAC.  It's a political action committee.
 8  Q.      Can you tell the Court the difference between a regular
 9  PAC and a super PAC?
10  A.      The -- a quote, unquote, "regular PAC" might be, like,
11  a leadership PAC that's -- that the candidates have access to.
12  We are separate from the candidates, but we support
13  candidates.
14  Q.      Okay.  So you are independent from candidates?
15  A.      Yes, sir.
16  Q.      As a consequence of that, you can take bigger
17  donations; isn't that correct?
18  A.      Yes, sir.
19  Q.      Tell us the relationship between SMP, or Senate
20  Majority PAC, and Highway 31.
21  A.      They were -- they were under our umbrella.
22  Q.      Okay.  Were they created by principals from your
23  organization?
24  A.      Yes, sir.
25  Q.      Okay.  And isn't it true that you had ultimate
```

1  authority over decisions they made with regard to these ads

2  that were made?

3  A.     We did, yes, sir.

4  Q.     How about you, yourself, personally, Mr. Poersch, did

5  you have input personally into whether or not the ads would be

6  published?

7  A.     Yes, sir.

8  Q.     And you made those decisions?

9  A.     Yes, sir.

10  Q.     Okay.  So you were actually one of the people that

11  approved this ad to go out?

12  A.     That's correct, sir.

13  Q.     Now, we did talk to you previously.  So all the talk

14  that I had with Mr. Muhlendorf about Highway 31 and whether or

15  not it was an Alabama-based PAC, like you said under your

16  umbrella, let me ask you this:  Do the creative team or any of

17  those people work directly for Highway 31, or did they work

18  for Senate Majority PAC?

19  A.     Well, you ran through with Mr. Muhlendorf the staff

20  that they had because they were a separate affiliate, a

21  separate entity from us, but they were under our umbrella.

22  And I think you mentioned two of the staff people that they

23  had, you know, and sundry field staff and et cetera.

24  Q.     Okay.

25  A.     There were people that knocked on doors and that kind

```
 1  of thing.
 2  Q.     So the creative team, quote, unquote, they were people
 3  that --
 4  A.     Were based in Washington, yes, sir.
 5  Q.     Based in Washington?
 6  A.     Yes, sir.
 7  Q.     And what about the research team, where were they
 8  based?
 9  A.     The research team was in D.C. too.  I can't remember.
10  There might have been a research person in Alabama too, but I
11  don't recall that.
12  Q.     Okay.  Now, on -- you don't know the name of any person
13  in Alabama that actually did any research?
14  A.     No, because we had people that came -- that were in
15  Alabama but weren't necessarily there the whole time, sir.
16  Q.     All right.  Now, your deposition was taken before;
17  isn't that correct?
18  A.     That's correct.
19  Q.     And so we did ask you -- can you pull up the slide,
20  please, the slide -- the slide with the two statements?
21         MR. CALEB MOORE:  Yes.
22  Q.     (By Mr. Wittenbrink) Now, Mr. Poersch, this first
23  sentence, Moore was actually banned from the Gadsden Mall for
24  soliciting sex from young girls --
25  A.     Yes, sir.
```

1  Q.      -- do you believe that Mr. Moore was actually banned

2  from the Gadsden Mall for soliciting sex from young girls?

3  A.      I do, sir.

4  Q.      When you were deposed on March 1st, 2022, did you have

5  a different opinion?

6          MR. RAGSDALE:  Your Honor, I think the witness needs

7  to be shown his deposition if he's going to be impeached with

8  it.

9          THE COURT:  Well, I think he's asking if he had a

10 different opinion at that time, so let's see if he remembers

11 whether or not he did.  I don't know what he said, so.

12         MR. RAGSDALE:  I don't either.

13         THE WITNESS:  I don't recall having a different

14 opinion.  I do remember being a little overwhelmed with all

15 the legalese.

16         MR. WITTENBRINK:  Okay.  May I approach the witness,

17 Judge?

18         THE COURT:  Yes.

19         MR. RAGSDALE:  Do you have a copy for us?

20         MR. WITTENBRINK:  It is pages 89 and 90 of the

21 deposition there.  I think it starts with -- okay.  It starts

22 here, and you can read through lines 19 to 23.

23 Q.      (By Mr. Wittenbrink) Mr. Poersch, I am going to show

24 you this deposition.

25         MR. WITTENBRINK:  Let the record reflect I am

1  showing him pages 89 and 90 of the transcript of J.B. Poersch

2  conducted on March 1st, 2022.

3          Judge, this says "confidential."

4          THE COURT:  Okay.

5          MR. WITTENBRINK:  I believe it is confidential

6  because there are some redacted matters that we have -- we are

7  not introducing the redacted matters.

8          THE COURT:  Hold on just second.  Go ahead and

9  finish.  Are you trying to introduce it or are you just trying

10 to refresh his recollection?

11         MR. WITTENBRINK:  I am trying to get the witness to

12 look at it.  We are not going to introduce the deposition at

13 this time.

14         THE COURT:  Okay.

15         MR. WITTENBRINK:  But I also wanted to note that

16 these lines do say "confidential" but we are not showing him

17 any information that is confidential or that was required or

18 requested to be redacted.

19         THE COURT:  Okay.

20         MR. RAGSDALE:  Your Honor, the entire deposition was

21 marked as confidential pursuant to the protective order

22 entered in this case.  I don't think this particular subject

23 is --

24         THE COURT:  Well, you have seen the lines he's

25 intending to ask him about.

1        MR. RAGSDALE:  I am not objecting to those lines,

2   but there are certainly portions of the deposition that are

3   confidential, proprietary, and with which this court has made

4   a ruling.

5        THE COURT:  We are not going to move in deposition.

6   I just want you to stick to those things you showed

7   Mr. Ragsdale.

8        MR. WITTENBRINK:  Yes, Your Honor.

9        MR. RAGSDALE:  I'm sorry.

10       MR. WITTENBRINK:  I would never do that.

11       MR. RAGSDALE:  What page are we looking at?  I'm

12   sorry.

13       MR. WITTENBRINK:  89 and 90.

14       MR. RAGSDALE:  Thank you.

15   Q.    (By Mr. Wittenbrink) Mr. Poersch, I'm going to read you

16   the question and ask you to read "A" for the answers as I go,

17   if you would.

18        The question was:  Well, the script said, What do

19   people who know Roy Moore say, Moore was actually banned from

20   the Gadsden Mall for soliciting sex from young girls, correct?

21   And it cites a New American Journal article of November 12th

22   2017, correct?

23        And read your answer.  It starts at "A" on Line 15.

24   A.    "Yeah, I'm not -- you used a phrase earlier Gadsden

25   Mall, I think.  I don't remember.  Yes, it says at the top

1  Gadsden Mall in your statement."

2  Q.      Okay.  And your answer continues.

3  A.      Oh, okay.  Thank you.

4          "The ad says -- I'm reading what -- thank you for

5  doing that, Mr. Anderson.  Moore was actually banned from

6  Gadsden Mall for soliciting sex from young -- for soliciting

7  sex from young girls.  I don't think the ad says at Gadsden

8  Mall."

9  Q.      Okay.  So your interpretation at the time you took this

10 deposition was the same as Mr. Muhlendorf's; is that correct?

11 A.      Yes.  Though I would have to say at the time I hadn't

12 seen the ad in five years, so I was having to do a lot from

13 memory at the time, sir.

14 Q.      I see.

15 A.      So I was confused at what was actually in the ad

16 because I hadn't seen it.

17 Q.      They showed you the ad at the time or not?

18 A.      Real quick.

19 Q.      Okay.

20 A.      I was seeing it for the first time in five years, sir.

21 Q.      Okay.  So the question goes on to the next line at

22 line 24:  "What is between at and from?"

23          If you would give me the answer.

24 A.      "From the Gadsden Mall is where he was" --

25 Q.      Where he was?

A.      "Where he was banned."

Q.      Okay.  And the question next question:  "What is the distinction between 'from' and 'at'?"

        And your answer?

A.      And then I said, "I will try again.  I thought I made that distinction that Moore was actually banned from the mall.  To my knowledge, the ad didn't state that he solicited at the Gadsden Mall, and I think there is a difference."

Q.      Okay.  Continue your answer.

A.      Yes, sir.  "There were -- the mall banned him for soliciting sex, but I don't think, you know, from what's in the ad, that he, that Judge Moore solicited sex at Gadsden Mall.  I think I'm being clear, sir."

Q.      Okay.  So before you got here today and after you took this deposition -- so your position now is that the ad does say that he was banned for soliciting sex at the Gadsden Mall; is that correct?

A.      I saw it on the screen, sir.

        MR. WITTENBRINK:  Can you put it on the screen?

Q.      Okay.  Read the first line.

A.      "Moore was actually banned from the Gadsden Mall for soliciting sex from young girls."

Q.      Okay.  Do you believe that that ad implies that he was soliciting sex from young girls at the mall?

A.      I do.

