FILED
2026 Jul-10 AM 11:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**FOR PUBLICATION**

In the
# United States Court of Appeals
For the Eleventh Circuit

---

No. 23-13531

---

ROY STEWART MOORE,

*Plaintiff-Appellee,*

*versus*

GUY CECIL, et al.,

*Defendants,*

SENATE MAJORITY PAC,
"SMP",

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:19-cv-01855-CLM

---

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

BRANCH, Circuit Judge:

In 2017, Roy Moore ran as the Republican nominee in a special election to fill an open seat for one of Alabama's United States senators. In the final weeks before the election, multiple news outlets reported that several women had accused Moore of inappropriate sexual conduct with them when they were young. Senate Majority PAC ("SMP") grabbed onto the news reports and ran a campaign ad that stated, among other things, in separate individual frames that (1) "'Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls,'" and (2) "[o]ne he approached 'was 14 and working as Santa's helper.'" SMP ran the ad hundreds of times, and Moore eventually lost the election.

Moore sued SMP for defamation and false-light invasion of privacy under Alabama law, arguing in relevant part that the two statements above when read together created the false defamatory implication that he had solicited the 14-year-old girl working as Santa's helper for sex.[1] Those two claims proceeded to a jury trial. The jury found SMP liable for defamation and false-light invasion of privacy, and it awarded Moore $8.2 million in compensatory damages. The district court denied SMP's renewed motion for judgment as a matter of law or for a new trial, and SMP appealed.

SMP raises several issues on appeal, including that the district court erred in denying its renewed motion for judgment as

[1] We note that Moore sued other defendants as well and raised additional claims, but for purposes of this appeal we discuss only SMP and the relevant defamation and false-light invasion of privacy claims.

a matter of law because Moore is a public figure and he failed to present clear and convincing evidence that SMP published the implication in the ad with actual malice as required under the *New York Times v. Sullivan* standard. 376 U.S. 254 (1964).[2] After careful review and with the benefit of oral argument, we agree with SMP. Accordingly, we reverse the district court's order denying SMP's renewed motion for judgment as a matter of law, and remand with instructions for the district court to enter judgment for SMP.

## I. Background

We divide our background discussion into three main sections. The first section provides the factual background relevant to understanding the claims at issue on appeal, including the substance of the news articles that led to SMP's ad and the ad's contents. The second section addresses the relevant procedural history leading up to the trial. Finally, the third section discusses the relevant trial proceedings.

### *A. Factual Background*

#### 1. News reports leading up to SMP's ad

In 2017, Jeff Sessions resigned as one of Alabama's United States Senators, and Moore secured the Republican Party's

---

[2] In *New York Times v. Sullivan*, the Supreme Court held that the First Amendment requires a public-figure plaintiff to demonstrate by clear and convincing evidence that the alleged defamatory "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80. We discuss the actual malice standard at length later in the opinion.

nomination for the special election to fill the empty seat. In the final weeks leading up to the special election, multiple news organizations reported that a number of women had accused Moore of improper sexual conduct.

On November 9, 2017, the *Washington Post* published an article involving allegations by Leah Corfman and others. Corfman said that she met Moore when she was 14 years old and waiting to enter a courtroom to attend a child custody hearing with her mother. Moore, then a 32-year-old assistant district attorney for Etowah County, Alabama, offered to watch Corfman while her mother attended the hearing. Corfman's mother accepted. While Corfman's mother was in the hearing, Moore talked alone with Corfman, eventually asking for her phone number. Corfman obliged. Days later, Moore picked Corfman up around the corner from her house, "drove her about 30 minutes to his home in the woods, told her how pretty she was[,] and kissed her." "On a second visit . . . , he took off her shirt and pants and removed his clothes. He touched her over her bra and underpants . . . and guided her hand to touch him over his underwear." Corfman eventually asked Moore to take her home, and he did.

The article then provided accounts from three other women that said that "Moore pursued them when they were between the ages of 16 and 18 and [Moore] was in his early 30s." Unlike Corfman, though, "[n]one of the three women sa[id] that Moore forced them into any sort of relationship or sexual contact." First, Wendy Miller said "she was 14 and working as a Santa's helper at

the Gadsden Mall when Moore first approached her, and 16 when he asked her on dates, which her mother forbade."[3] Second, Debbie Wesson Gibson said that "she was 17 when Moore spoke to her high school civics class and asked her out on the first of several dates that did not progress beyond kissing." And third, Gloria Thacker Deason said that "she was an 18-year-old cheerleader when Moore began taking her on dates that included bottles of . . . wine."

The article also reported that Moore denied the allegations in a written statement. Specifically, Moore asserted that "[t]hese allegations are completely false and are a desperate political attack by the National Democrat Party and the Washington Post on this campaign." In another statement, Moore's campaign called the allegations and news reports "garbage [that] is the very definition of fake news."

The *Washington Post* story led to a flood of additional reporting about Moore's alleged improper relations with young girls. The *New American Journal* published an article on November 12, 2017, with the headline, "Politics Makes Strange Bedfellows, but Jesus. Not this." The article stated that "[r]umors of Moore's dalliances with teenagers have been floating around for a long time," but clarified that none of the allegations involved "actual sexual intercourse or rape." The article also quoted a former

---

[3] Wendy Miller's allegations are the main focus of this suit. As we explain in greater detail below, she was the 14-year-old Santa's helper that the ad referenced.

deputy district attorney as saying: "It was common knowledge that Roy dated high school girls, everyone we knew thought it was weird." The article also stated: "Sources tell me Moore was actually banned from the Gadsden Mall and the YMCA for his inappropriate behavior of soliciting sex from young girls. If Moore keeps lying, that story will soon come out in a big way too."

The day after the *New American Journal* article, on November 13, 2017, AL.com published an article with the headline: "Gadsden locals say Moore's predatory behavior at mall, restaurants not a secret." As for Moore's conduct at the Gadsden Mall, the article mentioned Wendy Miller's report that she "was 14 and working as Santa's helper" when Moore first approached her and "told her she looked pretty." The article recounted that two years later, "when [Miller] was 16, he asked her out on dates," but her mother would not allow her to date him. The article also reported that witnesses claimed that Moore would often go to the mall and "flirt with all the young girls." At least one witness claimed to have been told that mall employees stayed on the lookout for Moore, "who was known to pick up younger girls." And another witness who owned a store at the mall claimed specifically that an off-duty police officer named J.D. Thomas told the witness that he should "look out" for Roy Moore. When the witness asked J.D. Thomas what Roy Moore did, Thomas responded: "If you see him, let me know. I'll take care of it." The article ended by quoting five other Gadsden residents, all of whom said something similar to the following: "[Moore] liking and dating young girls was never a secret in Gadsden . . . ."