```
 1  Q.     You do?

 2  A.     I do.

 3  Q.     Okay.  And then --

 4         MR. RAGSDALE:  Your Honor, could Mr. Wittenbrink

 5  return to either the table or --

 6         MR. WITTENBRINK:  I'm sorry.

 7         THE COURT:  Yeah, if you don't have anything else to

 8  show him, let's go back to the podium.

 9         You can ask a question.

10  Q.     (By Mr. Wittenbrink) All right.  The next line says --

11  read the next line for the jury, please.

12  A.     "One he approached 'was 14 and working as Santa's

13  helper.'"

14  Q.     Now, in your mind, Mr. Poersch, does that say that he

15  was soliciting sex from that young girl who was 14 and a

16  Santa's helper?

17  A.     It doesn't.  These are separate frames and separate

18  parts of the ad.

19  Q.     Okay.

20  A.     No, it doesn't, sir.

21  Q.     I know that there's a big line on there, on this slide,

22  but if I were to represent to you that the ad, when played,

23  does not show a line or separation there but runs those two

24  statements pretty quickly back to back, do you think that it

25  is fair that a reasonable person would assume that what you
```

1  were saying is he was banned from the Gadsden Mall for

2  soliciting sex from young girls and one he approached was 14

3  and working as a Santa's helper?  Do you think that is a fair

4  interpretation of that statement?

5  A.    It wasn't the intention of the ad, sir.  Those are two

6  separate quotes given there, two separate frames in the ads.

7  Q.    I see they are two separate quotes.

8  A.    Two separate frames in the ad, too, sir.

9  Q.    Okay.  So your statement to the jury is that SMP, which

10 approved the ad is what you said, did not intend to imply to

11 anyone that the 14-year-old working as Santa's helper was one

12 of the young girls he solicited for sex?

13 A.    Yes, sir.

14 Q.    Okay.  So anybody inferring that, they were just

15 mistaken?

16 A.    That's -- it wasn't the intention of the ad, sir, no.

17 Q.    Okay.  And yet when you are -- okay.

18        Now, you changed your mind about whether or not he

19 was banned from the Gadsden Mall for soliciting sex from young

20 girls at the mall; is that correct?

21 A.    I don't think I changed my mind, sir.  It was a little

22 confusing then, and I was seeing it for the first time.

23 Q.    So when you heard it during your deposition and this

24 statement was read to you, you didn't believe that you meant

25 to say that it was for young girls at the mall, that it was

1  just for soliciting sex from young girls, and it could have

2  been anywhere?

3  A.    My belief that that first statement is true, sir, but I

4  don't think the second statement, "one he approached was 14

5  and working as Santa's helper," no, I don't think the

6  intention of the ad was to suggest that that person had -- had

7  been -- solicited sex by Mr. Moore.

8  Q.    Did you have a report from anyone that said a

9  14-year-old girl was approached or was -- not approached --

10 was solicited for sex at the Gadsden Mall by the defendant Roy

11 Moore?

12 A.    No, sir.

13 Q.    Did you have personal knowledge of any of these

14 statements?

15 A.    There was quite a bit of reporting, as you know.

16 Q.    Right.  There's quite a bit of reporting.

17 A.    Yes, sir.

18 Q.    Do you know -- besides Glynn Wilson's report that said

19 "sources say" and some reports that repeated that, did you

20 know anybody that named a source that said that Mr. Moore was

21 banned from the Gadsden Mall for soliciting sex from young

22 girls?

23 A.    There were -- as I recall, sir, there were reports at

24 the time from people in the community, people in Etowah

25 County, people that were affiliated with Gadsden Mall that

1  said that he had been banned.  And that was part of the news

2  reports too.  I can't recall whether it all -- as you said, it

3  all came from one report.  I don't think that's true, sir.

4  Q.    Well, my question was a little bit more specific,

5  though.  Did you hear of any named source, anybody that said

6  personally and put their name to it that Judge Roy Moore was

7  banned from the Gadsden Mall for soliciting sex from young

8  girls?

9  A.    I don't -- I guess -- I will think about it, but I

10 guess I don't recall the specific names.

11 Q.    And do you recall -- and you didn't intend for the

12 14-year-old to be part of that sexual solicitation anyway?

13 A.    It wasn't intended, no.

14 Q.    Okay.  Now, when you were questioned back on March 1st

15 of 2022 -- well, let me show Mr. Ragsdale this.

16        MR. WITTENBRINK:  It is page 91, so start on line 3

17 and go through line 20.

18        MR. RAGSDALE:  Okay.

19        MR. WITTENBRINK:  May I approach the witness, Judge?

20        MR. RAGSDALE:  And just to be clear, is the question

21 has he changed his testimony?

22        MR. WITTENBRINK:  Yes.

23        MR. RAGSDALE:  Okay.

24        THE COURT:  Okay.  You can approach.

25 Q.    (By Mr. Wittenbrink) Mr. Poersch, I'm going to ask you

1  to review this on page 91.  Start with the question and your

2  answers, and read from line 3 to line 19.

3  A.    Okay.  All right.  The other lawyer's questions was:

4  "So what you are saying is that the ad connotes that he was

5  banned from Gadsden Mall for something that happened somewhere

6  else, not in the Gadsden Mall?"

7       The response:  "What I'm saying, sir, is the ad says

8  that he states he was banned from Gadsden Mall and banned for

9  soliciting sex from young girls.  I think, sir, you are taking

10 some liberties beyond that by what it may have started, but

11 it's right there.  If there's more to the script, we can go

12 back and look at the original script."

13      "It speaks for" -- the other lawyer asks, "It speaks

14 for itself, correct?  The ad speaks for itself."

15      The answer:  "Apparently not, sir, because you and I

16 have differing views."

17      Did I get it?

18 Q.    That's good.

19 A.    Okay.

20 Q.    So did your testimony change from the time of your

21 deposition to today?

22 A.    I don't -- what was given to me in terms of seeing the

23 ad for the first time, I might have been confused, but I don't

24 think my position has changed, no, sir.

25 Q.    Well, so you hadn't seen the ad for a while, but you

1  were the person responsible for creating it.

2  A.     I couldn't even -- in the deposition, I couldn't even

3  read the script because I didn't have reading glasses.  It was

4  all -- it was all a quite a blur, sir.

5  Q.     Okay.  So the attorney in the deposition didn't give

6  you a fair chance to read it and see what it said?

7  A.     It seemed to be moving quickly, yeah.

8         MR. RAGSDALE:  Your Honor, for the record, can we

9  say that this deposition was taken remotely?  I think it is

10 worth mentioning and obviously not by Mr. Wittenbrink.

11        THE COURT:  Understood.

12        MR. RAGSDALE:  Okay.

13 Q.     (By Mr. Wittenbrink) Do you know who the people were

14 that did the due diligence for the ad?

15 A.     They were research on SMP staff.

16 Q.     Do you know who those people were?

17 A.     It started with the research.  There were lawyers who

18 reviewed it too, sir.

19 Q.     Okay.  Did you -- can you tell us the names of the

20 people on the research staff that --

21 A.     The two I recall is Diana Astiz, who was our research

22 director at the time.  You know, in your documents, you cite

23 Dan Goldfield who was a junior researcher, but he was

24 primarily organizing clips.  I believe there was a third

25 researcher whose name I don't recall.