The same day that AL.com published its article, the *New Yorker* and the *New York Times* each published an article about Moore. The *New Yorker* article claimed—based on interactions "with more than a dozen people," including "a major political figure in the state"—that Moore "had been banned from the mall because he repeatedly badgered teen-age girls." The article cautioned, though, that a former mall manager did not remember Moore being on the mall ban list. And the *New York Times* article stated that a fifth woman, Beverly Nelson, had come forward and claimed that Moore had also inappropriately touched her. According to Nelson's allegations in the *New York Times* article, Moore assaulted 16-year-old Nelson one night after one of her shifts working at a restaurant. Nelson stated to reporters at a press conference: "I tried fighting him off, while yelling at him to stop, but instead of stopping, he began squeezing my neck, attempting to force my head onto his crotch . . . ."

Two days later, on November 15, 2017, the *New York Times* ran another article with the headline: "4 More Women Accuse Roy Moore of Misconduct." The allegations from the four new women raised the number of alleged victims to nine (the original *Washington Post* story had four victims, the first *New York Times* article added another, and this *New York Times* article added four more). This article reported that Moore engaged in varying degrees of inappropriate behavior, including flirting with young girls at the mall, groping one of the women's buttocks, and giving another woman a "forceful" kiss when she was 18.

Moore generally denied all the articles' allegations of improper conduct with young girls. Moore also "said that he couldn't be expected to remember every woman he'd ever dated," explaining that "'[a]fter [his] return from the military,' . . .'[he] dated a lot of young ladies.'"

To be sure, not all press coverage was against Moore. As mentioned, news reports generally reported Moore's denials of wrongdoing. And multiple sources reported that Moore was never banned from the Gadsden Mall for improper relations with young girls.

2. The SMP ad

Based on the above reporting, SMP created a political campaign ad targeting Moore's run for the United States Senate. The television ad ran approximately 533 times between November 27 and December 6, 2017.

The ad comprised six frames, with each frame displaying text and a voice-over simultaneously reading the displayed text.[4] For convenience, we reproduce each frame below:

[4] The video of the full ad is located at https://www.youtube.com/watch?v=2SCI7ZQ1ZY4.


What do people who know Roy Moore say?


"Moore was actually banned from the Gadsden Mall...
for soliciting sex from young girls."
New American Journal, 11/12/2017


One he approached "was 14
and working as Santa's helper."
AL.com, 11/13/2017


"These stories have been going around
this town for 30 years."
Blake Usry, AL.com, 11/13/2017


"These women are being skewered for the truth."
Teresa Jones, AL.com, 11/13/2017




The only frames relevant to this appeal are the second and third. The second frame directly quotes the *New American Journal* article and states: "'Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.'" The third frame then partially quotes the AL.com article and states: "One he approached 'was 14 and working as Santa's helper.'" Each of the frames includes a citation to the respective source and date of the statement.

### *B. Procedural History*

Following publication of SMP's ad and SMP's refusal to pull the ad, Moore sued SMP, asserting claims under Alabama law for defamation, defamation by implication, and invasion of privacy (false-light). As relevant here, Moore alleged that the ad defamed him and portrayed him in a false light by (1) falsely stating that he had been banned from the Gadsden Mall and (2) "deceptively juxtapos[ing]" the quotations in frames 2 and 3 "to create a false

impression" that Moore "solicited sex from young girls at the Gadsden Mall."

After SMP's unsuccessful motion to dismiss, SMP moved for summary judgment. The district court treated Moore's defamation and defamation-by-implication claims as a single claim because Alabama law does not recognize defamation-by-implication as a distinct tort. Instead, Alabama law recognizes a single tort of defamation that can be proved through various means, such as an express defamatory meaning, "defamatory implication," and "defamatory innuendo." *Finebaum v. Coulter*, 854 So. 2d 1120, 1124–25 (Ala. 2003).

The district court then determined as a matter of law that only frames 2 and 3 of SMP's ad could support Moore's claims for defamation and false-light invasion of privacy.[5] Specifically, the court explained that the statement in frame 2—that Moore was "actually banned from the Gadsden Mall . . . for soliciting sex from young girls"—was non-actionable standing alone because Moore could not show actual malice given that "previous reports support[ed] [the] statement that authorities banned Moore from the mall, in part, because Moore solicited young girls."

However, the district court reasoned that a reasonable jury could find that the juxtaposition of the statements in frames 2 and

---

[5] The district court noted that the statements in frames 4, 5, and 6 of the ad could not form the basis for Moore's claims because, among other things, Moore did not allege in his complaint that the statements were false or were made with actual malice. Moore has not challenged that ruling on appeal.

3 when read together could produce a potentially defamatory implication—"that Moore was banned from the mall for soliciting sex from a 14-year-old Santa's Helper"—when "there was no prior report that Moore asked Wendy Miller for sex" during the time that she worked as a Santa's helper at the mall. Instead, the relevant news article asserted that Moore approached Miller and told her she was pretty when she was 14 years old and working as Santa's helper and that Moore asked Miller out on dates two years later. Accordingly, the district court denied SMP's motion for summary judgment, and the case proceeded to a jury trial.[6]

*C. The Jury Trial*

As an initial matter, it was not disputed at trial that Moore was a public figure. Moore thus had to prove by clear and convincing evidence that SMP acted with actual malice when it published the statements in question in order to succeed on his defamation and false-light invasion of privacy claims. *See N.Y. Times*, 376 U.S. at 279–80; *see also Finebaum*, 854 So. 2d at 1124–25 (explaining that the actual malice standard applies to defamation under Alabama law); *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 496 n.1 (Ala. 2004) (explaining that the constitutional actual

---

[6] As described later, the case did not proceed to trial based on each of the two statements in frames 2 and 3 separately creating a defamation claim. Rather, the case was submitted to the jury only under the narrower theory that those two statements juxtaposed together back-to-back created a new message that was false and defamatory. Specifically, the juxtaposition of these two statements back-to-back allegedly implied that Moore solicited sex from Wendy Miller when she was 14 years old and working as Santa's helper.

malice standard applies to claims for false-light invasion of privacy). Whether Moore presented sufficient evidence to support the jury's finding of actual malice—under the clear and convincing evidence standard—is the key issue in this appeal. Thus, our discussion of the trial focuses solely on the evidence related to the issue of actual malice.

1. Testimony related to the meaning of and intent behind SMP's ad

Three witnesses testified about the ad and its preparation. The first witness was Adam Muhlendorf, who was a spokesperson for Highway 31, a PAC created for the special election that was "part of" SMP. The second witness was J.B. Poersch, the president of SMP. And the third witness was Diana Astiz, SMP's research director. We discuss each witness's testimony in turn.

To begin, Muhlendorf testified that he had no knowledge of how the ads were created, and he did not play any role in decisions related to the contents of the ad. Rather, "all [he] did was talk to the media." As to the ad's meaning, Muhlendorf testified that he did not believe that the ad conveyed the message that Moore complained of—*i.e.*, that Moore solicited sex from Miller when she was 14 years old and working as Santa's helper. Instead, Muhlendorf testified that he "read [frames 2 and 3] separately in that . . . the first slide says [Moore] was banned from the Gadsden Mall for soliciting sex from young girls, and the second slide refers to him approaching a 14-year-old working as Santa's helper." According to Muhlendorf, the intention of the ad was not to imply

that Moore solicited sex from Miller. Rather, he stated that "the intention of [the] ad was to take stories that were in the public domain, share them with the general public, and have [the public] make a decision on whether or not they wanted to support Roy Moore."