```
 1   Q.     Ms. Astiz is going to come and talk to us --
 2   A.     Yes, sir.
 3   Q.     -- about the case, correct?
 4   A.     That's my understanding.
 5   Q.     You were aware that Mr. Moore objected to the ad; is
 6   that correct?
 7   A.     In -- towards the end of the campaign, yes, there was
 8   some pushback from the campaign that said publicly they
 9   disagreed.
10   Q.     Did you see an e-mail indicating that Moore was going
11   to file suit?
12   A.     I have seen the -- I have seen the e-mails since, yes,
13   sir.
14   Q.     That was an e-mail from Chris Hayden about
15   December 6th?
16   A.     I have seen that e-mail recently, yes, sir.
17   Q.     Okay.  And you -- did you review that at the time?
18   A.     It's likely I would have seen it.  I don't recall it,
19   but it is likely I would have seen it.
20   Q.     You don't recall it right now?  You don't recall seeing
21   it?
22   A.     No.
23   Q.     But it's likely you would have seen it?
24   A.     If it was addressed to me, there is a good chance I
25   would have seen it, yes, sir.
```

Q.      The subject of that e-mail was that Moore was going to
file suit to stop the false Highway 31 ad, correct?

A.      Yes, sir.  My recollection was it was later, after the
ad had run for some time.

Q.      You got that e-mail from Adam Muhlendorf?

A.      Yeah.  He was the communications director -- oh, no.
I'm sorry.  If it came from Adam, Adam ran Highway 31.

Q.      Okay.  And did Adam ask you whether or not SMP would
pull the advertising in order to respond to Mr. Reeves of the
AP?

A.      I don't recall if he asked, but we never pulled the ad.

Q.      Did you think it was significant that Judge Moore was
asking the ad to be pulled?

A.      It seemed like something campaigns do.

Q.      In fact, do you recall saying that this was just a
politician in a political campaign waving their hands and
raising an objection?

A.      I don't recall that quote, no.

        MR. WITTENBRINK:  May I approach the witness, Judge?

        THE COURT:  Okay.

        MR. RAGSDALE:  What page are we on?

        MR. WITTENBRINK:  Page 132 and 133.  I am going to
start at line 15 on 132 and go through line 10.

Q.      (By Mr. Wittenbrink) I will read the question part,
Mr. Muhlendorf, if you don't mind.

```
1   A.      Mr. Poersch.

2   Q.      Mr. Poersch.  I'm sorry.

3   A.      That's okay.  That's okay.

4   Q.      I am mixing y'all up.

5           "That wasn't my question.  My question was:

6   Mr. Muhlendorf contacted you to see whether SMP would pull the

7   ad, which is Exhibit 7, correct?"

8               And Mr. Stafford objected.

9               And what was your answer?

10  A.      "The associated press" -- I know.  I just wanted to

11  read your part again.

12      (Witness reviews document.

13          THE WITNESS:  Okay.  And then you want me to read

14  from line 9?

15  Q.      (By Mr. Wittenbrink) Oh, no.  I'm sorry.  I started

16  here (indicating).

17  A.      Oh, I'm sorry.

18  Q.      I read:  "That wasn't my question.  My question was:

19  Mr. Muhlendorf contacted you to see whether SMP would pull the

20  ad, which was Exhibit 7."

21              And then there was an objection, but you answered.

22  What was the answer?

23  A.      "Yes.  In this context, while I don't recall, I know

24  that we never pulled the ad.  Under any circumstances, we

25  never -- that didn't happen."
```

1  Q.     Right.  And I am going to read the next question.

2  A.     Okay.

3  Q.     "Because your objection" -- it says "objection."  It

4  should say "objective" -- "was to win at all costs, correct?"

5         MR. RAGSDALE:  Your Honor, the objection on the

6  record was both to the form of the question and the fact that

7  it had been previously asked and answered.

8         THE COURT:  Okay.

9         MR. WITTENBRINK:  This is the first time it has been

10  asked for this particular time, Judge, so the objection was

11  about being asked and answered.  We are under

12  cross-examination.

13         THE COURT:  I will let him continue.

14  A.     Okay.  So --

15  Q.     And your answer?

16  A.     Right.  The other lawyer says your -- "was to win at

17  all costs, correct?"

18         And the response was:  "No, sir.  Ironically, no,

19  sir.  This was a politician in a political -- this was just a

20  politician in a political campaign waving their hands and

21  raising an objection.  To my knowledge, I don't remember when

22  he filed suit against Highway 31, unless this is that suit."

23  Q.     All right.  You didn't see Judge Moore's objections as

24  being significant; is that correct?  Is that fair to say?

25  A.     Well, I'm sure they were important to him, but at the

1   same time, it did seem political at the time.

2   Q.     Okay.  Do you agree that the charges that you made in

3   that ad are serious charges?  Is that correct, Mr. Poersch?

4   A.     Those were serious circumstances, yes, sir.

5   Q.     And it's your contention even as we sit here today that

6   that ad with the qualifications that you have given is

7   completely true?

8   A.     I believe it to be true.

9   Q.     And you don't believe that the words of the ad which

10  were not -- not the same words as some of the sources -- well,

11  you don't believe that the ad has been changed or in any way

12  made deceptive by the positioning of those statements

13  together?

14  A.     There was not an intention of deception, no, sir.

15  Q.     What would be the intention of the second sentence if

16  the first sentence were not in front of it?  In other words,

17  just pretend that the ad didn't have the first sentence.

18  Would you run an ad that said, Moore approached a girl who was

19  a Santa's helper when she was 14?

20  A.     I think the context, sir, that is missing here is

21  that -- over those 18 days between the initial Washington Post

22  story and when our ad got ran, there were stories that showed

23  that girls had alleged sexual assault.  There were stories

24  about Mr. Moore wandering around the mall and flirting,

25  harassment.  It was all in the media.

1  Q.     So --

2  A.     So some of it is represented there with the front, and

3  then some of it is represented later on.  And I -- that's --

4  that's why I think that line, "One he approached was 14 and

5  working as Santa's helper," that's a reference to what they

6  were already hearing in the media at the time.

7  Q.     So what you are saying -- I mean, even though you have

8  said earlier in your testimony that you really didn't mean to

9  say that he approached that Santa's helper for sex, you are

10 really saying that it in the context of what -- of everything

11 that was going on that you really think he was approaching her

12 for sex, and that's what you said?

13 A.     No.  I didn't say that.  You know, there were several

14 girls here, and it's hard to keep all of these stories apart,

15 but there were several girls.

16 Q.     Don't you think, Mr. Poersch, for the purposes of the

17 advertisement that you ran and the statements that were made

18 by SMP, it would be important to distinguish that, okay, we

19 think he was banned from the mall for soliciting sex from

20 young girls and this other unrelated thing, which is what you

21 are saying, don't you think it would be important to make that

22 distinction between those two events if that's what you were

23 trying to say?

24 A.     I think we did.  I think it was intended to keep

25 separate.

1  Q.     So you heard Mr. Muhlendorf testify that, you know, it

2  was really because you didn't have very much time, that you

3  had to get everything in 30 seconds.  And so the approach of

4  the young girl and the soliciting sex at the mall, they

5  weren't really meant to go together.  That's basically the

6  essence of your testimony, isn't it?

7  A.     No.  That's --

8  Q.     Explain it.

9  A.     I did hear what -- Mr. Muhlendorf said to you it is a

10 30-second ad.  I heard that.

11 Q.     Okay.

12 A.     But that wouldn't be how I would describe it, no, sir.

13 Q.     So you did use two quotes.

14 A.     Yeah.

15 Q.     Why did you use one person to narrate both those quotes

16 together?

17 A.     Well, the whole of the 30-second ad I believe has five

18 quotes and --

19 Q.     Right.

20 A.     -- yes, because it is a one ad, there's one narrator.

21 That's true.

22 Q.     Okay.  You don't think that having the one narrator

23 intended to run those quotes together?

24 A.     No.  I didn't -- it would be confusing, I think, to

25 have whole different bunch of voices.

1  Q.    Did you know whether or not Glynn Wilson of the

2  American Journal -- New American Journal, did you know whether

3  or not Mr. Wilson knew Roy Moore?

4  A.    I didn't at the time, no.

5  Q.    Do you believe that he does?

6  A.    My knowledge of Mr. Wilson is he was at the American

7  Journal and that it is out of Alabama.  I don't know the

8  relationship between the two men, no, sir.

9  Q.    Did anybody from SMP, anybody from Senate Majority PAC,

10 contact Mr. Wilson?

11 A.    No.

12 Q.    And you never attempted to contact Mr. Wilson?

13 A.    I didn't contact Mr. Wilson, no.

14 Q.    Did anybody at SMP know anything about Glynn Wilson's

15 reputation for truth?

16 A.    I -- we knew that it was an Alabama-based online news

17 journal.  We were aware of that, yes.

18 Q.    But my question was:  Did you know anything about his

19 reputation for truth?

20 A.    I don't -- I don't know what you think his reputation

21 for truth is.  No, sir.

22 Q.    Did you?  Did you?

23 A.    Did I?  No.

24 Q.    That's the pertinent question.

25 A.    No.

1  Q.     Are truthful and accurate sources important to your

2  organization, SMP, when they are making political ads?

3  A.     They are.

4  Q.     But SMP never attempted to find out who Mr. Wilson's

5  sources were; is that correct?

6  A.     Well, we did not have contact with Mr. Wilson, no.  No.

7  We did see the articles, obviously.  That and several other

8  articles that were made part of the backup.

9  Q.     You knew that Mr. Wilson's source that's quoted -- the

10  quote from the article here, you knew that those sources were

11  unnamed, anonymous sources, correct?

12  A.     At the time -- I think we knew they were unnamed, and

13  we knew that there were news reports where there were other

14  people in the community and from the Gadsden Mall that were

15  saying that he had been banned.  We knew that too.

16  Q.     But, again, you didn't have any named source that ever

17  said that?

18  A.     That -- that single story, I believe he didn't have --

19  again, you are asking me something from five years ago.  So I

20  don't recall for sure, but --

21  Q.     Well, it has been five years.  You did refresh your

22  recollection prior to coming here today; is that correct?

23  A.     Yeah, but not having met Glynn Wilson who -- I don't

24  know the answer to your question for sure.

25         (Brief pause)

1  Q.      (By Mr. Wittenbrink) When you were getting ready to

2  come here today, did you review the e-mails from Brentzel,

3  Chelsea, from WHNT?

4  A.      You will have to show them to me.

5       (Brief pause)

6  Q.      Mr. Muhlendorf testified that Highway 31 spent between

7  4- and $5 million dollars on the Roy Moore -- on the Doug

8  Jones campaign against Roy Moore; is that correct?

9  A.      I think that's ball park, yes, sir.

10 Q.      Do you think, Mr. Poersch, there's greater latitude to

11 twist the truth or not tell all the truth in a political

12 campaign as opposed to the ordinary walk of life?

13 A.      There are times when politics goes too far.  That

14 doesn't make it right.

15 Q.      Did you testify in your deposition that taking

16 liberties with the truth seems to be more common nowadays?

17 A.      I think I said that in the deposition, yes, sir.

18 Q.      Do you think it's okay?

19 A.      What, that it is okay?

20 Q.      Yeah, do you think it is okay?

21 A.      No.  I think it's -- it should be our intention in

22 everyday life, as you said, or in the practice of politics is

23 to present the truth.  I believe that.

24 Q.      You actually in your -- you actually testified before

25 that you push yourself to follow a high standard of truth.