As for whether Muhlendorf believed the truth of the assertions in the ad, he testified that he did. He believed that the statement that Moore was banned from the mall was true. And, even assuming that the statements in frame 2 and frame 3 implied that Moore solicited sex from Miller, Muhlendorf testified that he believed such an assertion would be a "reasonable conclusion" given that there were news articles circulating at the time that "did show that [Moore] was soliciting sex from 14-year-olds and 16-year-olds." In sum, Muhlendorf testified that at the time the ad was published, he "did not have any doubts" that the ad was true.

J.B. Poersch, the president of SMP, also testified. Poersch "ha[d] input personally into whether or not the ad[] would be published," and was "one of the people that approved th[e] ad to go out." Poersch—like Muhlendorf—testified that SMP did not intend to imply that Moore solicited sex from Miller when she was 14 and working as Santa's helper, and he did not believe the ad did so. Rather, he claimed that frames 2 and 3 were "separate frames and separate parts of the ad." As for the truth of the ad, Poersch testified that he indeed believed that Moore was banned from the mall for soliciting sex from young girls.

Next, Diana Astiz, SMP's research director, testified that she was responsible for making sure that "all of the communications that came from" SMP—including the ad here—were "factually accurate." Astiz described SMP's process for creating and fact-checking ads as follows: Once the media consultant team drafted a script for an ad, it would be sent to Astiz and her team, who would "go through . . . line by line by line by line and make sure that every single thing was factually accurate." In doing this, they would generate a document with the assertions made by the ads coupled with the documents or sources supporting those assertions. If Astiz and her team found something inaccurate, they would make the necessary edits; once she and her team were done, Astiz would send the ad off to lawyers for another round of approvals. Once the lawyers approved the ad, the media consultant team would produce the ad, incorporating any edits from Astiz, her team, and the lawyers. The produced ad would then be reviewed again by Astiz and her team, who would again "go through it line by line by line" to confirm its accuracy. If they discovered anything inaccurate, they would make a correction "and make it accurate." The ad would then undergo one more round of review with the lawyers before it was finally published.

When fact-checking the ad at issue here, Astiz and her team created a "research backup" document. As depicted in the selected images below,[7] each row represents a different frame in the ad.

[7] We include only the portions of the research backup document that are relevant to frames 2 and 3 of the ad.

The left column contains the text and voiceover for each of the ad's individual frames. And the right column contains the supporting sources.[8]

| | |
|---|---|
| V/O: Roy "Moore was actually banned from the Gadsden Mall…for soliciting sex from young girls."<br><br>TEXT: "Moore was actually banned from the Gadsden Mall…for soliciting sex from young girls."<br><br>CITE: New American Journal, 11/12/17 | **New American Journal: "Moore Was Actually Banned From The Gadsden Mall…For Soliciting Sex From Young Girls."** "Sources tell me Moore was actually banned from the Gadsden Mall and the YMCA for his inappropriate behavior of soliciting sex from young girls." [New American Journal, 11/12/17]<br><br>**ABC News: Alabama Woman Said Moore Was Banned From Gadsden Mall After Repeated Unwanted Advances.** "An Alabama woman who has accused Republican U.S. Senate candidate Roy Moore of sexually harassing her in the late 1970s said he was banned from the mall where she worked after she complained about his repeated, unwanted advances toward her. 'I went to my manager and talked to him about it and asked him, basically, what could be done," Becky Gray told ABC News late Wednesday night. 'Later on, he…came back through my department and told me that [Moore] had been banned from the mall." [ABC News, 11/16/17]<br><br>**New Yorker: "Moore Had Been Banned From The Mall Because He Repeatedly Badgered Teen-Age Girls."** "This past weekend, I spoke or messaged with more than a dozen people—including a major political figure in the state—who told me that they had heard, over the years, that Moore had been banned from the mall because he repeatedly badgered teen-age girls. Some say that they heard this at the time, others in the years since. These people include five members of the local legal community, two cops who worked in the town, several people who hung out at the mall in the early eighties, and a number of former mall employees." [New Yorker, 11/13/17]<br><br>**Retired Alabama Police Officer: "We Were Advised That He Was Being Suspended From The Mall."** "A retired Alabama police officer said police were told in the 1970s to make sure now-GOP Senate candidate Roy Moore stayed away from high school cheerleaders. Former Gadsden police officer Faye Gary told MSNBC that the 'rumor mill was that he liked young girls.' 'We were advised that he was being suspended from the mall because he would hang around the young girls that worked in the stores and, you know, really got into a place of where they say he was harassing,' former Gadsden police officer Faye Gary told MSNBC on Tuesday." [The Hill, 11/22/17]<br><br>**AL.com: Mall Employees Warned About Moore, Who "Often Walked Alone Around The Gadsden Mall."** "Colleagues and others who knew Moore told the Washington Post that he often walked alone around the Gadsden Mall…Jason Nelms, who now |

[8] We note that the various news articles were submitted as evidence at trial.

| | |
|---|---|
| | lives in Tennessee but grew up in nearby Southside, was a regular at the mall when he was a teenager. He recalled being told by a mall employee that they kept watch for an older guy who was known to pick up younger girls. Nelms said he was told later by a concession worker at the mall that it was Roy Moore." [AL.com, 11/13/17]<br><br>• **AL.com: Mall Security Guard Told Mall Employee To Alert Security If Moore Was Seen.** "Legat, now 59, said an off-duty Gadsden police officer named J.D. Thomas told him about various people he should look out for when he was working. This was around 1981, and Thomas worked security at the mall. One of the people was a pickpocket, he said, while another was someone prone to pick fights. One was Roy Moore. 'I asked him, 'What did he do?' Legat recalled. 'He said, 'If you see him, let me know. I'll take care of it.'" [AL.com, 11/13/17] |
| V/O: One he approached "was 14 and working as Santa's helper."<br><br>TEXT: One he approached "was 14 and working as Santa's helper."<br><br>CITE: AL.com, 11/13/17 | **AL.Com: Moore Flirted With Girl At Mall Who "Was 14 And Working As Santa's Helper."** "Colleagues and others who knew Moore told the Washington Post that the often walked alone around the Gadsden Mall...Wendy Miller told The Post that she was 14 and working as Santa's helper at the Gadsden Mall in 1977 when Moore first spoke with her and told her she looked pretty." [AL.com, 11/13/17]<br><br>• **Girl Was Approached By Moore At Age 14, Asked Out On Dates At Age 16.** "Wendy Miller says she was 14 and working as a Santa's helper at the Gadsden Mall when Moore first approached her, and 16 when he asked her on dates, which her mother forbade." [Washington Post, 11/09/17] |

As to the meaning of the ad, like the others, Astiz testified that the intent of the ad was to "amplify all of the different news articles that were coming out" and make the public aware of the allegations concerning Moore's "misconduct with girls." She did not believe that the ad conveyed the message that Moore solicited Miller for sex when Miller was 14 and working as Santa's helper. She added that even if the ad did convey that message, based on all the reporting about Moore and the seemingly credible allegations from multiple women about Moore's inappropriate behavior, she thought it was reasonable to conclude that Moore approached Miller to tell her she was pretty "for a reason" and "it seemed to be sexual in nature." Accordingly, Astiz stood by everything in the ad and maintained that she believed that everything contained in the ad was true.