```
 1           Isn't that what you testified previously?
 2  A.      We are trying to, yes, sir.
 3  Q.      And you expect that of all the people that work for
 4  you?
 5  A.      We are trying to get to that bar, yes, sir.
 6  Q.      And that would mean checking something out before you
 7  published it; isn't that correct?
 8  A.      Well, again, you know, as you showed, there was quite a
 9  bit done to collect, review the amount of reporting, the
10  amount of witnesses that had come forward, people that came
11  forward, but, you know, to go to the point where we are taking
12  on the role of a journalist, I'm not sure that's our role
13  here.
14  Q.      You did check different news sources and different
15  articles while you were publishing these ads; isn't that
16  correct?
17  A.      Could you ask that again, sir?
18  Q.      You did check different news sources and different
19  articles?  Did you have a clipping service?
20  A.      Yeah.  Yeah.
21  Q.      Did you see articles that were published and news
22  stories that were published that said that Roy Moore was never
23  banned from the Gadsden Mall?
24  A.      I believe there were a couple of people that made that
25  claim, yes.
```

Q.     Was one of the people that made the claim the manager

of the mall for many years?  Is that true, Mr. Poersch?

A.     Well, as I stated earlier, there were also several

other people that said he was banned.

Q.     Right.  But you are aware that the manager of the mall

said that he was not banned, correct?

A.     I don't remember whether he was the manager.  I think I

recall during the campaign that there were a couple of people

that said that he wasn't banned, yes.  I remember that.  I

don't remember the part about whether he was manager or not.

Q.     Would it be significant, do you think, that if the

former manager of the mall said that he had never been banned?

A.     Well, my recollection is some of the people that came

forward and said that he had been banned were, to use your

term, significant.  I wouldn't put them -- wipe them away.

Q.     Would it have -- if you knew that the manager of the

mall denied that he had been banned, would it have changed

your approach to the ad?

A.     There were several people that came forward and said

that he had been banned from the mall.

Q.     That is not my question, Mr. Poersch.  If you knew at

the time the manager of the mall said that he had not been

banned, would it have changed your approach to the

advertisement that you ran?

A.     We represented the information that we were seeing as

1  accurate.  I hear what you are saying, that Mr. Moore knew of

2  somebody that had a different point of view.  I hear that.

3  Q.    I am still -- you are still not answering my question,

4  Mr. Poersch.  If you were aware the manager of the Gadsden

5  Mall at the time of these, you know, these things would have

6  occurred --

7  A.    I wouldn't necessarily think that is a be-all end-all.

8  Q.    You wouldn't think that would be a big deal?

9  A.    No, sir, because there were other people that also

10  would have, you know -- I understand he's in a position of

11  authority as the head of the mall, but it doesn't mean that

12  other people who came forward and said he had been banned in

13  the mall, that doesn't mean their positions aren't worthy or

14  are inaccurate.

15  Q.    So your answer is it would not have changed your

16  position; is that correct?

17  A.    Based on what we are talking about, no.  I think that

18  we had appropriate evidence that at the time he had been

19  banned from the mall.

20  Q.    That still doesn't quite answer the question,

21  Mr. Poersch.  You still haven't said whether or not it would

22  change your position.

23         Would you -- if the manager of the mall said it, you

24  don't think that's significant enough to change your opinion?

25  A.    Well, I did answer that, sir.  I said that one single

1  piece of evidence is probably not --

2  Q.     It would not be enough?

3  A.     I did answer that.

4  Q.     Okay.

5  A.     Yes, sir.

6  Q.     Who is Mark Putnam?

7  A.     He is -- he makes television ads.

8  Q.     Do you remember getting an e-mail November 16th from

9  Mark Putnam with the subject matter of this ad?

10 A.     Yeah, I have seen the e-mail recently, yes, sir.

11 Q.     You have seen the e-mail recently?

12 A.     Yes, sir.

13 Q.     So you remember that Mr. Putnam said he wanted to get

14 that banned from the mall quote right up front and that the ad

15 would rock Alabama, and you agreed with that?

16 A.     That's -- no, I didn't agree with that.  No.

17 Q.     You didn't?

18 A.     No.  No.

19 Q.     Well, so you didn't say you agreed?

20 A.     No.  I didn't say I agreed.

21 Q.     Okay.

22 A.     Not to that, no.

23 Q.     Okay.  Do you know what you were agreeing to in the

24 e-mail?

25 A.     No.  But it wasn't to that.  It was --

1  Q.     So you didn't think that was going to be an important

2  ad?

3  A.     I thought the ad would have impact, yes, sir.

4  Q.     Okay.  Mr. Putnam thought it was going to be the most

5  potent ad to harm Judge Moore's campaign, didn't he?

6  A.     Well, I don't think those were his words, but --

7  Q.     He said it would rock Alabama.

8  A.     He said it would rock Alabama, yes.

9  Q.     Do you think it did?

10 A.     No, sir.

11 Q.     No?

12 A.     No.

13 Q.     No impact?

14 A.     No.

15 Q.     Do you know whether or not any of the people that are

16 quoted in the ad knew Roy Moore?

17 A.     Do I know for certain that any of the people who were

18 quoted -- I guess I don't know if they know him personally,

19 no, sir.

20 Q.     Okay.  Do you know if your creative team knew if any of

21 the people in the ad knew Roy Moore?

22 A.     No.

23 Q.     The lead-in says, "What do people who know Roy Moore

24 say."

25 A.     Yeah.  That was a reference to -- there were several

1  news stories.  We saw one earlier that talked about how

2  several people in the community had known for years and years

3  about Roy Moore's history.  So --

4  Q.      Right.

5  A.      -- that's what that refers to.

6  Q.      But none of those quoted people in any of those

7  articles that said that he was banned from the mall for

8  soliciting sex from young girls, did they?

9  A.      Could you ask that question again?  I'm sorry.

10 Q.      None of the people who were quoted -- none of the

11 quoted people, none of the people who were identified in the

12 articles said that Moore, Roy Moore, was actually banned from

13 the Gadsden Mall for soliciting sex from young girls.

14 A.      Yeah, I am not trying to be evasive, but there were a

15 lot of articles.

16 Q.      There were a lot of articles.  We brought a lot of

17 articles here today.

18 A.      Yeah.

19 Q.      Do you know if your legal team has assembled even a

20 single article with a person who says that they personally

21 know that Roy Moore was banned from the Gadsden Mall for

22 having sex with young girls?

23         MR. RAGSDALE:  I object.  That clearly calls for

24 attorney-client communication of whether I have told

25 Mr. Poersch what evidence we have or don't have.

1    THE COURT:  You can ask him if he has seen one.

2  Just don't ask what conversations he has had with counsel.

3    MR. WITTENBRINK:  Thank you, Your Honor.

4  Q.    (By Mr. Wittenbrink) Have you seen one, Mr. Poersch?

5  A.    Have I seen a --

6  Q.    Have you seen a single article of the hundreds that are

7  here from -- with your team, have you seen a single article,

8  anyone showed you an article where it says, Mr. Jones says

9  that he knew he saw that Roy Moore was banned from the Gadsden

10 Mall for soliciting sex from young girls?

11 A.    My recollection was there was testimony from people

12 that they knew he had been banned.  You are -- I think you are

13 taking it to did they know for certain.  I am not sure what