2. Testimony about Moore's conduct

Several witnesses testified about whether Moore ever inappropriately interacted with young girls and whether he was banned from the Gadsden Mall. First, and most relevant here, Wendy Miller testified that Moore never solicited her to have sex with him. Additionally, Miller stated that Moore never made her feel "uncomfortable physically" or "traumatized." But she also said that she thought Moore was "probably" flirting with her and that, as she got older, she began to believe that Moore approached her and asked her on dates "for the purposes of making sexual advances." But she did not realize Moore's intentions when she was 14.

Becky Gray, who worked at the mall during relevant periods, testified that Moore gave her "the creeps" because he was an older man trying to talk and flirt with young girls. Gray stated that Moore's conduct made her so uncomfortable that she complained about Moore to her manager, who then told her that Moore had been banned from the mall.

J.D. Thomas, who worked as a security guard at the mall, testified that during a period of a month to six weeks, he received about 10 complaints about Moore's conduct at the mall. Thomas explained that the complaints came "mostly [from] young girls, teenage girls, saying that he was asking them out, maybe talking inappropriately." Thomas testified that eventually he had to tell Moore to "cool it" and that at one point he told Moore that he was banned from the mall.

Finally, Moore testified and denied that he was ever banned from the mall or had solicited sex from young girls.[9] With regard to Miller, he denied any memory of telling her she was pretty or asking her out at 16. Yet, despite having no recollection, he testified that he knew he "didn't do that." He asserted that the allegations were entirely false and politically motivated, emphasizing that he had been an upstanding member of the legal and judicial community for a number of years before running in the 2017 special election. He also testified that the SMP ad "destroyed" his reputation.

After instructing the jury on the basic elements of a defamation claim under Alabama law, the district court instructed the jury that Moore had to prove by clear and convincing evidence "that SMP published the statement with actual malice."[10] Following deliberations, the jury returned a verdict in favor of Moore on both the defamation and false-light invasion of privacy claims and awarded him $8.2 million in damages.

[9] Several other witnesses, including members of Moore's family, also testified that Moore was never banned from the mall.

[10] Notably, both the jury charge and the verdict form used the singular term "the statement" because there was only one statement allegedly implied by the juxtaposition of frames 2 ("Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.") and 3 ("One he approached was '14 and working as Santa's helper.'"). Moore's appeal is thus about only the implied statement that Moore solicited sex from Wendy Miller when she was 14 and working as Santa's helper.

The jury completed a verdict form (attached in Appendix I), which asked the jury to answer four questions about each claim. Three of those eight questions are relevant to actual malice. We recount those three questions and answers.

As to the defamation claim, the verdict form asked: "Do you find that Roy S. Moore proved by clear and convincing evidence: That SMP published the statement with actual malice (that is, SMP knew that a statement was false or acted with reckless disregard to whether a statement was false)?" The jury circled "YES."

This same test for actual malice was also used in two jury questions on the verdict form as to Moore's false-light invasion of privacy claim. One question on the verdict form asked: "Do you find that Roy S. Moore proved by clear and convincing evidence: That SMP published information that it knew was false or SMP acted with reckless disregard about whether the information was false?" The jury circled "YES." Another question asked: "Do you find that Roy S. Moore proved by clear and convincing evidence: That SMP knew the information would place Moore in a false light, or SMP acted in reckless disregard to whether Moore would be placed in a false light?" The jury again circled "YES."

SMP initially moved for judgment as a matter of law during the trial, which was denied. After trial, SMP renewed its motion for judgment as a matter of law and alternatively moved for a new trial. SMP argued, in relevant part, that Moore failed to establish

by clear and convincing evidence that SMP had the requisite actual malice when it published the ad.[11]

The district court conducted an independent review and found that: (1) "the jury's fact findings and credibility determinations [were] not clearly erroneous;" (2) "Moore presented sufficient evidence to support the jury's finding of actual malice;" and (3) "denying SMP's motions to set aside the verdict [would] not have an undue chilling effect on protected speech." The district court denied SMP's renewed motion for judgment as a matter of law and its motion for a new trial. SMP timely appealed.

## II. Standard of Review

Ordinarily, after a jury verdict, "we review the denial of a motion for judgment as a matter of law *de novo*. In doing so, we draw all reasonable [evidentiary] inferences in favor of the nonmoving party." *Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*, 135 F.4th 1344, 1349 (11th Cir. 2025) (citation and quotations omitted); *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1244 (11th Cir.

---

[11] Because the actual malice standard is the same for defamation and false-light invasion of privacy claims brought under Alabama law, the district court below performed one actual malice analysis for both claims, and the parties on appeal present a single actual malice argument for both claims. *See Finebaum*, 854 So. 2d at 1124–25 (explaining that the actual malice standard applies to defamation claims brought under Alabama law); *Smith*, 888 So. 2d at 496 n.1 (explaining that the constitutional actual malice standard applies to claims for false-light invasion of privacy). So we too perform one actual malice analysis for both claims.

2023) (stating the same). "Where no legally sufficient evidentiary basis exists for a reasonable jury to find for that party on that issue, judgment as a matter of law is proper." *Henderson*, 72 F.4th at 1244 (quotations omitted).

However, because the jury verdict in this case concerns a defamation claim by a public figure, we also have a unique constitutional duty in reviewing this verdict. Specifically, the Supreme Court has established a constitutional rule, based on the First Amendment, requiring a public-figure plaintiff to establish actual malice by the defendant by clear and convincing evidence in order for the public figure to succeed on his defamation claim.[12] *See N.Y. Times*, 376 U.S. at 279–80. In order to ensure that the actual malice standard has been met, the Supreme Court has mandated

---

[12] We acknowledge that there has been criticism of the actual malice standard itself. *See Berisha v. Lawson*, 141 S. Ct. 2424, 2425 (2021) (Thomas, J., dissenting from the denial of *certiorari*) (emphasizing that the actual malice standard is a policy driven, judicially created doctrine that "bears no relation to the text, history, or structure of the Constitution" (quotations omitted)); *id.* at 2426–30 (Gorsuch, J., dissenting from the denial of *certiorari*) (explaining that due to modern developments of how news is delivered and how private citizens can easily become public figures on social media, the policy based actual malice standard likely no longer serves its intended goals); *McKee v. Cosby*, 586 U.S. 1172, 1173 (2019) (Thomas, J., concurring in the denial of *certiorari*) (discussing how the actual malice standard has no basis in the Constitution and urging the Court to return to the original meaning of the First Amendment); *Counterman v. Colorado*, 600 U.S. 66, 105–06 (2023) (Thomas, J., dissenting) ("*New York Times* and the Court's decisions extending it were policy-driven decisions masquerading as constitutional law." (quotations omitted)). However, unless and until the Supreme Court decides to revisit the actual malice standard, we must continue to apply it.