14 the difference is here.  I guess I don't know whether they saw

15 it for themselves or --

16 Q.    So you are saying you did see a quote from a person who

17 said that they knew Roy Moore was banned?

18 A.    Yeah.  In reporting, there were several people that had

19 said that he had been banned from Gadsden Mall.

20 Q.    Do you know the difference between someone saying they

21 heard he had been banned and that they knew he had been

22 banned?

23 A.    Why don't you ask me that again?

24 Q.    Do you know the difference between a person saying

25 they, quote, "heard he had been banned" and someone saying

1  that they knew he had been banned?

2  A.     I am -- I am under the impression from what I recall

3  that there are people that believe that he was banned.   I

4  don't -- I think that's the bridge between the two --

5  Q.     Right.

6  A.     -- whether they heard or knew, they believed that, yes.

7  Q.     Okay.  So we agree that people's belief may be based on

8  any number of things?  Whether somebody says something,

9  whether there's a rumor going around, a belief is not

10  necessarily evidence that it actually happened, is it?

11  A.     Yeah.  The reports made it clear that they had

12  information.

13  Q.     Did the research team that you had include any quotes

14  in this ad that did not fit the mall ad narrative?  In other

15  words, was there anything that they found in their research

16  that didn't match what this ad says?

17  A.     Well, you asked me earlier if we knew that Roy Moore

18  had somebody that said that he hadn't been banned.   I

19  guess that -- is that an example?

20  Q.     Sure.  Did they keep track of those quotes or how many

21  there were or look for any?

22  A.     They would have access to quotes, yes, sir.

23  Q.     Okay.

24  A.     Or clips.

25  Q.     But none of the quotes that they saw amounted to

1  anything that would change your mind about the ad?

2  A.     I think we presented an accurate ad five years ago.  I

3  think it is still accurate, yes, sir.

4          MR. WITTENBRINK:  One moment with my client?

5          THE COURT:  You may.

6          MR. WITTENBRINK:  Excuse me.

7      (Brief pause)

8          MR. RAGSDALE:  Is there a chance we could maybe take

9  it a down a whisper while he's talking to his client?

10         THE COURT:  Sarah, can you turn up the white noise,

11 please?

12         MR. WITTENBRINK:  I apologize, Judge.  I didn't know

13 we could be heard over here.

14     (Brief pause)

15         THE COURT:  All right.  You can take it back off.

16         Any further questions?

17 Q.     (By Mr. Wittenbrink) As we sit here today, you cannot

18 name one person who said that Roy Moore was banned from the

19 mall for soliciting sex from young girls, is that correct,

20 Mr. Poersch?

21 A.     Ask me the question again, sir.

22 Q.     As we sit here today, you, yourself, cannot name one

23 person who said -- besides this fellow Glynn Wilson who quoted

24 anonymous sources -- who said Roy Moore was banned from the

25 mall for soliciting sex from young girls?

1        MR. RAGSDALE:  Your Honor, I would only ask that

2   there be an instruction that he not disclose communications he

3   might have had with his lawyer by which he would have learned

4   that information.

5        THE COURT:  All right.  Other than any information

6   you would have gotten from your lawyer, you can answer the

7   question.

8        THE WITNESS:  I don't recall names while I'm sitting

9   here.  No, I don't recall the names, no.

10        MR. WITTENBRINK:  That's all I have, Judge.

11        THE COURT:  All right.  Any cross?

12                        CROSS-EXAMINATION

13   BY MR. RAGSDALE:

14   Q.    Good afternoon, Mr. Poersch.

15   A.    Good afternoon.

16   Q.    When Mr. Moore threatened suit in the middle of the

17   campaign, do you know whether or not any television stations

18   requested that we provide backup information regarding the ad?

19   A.    It's pretty common that stations request backup, yes,

20   sir.

21   Q.    And did we provide that backup, that is, did SMP --

22   A.    When it was requested, we would have provided it, yes.

23   Q.    Okay.  And despite Mr. Moore's protestations, no

24   station pulled that ad, right?

25   A.    The ad was never pulled.  It ran its full course in

1  every station in Alabama that it ran.

2  Q.     Okay.  We have watched the ad.  I don't think we need

3  to watch it again.  But you agree with me there are five

4  quotes in there, right?

5  A.     I think there were five, yes.

6  Q.     Okay.  And the last one comes from a Gadsden police

7  officer that says he's basically disgusted, right?

8  A.     I believe that was the last quote, yes.

9  Q.     Okay.  Do you think it is reasonable to read that last

10  quote as somehow relating to the first quote?

11  A.     As people say, yeah, I do.

12  Q.     And there's also a quote, is there not, in that ad that

13  says stories like this have been going around for 30 years,

14  right?

15  A.     Yep.

16          MR. RAGSDALE:  Could you pull up Number 3, please,

17  Mitch?  And if you could, scroll down to the second page, I

18  think.

19  Q.     It is true, is it not -- and I will give you a second

20  to look at that.  I want to ask you a question about the two

21  paragraphs right before "breaking news."  Do you see the one

22  that says "a former prosecutor"?

23  A.     Yes.  I do see it now.

24  Q.     Okay.  It's true, is it not, that Mr. Wilson's article

25  did quote Teresa Jones, a former deputy district attorney,

1  right?

2  A.     I see that in the story here, yes.

3  Q.     And according to Ms. Jones, it says, "It was common

4  knowledge that Roy dated high school girls.  Everyone we knew

5  thought it was weird, former deputy district attorney Teresa

6  Jones told CNN in comments aired Saturday."

7           "We wondered why someone his age would hang out at

8  high school football games and the mall, but you really

9  wouldn't say anything to someone like that."

10          Do you see that?

11  A.     Yeah, I remember this quote, yes.

12  Q.     Okay.  Now, finally, Mr. Poersch, Mr. Wittenbrink asked

13  you several questions about an unnamed mall manager who

14  allegedly said Mr. Moore was not banned.

15          Do you remember those questions?

16  A.     Yes, I do.

17  Q.     Do you know who that mall manager was?

18  A.     I don't.

19  Q.     If you learned that that mall manager didn't even start

20  working at the mall until 1981, would that influence how much

21  weight you put on his testimony?

22  A.     It probably would.

23  Q.     Okay.

24  A.     Yes.

25  Q.     And if you learned that his wife has testified under

1  oath in this case that that mall manager was not mentally

2  competent in 2017, would that affect whether you relied on

3  that?

4  A.     It would.

5          MR. RAGSDALE:  That's all I have, Your Honor.

6          THE COURT:  Any further questions?

7          MR. WITTENBRINK:  Yeah.  He's gone into these other

8  quotes that I didn't intend going on, Judge, and I have to

9  pull up those exhibits.

10          Just have 1 through 5 ready to go.

11          I need the list.  Let me pull up the list here.

12                    REDIRECT EXAMINATION

13  BY MR. WITTENBRINK:

14  Q.     We will start with the last quote first, the one from

15  the police officer.  Do you know what that police officer was

16  talking about in that article that was quoted?

17          MR. RAGSDALE:  I'm sorry, Your Honor.  It is

18  actually the ad.

19          MR. WITTENBRINK:  The ad.  I'm sorry.

20  Q.     In the ad that was quoted, do you know where that quote

21  came from?

22  A.     The citation was it came from a police officer, yes.

23          MR. WITTENBRINK:  Now I can't pull my computer up,

24  Judge.  I'm sorry.

25      (Brief pause)