that, in defamation cases brought by public figures, appellate courts have a constitutional duty to "make an independent examination of the whole record," and "determine whether the record establishes actual malice with convincing clarity" so that we may be "assure[d] . . . that the judgment . . . does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508, 514 (1984) (quotations omitted). Importantly, this "rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." *Id.* at 501 (conducting independent review of whether there was sufficient clear and convincing evidence of actual malice following a bench trial); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688–93 (1989) (conducting an independent review of whether the constitutional actual malice standard had been established by clear and convincing evidence in a jury trial); *see also Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1239, 1239–44 (11th Cir. 1999) (conducting independent review of whether the evidence was sufficient to support the jury's finding of actual malice). This requirement of independent appellate review is a rule of federal constitutional law which "reflects a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Bose*, 466 U.S. at 510–11. Thus, it necessarily follows from this requirement that "[t]he question [of] whether the evidence in the record . . . is of the convincing clarity required to strip the

utterance of First Amendment protection is not merely a question for the trier of fact." *Id.* at 511.

In sum, "whether the evidence . . . in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks*, 491 U.S. at 685. In this regard, the Supreme Court has explained that:

> This [standard] is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—however, is not readily captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards.

*Id.* at 685–86 (citations and quotations omitted). Accordingly, "judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." *Id.* at 686 (alteration adopted) (quotations omitted).

"In determining whether the constitutional [actual malice] standard has been satisfied," as part of our independent review, we

first "must consider the factual record in full." *Id.* at 688. In doing so, we fully accord the jury's credibility determinations the special deference to which they are entitled.[13] *See id.* at 689–92 (conducting an independent review that included the jury's answers to special interrogatories, the facts not in dispute, and certain defense testimony "the jury *must* have rejected," and upholding the jury verdict for the plaintiff); *see also id.* at 700 (Scalia, J., concurring in the judgment) ("I would . . . mak[e] our independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made."); *Levan*, 190 F.3d at 1239, 1244 (reversing a jury verdict for the plaintiffs, and stating that although "[w]e are required to make an independent examination of the entire record," we still consider the evidence "in the light most favorable to" the prevailing party at trial).

Next, we answer the question of law as to whether the record evidence is sufficient to support the jury's finding of actual malice by clear and convincing evidence.[14] *See Harte-Hanks*, 491

---

[13] To the extent Moore suggests at times in his briefing that, under Federal Rule of Civil Procedure 50(a) and (b), we must also defer to the jury's ultimate actual malice finding so long as it was reasonable, Moore's position is inconsistent with the Supreme Court's independent review directive in *Bose Corp.*, *Harte-Hanks*, and our *Levan* precedent. Accordingly, we reject it.

[14] "The 'clear and convincing' standard [is] an intermediate standard of proof that lies between proof by a preponderance of the evidence and proof beyond a reasonable doubt." *Fults v. GDCP Warden*, 764 F.3d 1311, 1314 (11th Cir. 2014). It requires "proof that a claim is highly probable." *Id.* (alterations adopted) (quotations omitted).

U.S. at 693 (concluding after a jury trial that "the evidence in the record in this case, when reviewed in its entirety, is 'unmistakably' sufficient to support a finding of actual malice"); *Levan*, 190 F.3d at 1244 (concluding after a jury trial that "the evidence in the record before [the Court], when considered in the light most favorable to [the plaintiffs], was insufficient to demonstrate the existence of actual malice by clear and convincing evidence"); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 564 (5th Cir. 1997) (concluding that "insufficient evidence" supported the jury's finding of actual malice and thus, "the district court erred in entering judgment for [the plaintiff] on its defamation claims"); *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1256 (9th Cir. 1997) (concluding after a jury trial that "intentional conduct [described in evidence of the case] satisfie[d] the 'actual malice' standard, permitting a [jury] verdict for [the plaintiff]"); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 679 (9th Cir. 1990) ("We conclude that the jury verdict cannot stand because the evidence fails to prove constitutional malice with 'convincing clarity.'"); *see also Bose*, 466 U.S. at 513 (reviewing a judgment for the plaintiff after a bench trial, and affirming the First Circuit's vacatur of that judgment because "as a matter of law . . . the record d[id] not contain clear and convincing evidence that [the defendants] prepared the [complained-of] article with knowledge that it contained a false statement, or with reckless disregard of the truth"); *Berisha v. Lawson*, 973 F.3d 1304, 1309–10, 1312, 1316 n.8, 1321 (11th Cir. 2020) (asking in a summary judgment appeal "whether the record could allow a reasonable juror to conclude (clearly and

convincingly) that [the defendant author] held serious doubts about the truth of the book's portrayal of [the plaintiff]" and concluding, *inter alia*, that "the evidence [was] insufficient to support a conclusion that [any defendant] acted with actual malice").

Finally, we note that when, as here, the alleged defamation is related to a political candidate for an elective office, the case "presents what is probably the strongest possible case for application of the *New York Times* rule, and the strongest possible case for independent review." *Harte-Hanks*, 491 U.S. at 686–87 (citation and quotation omitted).

## III. Discussion

SMP argues that Moore failed to meet the demanding constitutional actual malice standard; therefore, Moore's defamation and false-light invasion of privacy claims necessarily fail as a matter of law. Specifically, SMP argues that Moore did not present clear and convincing evidence that SMP subjectively knew or recklessly disregarded that its ad (frames 2 and 3 read together) implied that Moore solicited sex from Wendy Miller when she was 14 years old and working as Santa's helper. For the reasons that follow, we agree that the record does not contain sufficient clear and convincing evidence to support the jury's actual malice finding. We thus vacate the jury's verdict, reverse the denial of

SMP's motion for judgment as a matter of law, and remand for entry of judgment in favor of SMP.[15]

We divide our discussion into two sections. First, we set forth the relevant legal framework for defamation (here, defamation by implication) cases. Second, we engage in an independent review as outlined above to determine if the record contains clear and convincing evidence to support the jury's finding that SMP acted with actual malice. *See Harte-Hanks*, 491 U.S. at 690–91.