```
1   Q.      (By Mr. Wittenbrink) Do you know the context of the
2   rest of that quote, Mr. Poersch?
3   A.      You mean besides --
4   Q.      Besides the part where he says where he was disgusted,
5   do you know the rest of the context that he's quoting from in
6   that article?
7   A.      Off the top of my head, I don't want to --
8   Q.      Okay.
9           MR. WITTENBRINK:  Hold on a minute.
10      (Brief pause)
11  Q.      (By Mr. Wittenbrink) Mr. Poersch, would you agree
12  there's a difference between soliciting sex from young girls
13  and dating a young girl?
14  A.      Is there a difference between --
15  Q.      Is there a difference between soliciting sex from a
16  young girl and dating a young girl?
17  A.      There can be, yes.
18  Q.      I mean, you don't see those two statements as
19  equivalents, do you, Mr. Poersch?
20  A.      In and of themselves, are they the same thing?  Well,
21  it depends on the context.
22      (Brief pause)
23          MR. WITTENBRINK:  This is Exhibit 4, Judge.
24          THE COURT:  Okay.
25  Q.      (By Mr. Wittenbrink) Okay.  Can you see that,
```

1  Mr. Poersch?

2  A.      I see what you bolded, yes, sir.

3  Q.      There was a second officer who is unnamed.  It said a

4  friend of his told him he was banned from the mall.  He said

5  he actually voted for Moore, but he was disgusted, to be

6  honest.  He said -- well, read the quote for the ladies and

7  gentlemen of the jury, Mr. Poersch.

8  A.      Okay.  "I liked him at one time, but I'm basically

9  disgusted now, to be honest with you.  Some of the things he

10 said recently, I have changed my tune completely about this

11 guy -- he went on explaining why Moore no longer appeals to

12 him.  When I heard what he said on Hannity the other night, he

13 said -- referring to an appearance Moore made on Sean

14 Hannity's radio show last Friday -- I almost stood straight

15 up.  The thing about how he's never dated anybody without

16 their mother's permission, that appalled me.  That made me

17 want to throw up.  Why would you need someone's permission to

18 date somebody?  I'm probably going to write in Luther

19 Strange."

20 Q.      Okay.  The police officer in that quote, he didn't say

21 anything about soliciting sex, did he?

22 A.      I don't see it in this quote, no.

23 Q.      No.  And he didn't say anything about soliciting sex

24 from young girls at the mall.  He was talking about something

25 that Judge Roy Moore said on the Hannity show about asking a

1    girl's mother for permission before he dated her.

2    A.      That's what you have pulled up here.

3    Q.      And that was what caused him to be disgusted; isn't

4    that correct?

5    A.      That's what you have bolded here in this part, yes.

6    Q.      Now, you did say also that he had heard that he had

7    been banned from the mall and that he voted for him, that he

8    liked him at one time.  He was disgusted, but what he said was

9    the thing about how he's never dated anybody about their

10   mother's permission, there is a difference between asking a

11   girl on a date, asking their mother for a date, and soliciting

12   sex, isn't there, Mr. Poersch?

13   A.      There -- I think for -- I think for many people,

14   there's a difference here, but given the context, given the

15   case history, if you will, it's more than fair to ask of

16   Mr. Moore as to whether there was a -- whether that difference

17   was important.

18   Q.      Well, let me ask you this:  When you published the ad

19   that you published --

20   A.      Yep.

21   Q.       -- wouldn't it have been more accurate to say -- you

22   know, isn't it true that you conflated dating a young girl

23   with soliciting a young girl for sex?  Isn't it true that you

24   have conflated approaching a young girl and buying her a Coke

25   or saying she was pretty was soliciting her for sex?