### *A. The relevant legal framework for actual malice in a defamation by implication case requires clear and convincing evidence of both actual falsity and subjective intent to communicate the defamatory implication*

As noted previously, Alabama law recognizes a single tort of defamation that can be proved through various means, such as an express defamatory meaning, "defamatory implication," and "defamatory innuendo." *Finebaum*, 854 So. 2d at 1124–25. To establish a false-light invasion of privacy claim, a plaintiff must show that (1) the defendant gave "publicity to a matter concerning

---

[15] SMP also argues that: (1) the ad was not materially false; (2) the jury instructions were erroneous and prejudicial and allowed Moore to establish liability and damages based on non-actionable statements; and (3) the jury's award was excessive. However, because we agree with SMP that Moore failed to present clear and convincing evidence of actual malice, we do not reach these other issues.

another that places the other before the public in a false light," (2) "the false light in which the other was placed would be highly offensive to a reasonable person," and (3) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Flickinger v. King*, 385 So. 3d 504, 517 (Ala. 2023) (quotation and emphases omitted). The constitutional actual malice standard applies to both defamation and false-light invasion of privacy claims under Alabama law. *Finebaum*, 854 So. 2d at 1124–25 (defamation); *Smith*, 888 So. 2d at 496 n.1 (false-light invasion of privacy).

Actual malice means that the plaintiff must prove that "the defendant made the alleged defamatory statement with . . . knowledge that it was false or with reckless disregard of whether it was false or not." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (quotations omitted). The actual malice test is subjective, meaning that we focus only on the defendant's actual state of mind. *N.Y. Times*, 376 U.S. at 279–80; *Coral Ridge Ministries*, 6 F.4th at 1252 ("This actual malice test is subjective; the public-figure plaintiff must show that the defendant *in fact* entertained serious doubts as to the truth of the statement." (emphasis in original) (quotations omitted)); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702–03 (11th Cir. 2016) ("The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant."). Under this subjective test, the plaintiff must show that (A) the defendant knew the alleged defamatory statement was in fact false; or (B) "actually entertained

serious doubts as to the veracity of the published account, or was highly aware that the account was probably false"—*i.e.*, the defendant acted with reckless disregard of whether the statement was false or not. *Michel*, 816 F.3d at 703; *see also Harte-Hanks*, 491 U.S. at 667 (explaining that reckless disregard for the truth at a minimum means that "the defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication" (quotations and citation omitted)). In other words, "[t]o be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that [the] publication is false." *Herbert v. Lando*, 441 U.S. 153, 160 (1979). Importantly, "[i]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with actual malice." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) (quotations omitted); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."). Nevertheless, "[t]he defendant in a defamation action brought by a public official cannot . . . automatically [e]nsure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

In sum, in the typical express defamation case, the constitutional actual malice standard requires that the plaintiff establish by clear and convincing evidence the defendant's actual state of mind concerning the veracity of the alleged defamatory

statement. And by showing that the defendant knew the statement was false or that the defendant acted with reckless disregard to its falsity, the plaintiff necessarily shows that the defendant had an intent to defame. *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013) ("In ordinary defamation cases, intent to defame can be established solely through knowledge that the statement was false. After all, if the defendants knew that the statement made was false and defamatory, then they must have intended to defame."). Thus, the defendant's intent to defame is a necessary and inherent part of the Supreme Court's actual malice standard.

Moore's case, however, involves an allegation of defamation-by-implication (or as Moore puts it, the statement that resulted from the juxtaposition of frames 2 and 3 of SMP's ad),[16]

[16] Again, Moore's theory was that the statement in frame 2 that he "was actually banned from the Gadsden Mall . . . for soliciting sex from young girls," when combined with the statement from frame 3 that "[o]ne he approached 'was 14 and working as Santa's helper,'" falsely created "a new statement" that he solicited sex from Wendy Miller when she was 14 years old and working as Santa's helper. To the extent that he asserts that his claim is not about defamation by implication, we disagree. First, the record belies Moore's contention that this case was not about defamation by implication. Moore pleaded and labeled the present claim as a defamation-by-implication claim, and he asserted that frames 2 and 3, when read together, "convey[ed] the implication that [he] had solicited sex from young girls at the Gadsden Mall, including one that was 14 years old." Second, the jury instructions discussed the statement "conveyed" (*i.e.*, implied) by the ad. And third, the "juxtaposition" of words is encompassed within the ambit of defamation by implication. *See* 50 Am. Jur. 2d *Libel and Slander* § 161. Thus, no matter whether it is phrased as the juxtaposition of words or defamation by implication, Moore's claim is in fact an implication claim.

not express defamation. Defamation-by-implication is fraught with subtle complexities and is more nuanced than express defamation. "'Defamation by implication' occurs when a defendant juxtaposes a series of facts to imply a defamatory connection between them." 50 Am. Jur. 2d *Libel and Slander* § 161. Thus, "a defamation by implication stems not from what is literally stated but from what is implied." *Id.* Because the defamatory meaning is *implied* as opposed to explicitly stated, it necessarily follows that the challenged statement could have multiple meanings—some defamatory and some not. Accordingly, because the challenged statement in a defamation-by-implication case has multiple meanings, the question that necessarily follows is whether showing known falsity or reckless disregard of the falsity of the implied defamatory statement is enough to show the necessary intent to defame for purposes of the actual malice standard.

Although we have not addressed this question, several of our sister circuits have, and they have concluded that, in a defamation-by-implication case, showing that the defendant knew that the implied defamatory statement was false or acted with reckless disregard to its falsity alone is not enough to establish the necessary intent to defame. *See, e.g.*, *Kendall*, 716 F.3d at 90–91. We agree. Unlike in express defamation cases, "in defamation-by-implication cases, showing known falsity [of the implication] alone is inadequate to establish an intent to defame" because the challenged statement "has defamatory and nondefamatory meanings," which means that we can "no longer presume with

certainty that the defendant knew they were making a defamatory statement." *Id.* at 90.

Accordingly, in a defamation-by-implication case, to show the necessary intent to defame inherent in the actual malice standard, the "plaintiff[] must show something that establishes [the] defendant['s] intent to communicate the defamatory [implied] meaning" or that the defendant acted with "reckless disregard for the defamatory [implied] meaning." *Id.* at 90–91. Consequently, in a defamation-by-implication case, the plaintiff must show by clear and convincing evidence not only (1) that the defendant knew of or recklessly disregarded the falsity of the implied defamatory statement, but also (2) that the defendant "inten[ded] to communicate the defamatory meaning" or recklessly disregarded the defamatory meaning—*i.e.*, "the defendant[] knew that the defamatory meaning was not just possible, but likely, and still made the statement despite their knowledge of that likelihood." *See id.*

This approach is consistent with that of our sister circuits. *See, e.g.*, *id.* (holding that in order to show actual malice in a defamation-by-implication case, the plaintiff must show the defendant's "intent to communicate the defamatory meaning" and that the defendant either knew that the defamatory meaning was false or acted in reckless disregard to its falsity); *Compuware Corp. v. Moody's Invs. Servs.*, 499 F.3d 520, 526, 528–29 (6th Cir. 2007) ("[W]here the plaintiff is claiming defamation by innuendo [or implication], he must show with clear and convincing evidence

that the defendant intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." (alterations adopted) (quotation omitted)); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (explaining that "where the plaintiff is claiming injury from an allegedly harmful implication arising from the defendant's article, he must show with clear and convincing evidence that the defendant intended or knew of the implications that the plaintiff is attempting to draw" (alteration adopted) (quotation omitted)); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1317–18 (7th Cir. 1988) ("If a plaintiff official . . . is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material.").