```
 1  A.      No, I don't think we did, sir.

 2  Q.      Okay.

 3  A.      Not given the number of stories that were out there,

 4  no.

 5  Q.      And you don't think that that quote taken in that

 6  context is unfairly placed in that ad?

 7  A.      I don't.

 8  Q.      All right.

 9      (Brief pause)

10  Q.      (By Mr. Wittenbrink) Okay.  Mr. Poersch -- highlight

11  that "common knowledge."  Common knowledge.  It was common

12  knowledge.  Right there (indicating).

13  A.      Can you bold it again, too, please?

14  Q.      That's what we are trying to do.  Okay.

15           "It was common knowledge that Roy dated high school

16  girls.  Everyone we knew thought it was weird.  We wondered

17  why someone his age would hang out at high school football

18  games and at the mall, but you really wouldn't say anything to

19  someone like that."

20           Let me ask you this:  Did Teresa Jones say that he

21  was soliciting sex from high school girls?

22  A.      It's not in that quote, no.  I remember seeing that

23  quote, but no, she doesn't say it in that quote, no.

24  Q.      It doesn't say he was banned from the mall for

25  soliciting sex from high school girls.
```

```
 1   A.      No.
 2   Q.      In fact, she's not part of that quote talking about
 3   being banned from the mall, is she?
 4   A.      She's talking about that part where she found it and
 5   many others in the community found it strange that he -- that
 6   Moore kept showing up in the mall, and she leaves it at that.
 7           What she doesn't --
 8   Q.      Let me ask you this.
 9   A.      Yes, sir.
10   Q.      Teresa Jones was a deputy prosecutor.
11   A.      Yep.  That's what it says.
12   Q.      Do you think that someone would have been told at the
13   prosecutor's office that Mr. Moore had been banned from the
14   mall for soliciting sex?
15   A.      It doesn't say where she was deputy district attorney,
16   so I don't even know that.
17   Q.      Well, doesn't it imply that that's where she -- it
18   says, "A former prosecutor who worked alongside Moore in the
19   early 1980s" --
20   A.      Oh, that wasn't bolded.  Sorry.  That wasn't bolded.
21   Sorry.
22   Q.      Yeah, we can bold that.  Go ahead and bold that for
23   him.
24   A.      I see it now.
25   Q.      So she knew him as being a prosecutor.  He was a deputy
```

1  prosecutor like she was.  She worked alongside him.

2  A.      Yeah.

3  Q.      Do you think if he had been banned from the mall that

4  she would have known it?

5  A.      Well, you are reading a lot into that quote, sir.  It

6  also doesn't say that she didn't know it.

7  Q.      Well, let me ask you this:  Do you think if it was

8  known by the district attorney that Judge Moore had been

9  banned from the mall for soliciting sex, do you think the

10 district attorney would have countenanced that activity?  Do

11 you think that would have been okay?

12 A.      Well, I have to tell you, I don't even know from

13 reading this quote where she was the district attorney from.

14 Again, I'm not trying to be evasive, but it doesn't say, sir.

15 Q.      Sir, it does say in the quote that she was a former

16 prosecutor who worked alongside Moore in the early 1980s --

17 A.      Who knew him back in the day.  That's --

18        (Simultaneous speakers)

19        (Court reporter interruption)

20            MR. WITTENBRINK:  I apologize, ma'am.

21            THE WITNESS:  Sorry.

22            THE COURT:  Mr. Wittenbrink first.

23            MR. WITTENBRINK:  Okay.

24            THE COURT:  And then Mr. Poersch can answer.

25 Q.      (By Mr. Wittenbrink) Okay.  Mr. Poersch, it does say

1  that she was a former prosecutor who worked alongside Moore in

2  the early 1980s who told CNN at the time that Moore dated high

3  school girls.  Common knowledge.  We all thought it was weird.

4  Okay.

5           But do you think that if she knew that Roy Moore had

6  been banned from the mall, that the district attorney wouldn't

7  have known?

8           Does that make any sense to you, Mr. Poersch?

9  A.    I -- I think her point of view here is important, and

10 it's valid.  I can't speak to what she didn't say, sir.

11 Q.    Okay.

12 A.    I just don't have that information.  I can't speak to

13 what she didn't say.

14 Q.    Does it make sense to you that -- she's talking about

15 how important Mr. Moore was.  Does it make sense to you that

16 he could be banned from the mall and people wouldn't know it

17 in his position?

18 A.    There -- if -- if what you are telling me is she was

19 the district attorney at the same time and that she didn't

20 know, I suppose that's unusual if she was -- I don't even know

21 if she was know privy to the case, part of it.  It seems to me

22 that she's speaking as a member of the community and saying,

23 You know what, everybody knew in the community that it was

24 pretty weird.  He was wandering around the mall.  That's what

25 I take from that, sir.  I don't -- I don't know what else you

1  are trying to get me to glean from it because I think that's

2  what is there in the quote.

3  Q.     Okay.  So that's clearly what is there, but what is not

4  there is the idea that she worked alongside Judge Roy Moore in

5  the 1980s as a district attorney.  And if she thought it was

6  weird that he was dating high school girls, she would think it

7  was really bad and weird if he was soliciting sex.  Don't you

8  think?

9  A.     It's possible.  But, again, I can't tell you what she

10  didn't say.

11  Q.     It's impossible to know.  Is that your position?

12  A.     It's certainly not stated here, yes, sir.

13  Q.     Okay.  Does it make any sense to you?  It was already

14  clear that she thought it was weird.  Why wouldn't she have

15  reported him for soliciting sex?

16  A.     Yeah.  It -- again, I don't know the context of her

17  history here.  Not -- I apologize.  I am not trying to be

18  evasive.  I just -- I think I'm answering your question as

19  best as I can.

20  Q.     Mr. Poersch, in the context of political campaigns, you

21  gave a quote to C-SPAN back in -- when was that -- 2017.  This

22  was right around the time you became the president of the

23  Senate Majority PAC; isn't that right?  When did you become

24  the president?

25  A.     April of 2017.

```
 1  Q.    April.  So April right before this very important
 2  election?
 3  A.    Yeah.  It's --
 4  Q.    Isn't it true that you told C-SPAN in an interview with
 5  regard to political campaigns that you guys do whatever it
 6  takes to win.  Isn't that correct?
 7  A.    We don't do whatever it takes to win.
 8  Q.    Okay.  I would like to play that clip, please.
 9        MR. WITTENBRINK:  And, Judge, this is for
10  impeachment.  It is not a previously provided exhibit.
11        Mr. Ragsdale, do you want to see this clip?  Are you
12  aware of it?
13        MR. RAGSDALE:  I've seen it.
14        MR. WITTENBRINK:  Okay.  Go ahead and play it.
15     (Video played)
16        "MR. POERSCH:  We are interested in winning, and we
17  do what we need to in order to win."
18     (Video stopped)
19  Q.    (By Mr. Wittenbrink) That's you quoting that, isn't it,
20  Mr. Poersch?
21  A.    Yeah, but that's -- I recall that conversation.  That's
22  about our role in campaigns, how we show up.
23  Q.    Sure.
24  A.    And, you know, we certainly do everything we can to
25  help our campaigns win, but we follow the rules, sir.
```

```
 1  Q.     Okay.

 2  A.     We do.

 3  Q.     All right.

 4  A.     And that would never be my implication -- or my

 5  intention to state otherwise.

 6         MR. WITTENBRINK:  That's all I have for this

 7  witness, Judge.

 8         THE COURT:  Mr. Ragsdale?

 9         MR. RAGSDALE.  Whew.  Sorry.  I didn't mean to do

10  that out loud.

11         This is not our laptop, is it?

12         I don't know whose -- is this yours?

13         MR. WITTENBRINK:  Oh, my gosh.  That's mine.  Sorry.

14  Judge, I'm taking over here -- I'm leaving all my

15  proprietary --

16         MR. RAGSDALE:  That's mine.

17         MR. WITTENBRINK:  That's my pen.  Can you check that

18  document you've got inside there and make sure I didn't stick

19  something in there?

20         MR. RAGSDALE:  No.  It's mine.  I promise.

21         MR. WITTENBRINK:  All right.

22         THE COURT:  All right.  You can proceed.

23         MR. RAGSDALE:  Put up Number 4.  And let's go to the

24  second page.  And would you highlight the paragraph that says

25  "Greg Legat"?  And actually, the next paragraph, if you would.
```

RECROSS-EXAMINATION

BY MR. RAGSDALE:

Q.     And, Mr. Poersch, this -- first of all, this article, just so that everybody can follow along, do you know the date of this article?

A.     Off the -- no, sir, I don't.

Q.     Sorry.

A.     That's okay.

Q.     I did that to you.  I am going to represent to you it is November 13th, okay?

A.     Okay.

Q.     That's before our ad was run, right?

A.     Right.

Q.     Two full weeks, right?

A.     Right.  November 27th, the ad ran.

Q.     Okay.  And in this report, it quotes a guy named Greg Legat.  Do you know Mr. Legat?

A.     No.  I don't think I do, no.

Q.     Okay.  And Mr. Legat said that he had -- that he saw Moore there a few times, even though his understanding then was that he had already been banned.  "'It started around 1979, I think,' Legat said.  'I know the ban was still in place when I got there.'  Legat recalled a Gadsden police officer named J.D. Thomas, now retired, who worked security at the mall, 'J.D. was a fixture there when I was working at the

```
 1  store,' Legat said.  'He really looked after the kids there.
 2  He was a good guy.  J.D. told me, If you see Roy, let me know.
 3  He's banned from the mall.'"
 4           Did I read that correctly?
 5  A.    Yes, you did.
 6  Q.    And was this one of the articles on which SMP relied in
 7  running that ad?
 8  A.    This was one of the statements or testimony we had seen
 9  earlier, yes.
10  Q.    And just so we are clear, this quotes not only
11  Mr. Legat but a former Gadsden police officer that told
12  Mr. Legat that Mr. Moore had been banned from the mall, right?
13  A.    As stated in this story, yes.
14           MR. RAGSDALE:  That is all I have, Your Honor.
15           THE COURT:  Mr. Wittenbrink?
16           MR. WITTENBRINK:  Yes, Your Honor.
17           Judge, I would just like to repeat the instruction
18  to the jury that none of these things are offered for the
19  truth of what they say.  The truth -- in fact, this is double
20  hearsay, which they would never see or hear but for the
21  publication of these articles.
22           THE COURT:  Hold on.
23           MR. RAGSDALE:  Sorry.
24           THE COURT:  Yes, the exhibit is already admitted, so
25  this is not an objection as to whether or not it could be
```

1  read.

2          The point, ladies and gentlemen, as I have told you

3  from the beginning is these articles were not given to you so

4  that you could determine whether or not the allegations were

5  true based on what people have previously said.  They are

6  given to you to determine or to prove or disprove whether or

7  not the defendants knew that the ad they made, particularly

8  the combined statements, conveyed a message that was either

9  false or that they were reckless in disregarding whether it

10 was false or not.  Understood?

11         Any further questions, Mr. Wittenbrink?

12         MR. WITTENBRINK:  That's all I have, Judge.

13         THE COURT:  All right.  Before we take our last

14 break of the day, let me ask the jury this:  Who is driving

15 the farthest?  Do we have Marshall County, the Albertville,

16 Arab area?  Are y'all comfortable starting at 8:30?

17         Y'all had to get her at 8:15 today, right?  Is

18 everybody else okay with 8:30 tomorrow?

19         All right.  It is 4:20 now.  We are going to come

20 get you at 4:30.  In the meantime, I am going to talk some

21 planning and scheduling with the attorneys, so we will see you

22 in about ten minutes.

23     (Jury out at 4:20 p.m.)

24         THE COURT:  You can go back to your seat at the

25 table.