Consistent with the framework above, the jury in this case was instructed that in order to prove actual malice, Moore had to show by clear and convincing evidence that (1) SMP knew the implied statement in the ad was false or SMP recklessly disregarded its falsity (the falsity component of actual malice); and (2) SMP intended the ad to convey that Moore solicited sex from Miller when she was 14, or SMP recklessly disregarded that the ad conveyed the implication that Moore solicited sex from Miller when she was 14 (the intent component of actual malice).[17] In

---

[17] The district court charged the jury, *inter alia*, that "Moore must prove it is highly probable that, when SMP juxtaposed quotes in the Shopping Mall ad, SMP knew that it was materially changing the meaning of the quotes to convey false information about Moore," or alternatively, "that SMP acted with

other words, the jury was charged with determining whether, when SMP juxtaposed frames 2 and 3 back-to-back, SMP intended or recklessly disregarded that it was materially changing the meaning of the quotes to convey a new implied message about Moore that it knew was false and defamatory.

With this legal framework in mind, we now turn to our independent review of whether Moore's evidence was sufficient to support the jury's finding of actual malice by clear and convincing evidence. *See Harte-Hanks*, 491 U.S. at 690–91. The parties focus primarily on whether Moore established by clear and convincing evidence that SMP intended or recklessly disregarded the ad's alleged defamatory implication. So we begin with that question as well.

### *B. Moore failed to present clear and convincing evidence that SMP intended or recklessly disregarded the ad's alleged defamatory implication and therefore insufficient evidence exists to support the jury's finding of actual malice*

SMP contends that Moore failed to prove by clear and convincing evidence that it intended or recklessly disregarded that

---

reckless disregard to whether it was materially changing the meaning of the quotes to convey false information about Moore." The district court then clarified that the instructions meant "Moore must prove that SMP intended to convey that Moore solicited sex from Wendy Miller when she was 14, or SMP recklessly disregarded the possibility that an average viewer of the ad would believe that Moore solicited sex from Wendy Miller when she was 14."

its ad implied that Moore solicited sex from Miller when she was 14 years old and working as Santa's helper at the Gadsden Mall. Moore, on the other hand, argues that he established SMP's intent to defame based on three facts: (1) the jury's disbelief of the SMP witnesses' testimony that they did not intend the implication or otherwise believe that the ad implied that Moore solicited sex from 14-year-old Miller; (2) the ad itself; and (3) the fact that SMP vetted the ad before publishing it, which necessarily confirmed that Miller never said Moore solicited her for sex. After careful review, we conclude that none of the three facts relied on by Moore give rise to the necessary intent to defame for actual malice.

We begin with the jury's rejection of the SMP witnesses' testimony and whether that rejection is enough to demonstrate by clear and convincing evidence that SMP intended the ad's defamatory implied meaning or that SMP acted with reckless disregard to the defamatory implied meaning. Every SMP witness who took the stand testified that he or she did not intend for the ad to imply that Moore solicited sex from Miller when she was 14 years old. SMP thus argues that this unrebutted testimony clearly precludes a finding of the necessary intent to defame for actual malice. The jury, however, was entitled to disbelieve this testimony, and given the district court's instructions—that Moore had to "prove that SMP intended [in the ad] to convey that Moore solicited sex from Wendy Miller when she was 14, or SMP recklessly disregarded the possibility" that the ad conveyed this implication—and the jury's verdict in favor of Moore, we agree that the jury must have discredited and rejected the SMP witnesses'

testimony. *See Harte-Hanks*, 491 U.S. at 690. "When the testimony of a witness is not believed, the trier of fact may simply disregard it." *Bose Corp.*, 466 U.S. at 512. We must give these credibility findings deference as SMP has not shown they are clearly erroneous. *See Harte-Hanks*, 491 U.S. at 690.

Even so, the jury's rejection of the SMP witnesses' testimony about the intent of the ad is not itself clear and convincing evidence of actual malice. The Supreme Court has explained that "discredited testimony is not considered a sufficient basis for drawing a contrary conclusion" and finding actual malice. *Bose Corp.*, 466 U.S. at 512; *see also Newton*, 930 F.2d at 680 (holding it was error under *Bose* to conclude "that the jury could have based a finding of actual malice on a determination that the journalists' testimony about their state of mind was not credible"); *Kendall*, 716 F.3d at 93 ("Mere disbelief of a defendant's statement ordinarily is insufficient to establish malice."). Accordingly, the fact that the jury disbelieved the SMP witnesses' testimony that SMP did not intend for the ad to imply that Moore solicited sex from Miller and that SMP did not view the ad as making this implication "does not establish that [SMP] realized [(*i.e.*, intended) or recklessly disregarded that the implication existed] at the time of publication." *Bose Corp.*, 466 U.S. at 512; *see also Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir. 1980)[18] (holding that, given the lack of

[18] Decisions of the former Fifth Circuit rendered "prior to the close of business" on September 30, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

"documentary evidence" showing actual malice, even "conflicting accounts" of the defendant's intent could not show actual malice clearly and convincingly). In short, to establish actual malice by clear and convincing evidence, Moore needed more evidence than just the jury's disbelief of SMP's witnesses to establish that SMP intended the defamatory implied meaning in the ad or acted with reckless disregard to the defamatory implied meaning.

Next, Moore argues that SMP's intent or recklessness can be inferred from the ad itself. According to Moore, "the phrase 'One he approached'" in frame 3 "necessarily refers back" to the statement in frame 2, that "'Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls.'" Thus, he maintains that in reading these two frames together "[i]t is impossible that an average viewer of that ad would *not* believe that Moore solicited sex from Wendy Miller when she was 14." In other words, Moore contends that the defamatory implication is the "most obvious message of the ad," and SMP therefore must have intended the defamatory implication or otherwise acted with reckless disregard to it. Moore's contention, however, conflicts with the Supreme Court's directives concerning actual malice.

Again, the actual malice standard is deliberately subjective. *See N.Y. Times*, 376 U.S. at 279–80; *Harte-Hanks*, 491 U.S. at 688. As a result, "constitutional malice does not flow from a finding . . . [that] the [ad] may be capable of supporting the impression [the plaintiff] claims." *Newton*, 930 F.2d at 681; *see also Dunn*, 193 F.3d at 1200 (explaining that "[i]t is the Defendants'

Case 4:19-cv-01855-CLM Document 265-1 Filed 07/10/26 Page 40 of 45
USCA11 Case: 23-13531 Document: 49-1 Date Filed: 04/24/2026 Page: 40 of 45



subjective view" at the time the communication was made, not the plaintiff's "subjective impression" of that communication, "that determines whether [the communication was] issued with actual malice"). This principle holds true even if the "impressions were clear and unescapable." *Newton*, 930 F.2d at 680 (quotations omitted). "Simply because a statement reasonably can be read to contain a defamatory inference does not mean" that "the publisher of the statement either intended the statement to contain such a defamatory implication or even knew the readers could reasonably interpret the statements to contain the defamatory implication." *Saenz*, 841 F.2d at 1318 (quotation omitted); *see also Kendall*, 716 F.3d at 91–93. To conclude otherwise would allow a defamation plaintiff to hold a defendant liable for defamatory implied statements *negligently* conveyed, rather than only for defamatory implied statements the defendant knowingly intended to convey or recklessly conveyed, which would eviscerate the First Amendment protections that the Supreme Court established in *New York Times* and its progeny. Thus, although we agree that the statements in frames 2 and 3 of SMP's ad *could* convey the implication that Moore solicited sex from Miller when she was 14 and working at the mall as Santa's helper, that fact is not clear and convincing evidence that SMP intended that implication or recklessly disregarded that the ad conveyed that implication, which is the critical inquiry. *See Newton*, 930 F.2d at 681; *Saenz*, 841 F.2d at 1318; *Kendall*, 716 F.3d at 91–93.