```
 1        (Witness excused)
 2             THE COURT:  All right.  Y'all can be seated.  Who is
 3   going to be our next witness?
 4             MR. WITTENBRINK:  The first witness we have in the
 5   morning, Judge, is Barbara Robinson -- Brenda Boyle.  I'm
 6   sorry.  Not Barbara Robinson.
 7             THE COURT:  Do you have anybody else you are going
 8   to put on today?
 9             MR. WITTENBRINK:  I don't have anybody else that
10   I was going to put on today.
11             THE COURT:  Well, I should have just sent them home.
12             MR. WITTENBRINK:  I thought that -- well, I thought
13   that's what you were getting ready to do.
14             THE COURT:  That's fine.  We will bring them back in
15   in a minute.  Then let's talk about tomorrow.
16             MR. WITTENBRINK:  We have about --
17             THE COURT:  So Boyle first.
18             MR. WITTENBRINK:  Boyle first.  Where is my list?
19   Hold on a second.  I have it all written down.
20             We have about ten witnesses for tomorrow.  Most of
21   them are going to be fairly brief, but I think that we will
22   get through all of them.
23             The first one is going to be Brenda Boyle.  After
24   that, I believe we have --
25             MR. MOORE:  Your Honor, we have got several
```

```
 1   character witnesses.  We haven't determined, but we are going
 2   to get several character witnesses off very quickly.
 3              THE COURT:  Okay.
 4              MR. MOORE:  We're going to have a couple other
 5   witnesses very quickly.  I think we can have approximately ten
 6   witnesses tomorrow.  It shouldn't --
 7              THE COURT:  I am pulling the slideshow back up now
 8   so we can see the names, if that helps.
 9              MR. WITTERNBRINK:  Okay.  That's good.
10              THE COURT:  All right.
11              MR. WITTENBRINK:  Okay.  So for tomorrow, we had
12   Brenda Boyle, then Johnny Adams.  Then we are going to have
13   three -- Toni Martin, Genia Craft, and Connie Wilkerson.
14              THE COURT:  Martin, Wilkerson, and Craft of the
15   character, okay.
16              MR. WITTENBRINK:  Okay.  And then Kayla Moore and --
17   Heather Moore and then Kayla Moore.
18              THE COURT:  Okay.
19              MR. WITTENBRINK:  And I believe that we will go
20   through all of those, and then the next day we will have --
21              MR. MOORE:  Kayla Moore will go first.
22              MR. WITTENBRINK:  Either one.
23              THE COURT:  All right.  So tomorrow, Defendants be
24   prepared for Brenda Boyle, Johnny Adams, and then on the
25   character side, Toni Martin, Connie Wilkerson, Genia Craft.
```

 1   And then with the remaining time, Kayla Moore, Heather Mayo,

 2   correct?

 3            MR. WITTENBRINK:  That's correct, Judge.

 4            THE COURT:  Okay.  That would leave us with the

 5   plaintiff, potentially J.B. Jeffers, Terry White, and then

 6   Flannagan and Holifield.

 7            MR. WITTENBRINK:  Flannagan and Holifield.

 8            THE COURT:  So we are probably looking at, depending

 9   on how long the plaintiff's testimony takes, your case lasting

10   through the end of Wednesday.

11            MR. MOORE:  Maybe not that long.

12            MR. WITTENBRINK:  Maybe not that long.

13            THE COURT:  All right.  So start preparing for your

14   case to be on Wednesday.  We definitely won't finish tomorrow,

15   but be ready to have a witness to go Wednesday, all right?

16            MR. RAGSDALE:  The only thing I would ask, Your

17   Honor -- these witnesses, I think, went quicker than maybe

18   Mr. Wittenbrink anticipated.  We have eight witnesses for

19   tomorrow that are going to be quick.

20            Is the plan, then, to put the plaintiff on, or what

21   happens if we get through these eight and --

22            THE COURT:  Yeah, let's have people ready.  I have

23   got seven for tomorrow, so I may have missed one.

24            MR. WITTENBRINK:  Okay.  Well, then at that point --

25            THE COURT:  We will know by lunch tomorrow, I'm

1  sure.

2        MR. WITTENBRINK:  Yeah.  I don't want to -- I want

3  to put the plaintiff on last, Judge.

4        THE COURT:  I know strategically that -- I assumed

5  you were going to keep him for last or him and then Jeffers

6  and White, but -- all right.  So let's at lunch tomorrow

7  discuss how quickly things have gone, if you may need to call

8  one or two others tomorrow.

9        MR. WITTENBRINK:  All right.

10       THE COURT:  All right?

11       MR. WITTENBRINK:  Yes, Your Honor.

12       THE COURT:  All right.  Tomorrow, 8:30 ready to

13  start.  Everybody understand?

14       MR. RAGSDALE:  Yes, sir.

15       THE COURT:  Ms. Sarah, let's bring them back early.

16  They will like that.

17       MR. RAGSDALE:  Can I get credit for it or --

18       THE COURT:  I will give you both credit for it as I

19  always do.

20     (Jury in at 4:25 p.m.)

21       THE COURT:  Everyone may be seated.  I did not give

22  you the full ten minutes that I promised, but I have a good

23  reason.  So I have had a discussion with the attorneys, and we

24  have made very good progress today.  We have been able to get

25  through things we needed to do today very efficiently.  And

1  because of that, I am going to let you go home early today.

2  So that's all you are going to hear for today.

3         We are going to start back tomorrow at 8:30 a.m.

4  The bad news is, is I don't get to furnish lunch for you

5  tomorrow.  You will have lunch on your own.

6         Otherwise, it will be just like today.  We will

7  start at 8:30 and go until sometime around 5:00 o'clock

8  tomorrow.

9         In the meantime, while you are gone, please remember

10  your earlier instructions:  Don't discuss the case with

11  anyone, whether it is each other, a spouse, relative.  Don't

12  look up anything tonight about the case or the parties or any

13  of the venues where things may or may not have happened.

14  Understood?

15         Get a good night's sleep, and we will see you back

16  tomorrow.

17     (Jury out at 4:27 p.m.)

18         THE COURT:  Y'all can be seated.

19         Mr. Wittenbrink, anything you need to bring up

20  before we take off for the day?

21         MR. WITTENBRINK:  I think that's all we have, Judge.

22         THE COURT:  Mr. Ragsdale?

23         MR. RAGSDALE:  Nothing -- oh, wait.  Maybe, yes.

24         I guess I'm not entirely clear about the polygraph

25  reference.  If we have beaten that horse, I don't want to do

1 it again.  We did do a brief on the admissibility.

2        THE COURT:  Okay.  If you want to give it to Mindy,

3 that's great.

4        MR. RAGSDALE:  Do we have more than one copy?

5        MS. JOHNSON:  Yes.  To give right now?

6        THE COURT:  I mean, the best thing to do is just to

7 e-mail it the same way we have been doing everything.

8        MS. JOHNSON:  We can do that, yeah.

9        THE COURT:  That's fine.

10        MR. WITTENBRINK:  All right.  And, Judge, we will

11 find anything we can on simply mentioning it as opposed to

12 verifying it.

13        THE COURT:  That's fine as well.  It does not appear

14 that Mr. Moore will testify until Wednesday, so as long as I

15 get that by lunch tomorrow, that will give me time to look at

16 everything.

17        MR. WITTENBRINK:  Great.

18        MR. RAGSDALE:  Thank you, Your Honor.

19        THE COURT:  All right.  Y'all are free to go.

20     (Proceedings adjourned at 4:28 p.m.)

21

22

23

24

25

C E R T I F I C A T E

        I certify that the foregoing is a correct transcript to
the best of my ability from the record of proceedings in the
above-entitled matter.


        So certified on this date, September 11, 2022.


_____
Carrie M. Robinson, RPR, CRR, CRI
Federal Official Court Reporter