Moore resists this conclusion by arguing that the ad itself establishes the requisite intent for actual malice because this case is

in reality "an altered quote case" akin to the Supreme Court's decision in *Masson*. We are unpersuaded. In *Masson*, the defendant reporter interviewed the plaintiff for an article in *The New Yorker*. 501 U.S. at 500. The final article purported to quote statements the plaintiff made during the interview, but in doing so, the author had materially altered the plaintiff's words. *See id.* at 502–08, 522–25. The Supreme Court held that the alterations of the quotes that "materially alter[ed]" the meaning of the plaintiff's statements could support a finding of actual malice, and it remanded the case to the Ninth Circuit to consider whether actual malice had been established in the first instance. *Id.* at 522–25.

Moore's case is not like *Masson*. Here, frame 2 of SMP's ad contained the following quote: "Moore was actually banned from the Gadsden Mall . . . for soliciting sex from young girls." The frame included a citation for the quote, and Moore admits that this quote is an accurate excerpt from the cited article. Frame 3 contained the following language: "One he approached 'was 14 and working as Santa's helper.'" The frame included a citation for the direct quote, and Moore does not dispute that the directly quoted phrase—"was 14 and working as Santa's helper"—was an accurate excerpt from the AL.com article. Accordingly, unlike in *Masson*, Moore's claims do not turn on the alteration of direct quotes from the news reports on which SMP relied. *Masson* is thus inapposite and does not compel the conclusion that the ad itself demonstrates actual malice.

Moreover, we cannot ignore that SMP included citations to the news articles that it relied on in the ad itself. "Where a publisher gives readers sufficient information to weigh for themselves the likelihood of [a statement's] veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has." *Michel*, 816 F.3d at 703. Thus, SMP's inclusion in the ad of citations to the news articles on which it relied not only allowed viewers to verify the ad's contents (or any resulting implications from the ad as a whole) but also further undermines Moore's contention that the ad itself demonstrates actual malice.[19]

Lastly, Moore contends that SMP must have intended or recklessly disregarded that the ad conveyed the defamatory implication because SMP vetted or fact-checked the ad before publishing it. Moore asserts that because SMP's research team "read all of the articles" cited in the ad and attempted to ensure the ad's accuracy, and none of the articles supported the assertion that Moore solicited a 14-year-old girl working at the mall for sex, it necessarily follows that SMP intended, or recklessly disregarded, the ad's defamatory implication. We disagree.

---

[19] To be clear, our conclusion that the ad itself does not establish SMP's intent does not mean that, in another case, the defendant's intent to defame could never be inferred from the allegedly defamatory implied statement. There might be circumstances where the publication itself could demonstrate the requisite intent to defame even when, as here, the defendant denies such an intent. We need not determine what those circumstances might be, because the ad before us does not allow for such an inference.

A defendant's efforts to verify the accuracy of its statements militates against a finding of actual malice. *See Levan*, 190 F.3d at 1242 (crediting the defendant for "double-check[ing] with numerous" sources to verify the accuracy of a report). After all, "[t]he publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is . . . given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability." *Time, Inc. v. Pape*, 401 U.S. 279, 291 (1971). Here, as shown by SMP's "research backup document," Astiz and her team fact-checked each frame of the ad and attempted to ensure its accuracy. It is true that SMP did not fact-check the implied assertion that Moore solicited sex from Miller when she was 14 years old and working as Santa's helper. But the fact that SMP did not do so does not show that SMP intended or recklessly disregarded that the implied statement in the ad. Indeed, one could argue that, given SMP's detailed fact-checking of the other statements in the ad, SMP's failure to fact-check the veracity of the implication shows that SMP did not know that the implication even existed. SMP's thorough vetting process is inconsistent with and belies any allegations of intentional or reckless publication of the defamatory implication, and so it cannot provide sufficient evidence of SMP's intent. *See Time, Inc.*, 401 U.S. at 291. At most, it shows that SMP made a poor choice of words in frame 3—a negligent error at best. And a negligent error is not a basis for a finding of actual malice. *See id.*; *see also Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 2016) ("We believe that the First Amendment cautions courts against intruding too

closely into questions of editorial judgment, such as the choice of specific words.”).

In sum, Moore points to, and our independent review has revealed, no other evidence in the record showing that SMP intended or recklessly disregarded that its ad implied that Moore solicited sex from Miller when she was 14 and working as Santa's helper. Because the evidence discussed above is inadequate to support a finding of the necessary intent to defame for purposes of actual malice in a defamation-by-implication case, Moore's defamation and false-light claims necessarily fail.[20] As a result, the jury verdict cannot stand.

## III. Conclusion

For these reasons, we reverse the district court's order denying SMP's renewed motion for judgment as a matter of law, and remand with instructions for the district court to enter judgment for SMP.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

---

[20] Because we conclude that the record evidence is insufficient to establish the intent component of the actual malice standard, we do not reach whether Moore established that SMP knew or recklessly disregarded that the implied statement was false.

# Appendix I

FILED
AUG 12 2022
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## JURY VERDICT FORM

**Count 1: Defamation** (pages 7-11)

**Do you find that Roy S. Moore proved by a preponderance of the evidence:**

1. That SMP made a false statement about Moore? (YES) NO
2. That the statement was defamatory? (YES) NO
3. That SMP published the statement to another person? (YES) NO

**Do you find that Roy S. Moore proved by clear and convincing evidence:**

4. That SMP published the statement with actual malice (that is, SMP knew that a statement was false or acted with reckless disregard to whether a statement was false)? (YES) NO

**Count 2: Invasion of Privacy, False Light** (pages 11-13)

**Do you find that Roy S. Moore proved by a preponderance of the evidence:**

1. That SMP intentionally publicized false information about Moore? (YES) NO
2. That the information placed Moore in a false light in the public eye and the false light would be highly offensive to a reasonable person? (YES) NO

**Do you find that Roy S. Moore proved by clear and convincing evidence:**

3. That SMP published information that it knew was false or SMP acted with reckless disregard about whether the information was false? (YES) NO
4. That SMP knew the information would place Moore in a false light, or SMP acted in reckless disregard to whether Moore would be placed in a false light? (YES) NO